1

<pre>
 1              IN THE UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF COLORADO
 2
      Civil Action No. 20-cv-1962-NRN
 3
      BEST BEACH GETAWAYS, LLC., a Florida limited liability
 4    company,

 5    Plaintiff,

 6    vs.

 7    TSYS MERCHANT SOLUTIONS, LLC., a foreign limited liability
      company,
 8
      Defendant.
 9
      -----------------------------------------------------------
10
                       REPORTER'S TRANSCRIPT
11                  (Preliminary Injunction Hearing)

12    -----------------------------------------------------------

13        Proceedings before MAGISTRATE JUDGE N. REID NEUREITER

14    United States District Court for the District of Colorado,

15    commencing at 9:00 a.m., on the 10th day of August, 2020, in

16    Courtroom A-1002, United States Courthouse, Denver,

17    Colorado.

18                          APPEARANCES

19        ANTHONY B. DOGALI, Dogali Law Group, 19321 U.S. Highway
      19 North, Suite 307, Clearwater, Florida 33764, appearing
20    for the plaintiff.

21        ALEXANDRA S. PEURACH nd DAVID E. MEADOWS, Troutman
      Sanders Pepper Hamilton, LLP-Atlanta, 600 Peachtree Street
22    NE, Suite 3000, Atlanta, Georgia 30308, appearing for the
      defendant.
23
                     MARY J. GEORGE, FCRR, CRR, RMR
24                901 19th Street, Denver, Colorado 80294
                 Proceedings Reported by Mechanical Stenography
25                Transcription Produced via Computer
</pre>

```
 1                      P R O C E E D I N G S
 2           (Call to order of the court at 9:00 a.m.)
 3                THE COURT:  This is Magistrate Judge Reid Neureiter
 4      on the 10th floor of the Arraj courthouse in Denver,
 5      Colorado, federal courthouse.  I'm calling in the matter of
 6      20-cv-01962 Best Beach Getaways versus TSYS Merchant
 7      solutions.  Appearances for the plaintiff, please.
 8                MR. DOGALI:  Yes, Your Honor.  Andy Dogali now --
 9                THE COURT:  We're having a little trouble hearing
10      you.  Are you speaking into a speakerphone or is there a way
11      you can bring it closer to you?
12                MR. DOGALI:  Yes, sir.  Perhaps that's better.
13      This is Andy Dogali today in Panama City, Florida, for Best
14      Beach Getaway.
15                THE COURT:  Super, that is better.  Thank you.  And
16      just so everyone knows, we do have a live court reporter
17      here so it's not just being tape-recorded, but -- and so to
18      the extent she is having trouble hearing, she may interrupt,
19      ask people to repeat things, ask for spelling, so it's as if
20      we have a live court reporter because we do have a live
21      court reporter.  And we thank her for coming in today.  So
22      thank you, Mr. Dogali.
23                Appearances for the defendant.
24                MR. MEADOWS:  Your Honor, David Meadows with
25      Troutman Pepper Firm, and Alex --
```

1          MS. PEURACH:  Alex Peurach.

2          THE COURT:  Thank you.  So we're here on the

3     hearing for the preliminary injunction.  We'll start with

4     15-minute opening statements from each side and then proceed

5     as I had previously indicated with a short introduction, if

6     any, by the witnesses for the plaintiff, the introduction of

7     any exhibits that those witnesses are sponsoring.  And then

8     I have read all of the affidavits so then we'll -- after

9     that short introduction, I may have some questions but then

10    we'll move on to cross-examination.

11         A few preliminary comments that I'll make, though.

12    I read your briefs on the preliminary injunction and I hate

13    to say it but I think folks missed the marks a little bit on

14    Colorado law, which apparently applies to this contract.

15    Colorado has fairly -- the duty of good faith and fair

16    dealing in Colorado law is very well developed.  It's --

17    arises out of a case called *Amoco Oil v. Ervin*, 908 P.2d

18    493, by the Colorado Supreme Court in 1995.  A very good

19    summary of all the principles the implied duty of good faith

20    and fair dealing would be found in the Colorado Pattern

21    Civil Jury Instructions, which are available for free online

22    in Section 30:16, Contract Performance - Implied duty of

23    Good Faith and Fair Dealing, and it gives the citations to

24    all the cases.

25         All the --

1              (Technical difficulties)

2                   THE COURT:  Can everybody hear me?

3                   MR. DOGALI:  I can.  I hope you can still hear the

4       plaintiffs, Your Honor.

5                   MR. MEADOWS:  Yes, Your Honor.

6                   THE COURT:  There was another person that was on

7       before.

8                   COURTROOM DEPUTY:  I think he was lost in the

9       shuffle.

10                  THE COURT:  He's no longer on.  Do we know who that

11      person was, by the way?  I did not inquire.  Was that a

12      representative for the defendants?

13                  MR. MEADOWS:  Your Honor, I should have introduced

14      our representative who's Phil Laffey, who's an in-house

15      counsel with TSYS, and I believe I see him so he's still on

16      the line.

17                  THE COURT:  Okay.

18                  MR. LAFFEY:  I'm here, thank you.  Nice to meet

19      you, Your Honor.

20                  THE COURT:  All right.  Thank you.

21              So as I was saying, Section 30:16 of the Colorado

22      Pattern Jury Instructions covers the implied duty of good

23      faith and fair dealing and the summary is a party performs a

24      contract in good faith when his, her, or its actions are

25      consistent with the agreed common purpose and the reasonable

1   expectations of the parties.  The duty of good faith and

2   fair dealing is breached when a party acts contrary to that

3   agreed common purpose and the parties' reasonable

4   expectations.

5           Another articulation of the duty is if -- it only

6   applies when somebody has discretion under a contract and

7   that discretion has to be exercised in a manner that's

8   consistent with the parties' reasonable expectations, so if

9   somebody exercises the discretion that's given to them under

10  the contract in a way that essentially eliminates the

11  benefits of the contract for the other party, then there's a

12  breach of the duty of good faith and fair dealing and that's

13  all articulated in the case law.

14          It was touched on not at all in the plaintiff's

15  brief.  There was only one mention in the defendant's brief

16  to a decision by Judge Martínez from 2015, McDonald v.

17  Zion's First National, but you all are citing cases from

18  other jurisdictions, Georgia and other places.  And

19  Colorado's version of the duty of good faith and fair

20  dealing is very different, it's sort of unique, and it seems

21  potentially applicable to the circumstances here in a way

22  that, you know, if -- if the defendant is saying, Well,

23  we're not acting in bad faith, bad faith really doesn't have

24  anything to do with it.

25          The duty of good faith and fair dealing is a term

1    of art under Colorado law and nobody addressed it.  And I

2    know, Mr. Dogali, you're sort of flying solo here, and you

3    don't have a slew of associates to go and research that, but

4    if somebody wants to take a look at the *Amoco Oil* case over

5    lunch, because I do think it's relevant.  I do think

6    nobody's addressed it, and to the ex- -- and I -- my general

7    view is that, to the extent a preliminary injunction is

8    warranted here, it would be warranted if someone was able to

9    show likelihood in the success of the merits of that claim.

10   So that's my thought and thinking.

11            I just -- I don't feel it's fair for people to go

12   into a proceeding when the audience -- without knowing sort

13   of what the audience's thinking is.  So that's my thinking

14   preliminarily.  So take that for what it's worth.

15            Mr. Dogali, why don't you start your opening

16   statement.

17            MR. DOGALI:  Thank you, Your Honor.  I apologize if

18   it seems like a material omission to not have that

19   presentation of law as well in the briefing being the

20   proposition here today is that what we hope to show you is

21   that this standard of lack of good faith would -- or this

22   evidence of lack of good faith would meet any standard

23   anywhere, including Colorado, and even those that have

24   Archer standards for the reason that it's an obvious case

25   of, at a minimum, recklessness, which would fly in the face

1    of Colorado law, and that reckless disregard for Best Beach

2    Getaways' interest would never be part of a common purpose.

3        With respect to today, what we hope to do is

4    demonstrate to you that this deprivation of all available

5    cash flow for Best Beach Getaways simply can't be carried

6    out in some good faith effort to advance the ball for both

7    parties to this agreement, but all -- this is a purely

8    self-interested activity on the part of TSYS for various

9    reasons not actually authorized under the contract.

10       So the substantial likelihood of the merits would

11   exist not just on the breach of duty of good faith and fair

12   dealing but also in connection with the tortious

13   interference claims and the statutory claim and even a

14   breach of contract claim.

15       And to support all those facts, forwarding a little

16   bit at the end of the day, Your Honor will want to know what

17   is the injunctive relief.  That temporarily at least that --

18       THE COURT:  Can I interrupt you for a second, Mr.

19   Dogali.  For some reason, you are just appearing as a small

20   square at the bottom of the screen.  I'm looking to the

21   clerk to see if rather than having the defense counsel be

22   the focus when Mr. Dogali's speaking, he can occupy most of

23   the screen.

24       COURTROOM DEPUTY:  I don't believe it can be.  It

25   just shows -- I'm looking at it through the -- to the

```
 1    internet and it just highlights blue as to when somebody's
 2    talking.  I don't know if there's a way to change that in
 3    the system internally.
 4              THE COURT:  Okay.  Sorry.
 5              MR. DOGALI:  It might be my good fortune for those
 6    who cannot actually see me up close, Judge.
 7              THE COURT:  That's fine.  Okay.
 8              MR. DOGALI:  But we --
 9              THE COURT:  I'm a little worried about the
10    witnesses and not being able to see the witnesses, but go
11    ahead, Mr. Dogali.  I interrupted you.
12              MR. DOGALI:  Are the witnesses visible to you right
13    now, Your Honor?  They're on each side of me.
14              THE COURT:  Yes, but they're tiny, tiny because
15    your room is the size of -- is about two inches across on my
16    screen, so we'll talk to our IT people and see if that can
17    be changed.
18              MR. DOGALI:  On a break we perhaps --
19              THE COURT:  Robb, could you just see if you could
20    text the IT people and ask if there is a way to get the
21    speaker to occupy the full screen?
22              Okay.  Go ahead, Mr. Dogali, please.
23              MR. DOGALI:  Thank you, Your Honor.  And -- and if
24    I may back up just one second, I -- you probably surmised
25    it, but with me, next to me, on your left in the box is the
```

1    president of Best Beach's Getaways.  On your right is Sheri

2    Klanjac, who is a CPA here in Florida.  She is both a fact

3    witness and can offer some opinion testimony.  She has been

4    the performer of accounting and tax services for Best Beach

5    Getaways for quite a few years.

6         With respect to where I was going as what we will

7    be seeking today, the relief sort of comes temporarily in

8    three parts.  The first would be some sort of substitute

9    reasonable protection.  We don't take the position, Your

10   Honor, that this agreement would allow zero security or

11   protection for TSYS.  We might be in a position to take that

12   approach, but for temporary injunction purposes, it does

13   seem if they had followed the niceties of the agreement, we

14   would have been in the position to put forward some sort of

15   collateral to protect them.  So that would -- that can come

16   in three different parts.  This sort of adequate protection

17   idea is a term that you'll hear more often in bankruptcy

18   court than anywhere else when one has to do something to

19   build the security of a secured creditor for a period of

20   time in a bankruptcy.  In this situation, it could come in

21   simply reducing the amount of the reserve.

22        With respect to that, Your Honor, there is a piece

23   of new information that you should be aware of, I believe.

24   On Friday afternoon -- I think you'll know from the

25   briefing, three Fridays ago on the afternoon of July 31,

1    TSYS released a million dollars and stopped holding further

2    funds.  They didn't say they won't do either of those things

3    in the future again but they did on Friday, the 31st,

4    stopped holding future funds and they released an even

5    $1 million that afternoon.

6              They did that contemporaneously with a proposal to

7    me that at that point in time Best Beach Getaways injunctive

8    effort was mooted and should be dropped, but what that

9    effectively did was drop the reserve, the 1.7, to 3.75.

10             Last Friday, the same thing happened again.  Friday

11   afternoon, that is.  A few -- the business day before this

12   hearing -- a few business hours before this hearing, Friday

13   afternoon, there was another release of almost $1.5 million,

14   placing the current reserves at about 2.3 million.  As we

15   will show, they will require a little bit of modification to

16   some of these propositions that Best Beach Getaways put

17   forward, but we will, in general terms, put forward the

18   notion that, okay, that's enough of an infusion that August

19   15th is survivable but September 15th is not.  What we would

20   propose, Your Honor, is this idea of on the Friday before a

21   hearing just infusing more cash to sort of try and moot the

22   effort, or postpone doom, would not undermine our effort

23   today to seek some sort of temporary relief.

24             That relief -- I'm sorry to strain it there, but

25   would take the form of perhaps as simple as a reduced amount

1   of reserves to an amount that you'll hear talked about today

2   that might be more tailored to whatever this risk is; that

3   is, it's something akin to enrolling averages or something

4   like that.  A possibility would be to create an actual

5   escrow account.

6          The testimony you will hear today, as it comes

7   forward, will be this has always been called an escrow

8   account and Best Beach Getaways has been very scrupulous

9   about treating it like one would treat an escrow account.

10  TSYS makes certain noise about, well, it's not really one;

11  it's not really held in trust.  The evidence will show --

12  all it will show is that it's always been treated just like

13  it was an escrow or trust account in that its balance never

14  dipped below the amount of the prepaid deposits in rent that

15  were available for anybody who might show up and stay.

16  Because prepaid funds always remained on accounts, they're

17  always available for refund.

18         And we could simply implement by Your Honor's

19  order -- Your Honor's order simply to put an actual escrow

20  account in place that would just simply provide that Best

21  Beach Getaways keeps doing exactly what they're doing except

22  there's an escrow agent there to make sure the prepaid

23  monies remain there until they come due and are actually

24  earned by all those that have a dog in that fight, that --

25  because that escrow account would be purely for the benefit

1      of TSYS and would accomplish nothing for Best Beach
2      Getaways, an order enjoining that should provide the escrow
3      account -- escrow agent and escrow account process is at the
4      expense of TSYS, at least pending some final relief for
5      adjudication of the case.
6              The third possibility would be that Best Beach
7      Getaways could post a bond if the -- if the -- here is that
8      somehow this money is going to disappear, even though none
9      of it ever did for 10 years, well, there could be a bond
10     posted, might need to be a little feasible effort to make
11     sure that bond's going to be acquired, but I've had clients
12     obtain similar bonds in many different situations.  It
13     should be for a reasonable penal amount, but in this
14     situation, because just like an escrow account, it would be
15     purely for the benefit of TSYS and not Best Beach Getaways.
16             The -- I don't know that it should -- it should
17     then be at the cost of TSYS to inform this bond because it's
18     the obligee on the bond and the beneficiary of that.  So for
19     that reason I don't know that Best Beach Getaways really
20     cares about the amount of what the penal sum on that bond
21     is, and so there are different ways to skin the cat, if you
22     will, when it comes to injunctive relief.  Any of those can
23     provide adequate protection to TSYS, but allow Best Beach
24     Getaways to keep doing business.
25             There are two other --

1           THE COURT:  Can I ask one question, Mr. Dogali.

2   What number of a reserve would be tolerable for your client?

3           MR. DOGALI:  We believe that number is in like the

4   middle six digits, representing a fairly bad case.  That

5   would be more than the rolling average of chargeback

6   coverage for each month.  The rolling average of chargeback

7   which would only be about 2 percent of sales, so that would

8   be more than adequate, that actually errs on the side of

9   TSYS.  In our view actually adequate protection is zero

10  because there's never been a risk -- the chargeback wouldn't

11  be made; never been one that wasn't made, or a refund.  So

12  in reality, I'm not sure anything is required.

13          But if there's some -- if TSYS had implemented some

14  sort of good faith business judgment, it wouldn't have come

15  up with an answer that always exceeds the available cash

16  flow of Best Beach Getaways, it would come one -- up with

17  one that is calculated to keep the firm in business and

18  allow it to keep its operations going, and that's where that

19  would be.  It wouldn't be a seven-digit number.

20          Whatever may be the adequate protection, Your

21  Honor, there would have to be two other components to

22  injunctive relief.  One is what I call a clean break.  That

23  would be if this agreement is made by either party, that

24  could happen, we don't have to remain hitched to one another

25  for the rest of the case.  In that type of -- we would need

1     some protection that -- that there would -- since there will

2     not have been a default, that TSYS would not report Best

3     Beach get --

4          (Technical difficulties)

5          THE COURT:  To the what program?

6          MR. DOGALI:  It is called MATCH, Your Honor, in all

7     caps.  I don't remember what the acronym stands for.  But it

8     is a blacklist of merchants that, typically when there is a

9     default on a credit card agreement, the -- the processor

10    reports the merchant to the MATCH program.  And it's

11    extremely difficult, nearly impossible thereafter to get

12    another processor in place with MasterCard and VISA.  So

13    there needs -- since there would have been no default,

14    there's no basis for doing that, but we want to know the

15    assurance is there.  There would be, after that termination,

16    no need for a reserve account, so it would dissolve.

17    Whatever might be temporarily ordered by the Court.

18          Similarly, if there's a security interest in place

19    in favor of TSYS, that would dissolve, as would any

20    individual guarantees for the Best Beach Getaways'

21    principals.  So that's sort of the clean break idea.

22    There's both sides have -- there have been some

23    communication about what if there's a termination.  This is

24    month-to-month, so there isn't a prohibition against doing

25    it right now.  Best Beach Getaways is somewhat hostage, and

1    so this clean break idea would be critical, but --

2              THE COURT:  Hold on one -- hold on one second, Mr.

3    Dogali.

4              COURTROOM DEPUTY:  I'm sorry, Your Honor, IT has

5    suggested some things but I didn't want to interrupt his to

6    toggle the monitors so you get a bigger -- that didn't do

7    it.  Sorry.  That didn't do it.

8              THE COURT:  All right.  At a break maybe we will

9    address this.

10             Go ahead, Mr. Dogali.

11             MR. DOGALI:  Your Honor, the first two components

12   being adequate protection for TSYS and a clean break for

13   Best Beach Getaways.  The third would be attorney fees and

14   costs of -- related to the temporary injunction for Best

15   Beach Getaways.  There is authority in the Tenth Circuit, it

16   is *Kansas Judicial Watch v. Stout*, 653 F.3d 1230 --

17             THE COURT:  You've got to go a little slower, Mr.

18   Dogali.  We've got a court reporter who's trying to write

19   this down, and I can't write down citations when you go so

20   quickly, so please slow down.

21             MR. DOGALI:  All right.  Of course, Your Honor.  My

22   apologies.  That case was -- or is *Kansas Judicial Watch v.*

23   *Stout*.  It could be found at 653 F.3d 1230, from 2011, Tenth

24   Circuit.  The case squarely holds what we are dealing with:

25   A statutory fee-shifting provision that, prevailing on a

1    temporary injunction, will entitle that party to attorney's

2    fees and costs.  In this instance, of course, that would be

3    those related only to the temporary injunction.  If there

4    had been attorney's fees incurred, it would have been

5    incurred anyway in connection with the overall case before

6    final adjudication that would be part of this.  Those

7    components, Your Honor, would be what we hope to achieve

8    today:  adequate protection, a clean break, and attorney's

9    fees and costs.

10           And with that, unless you have any more questions,

11   Your Honor, the plaintiff can certainly move forward with

12   the evidence after Mr. Meadows has had a chance.

13           THE COURT:  Okay.  Let-me ask a question.  On the

14   attorney's fees and costs, you cite a case and you mention

15   that it was a statutory fee-shifting provision.  What's the

16   statute on which you rely for fee shifting?  Does the --

17   does the -- is there a contractual fee-shifting agreement

18   here?

19           MR. DOGALI:  There is a contractual -- there's a

20   one-way contractual fee-shifting agreement.  In Florida, all

21   one ways work two ways; in Colorado, that does not seem

22   clear.  The statutory claims would be both consumer fraud

23   statutes, there is in the amended complaint both a Florida

24   claim and a Colorado claim.  Under the consumer fraud

25   statute of each state, they're structured fairly similarly.

1   Colorado's is perhaps a lower standard for a plaintiff to

2   achieve to show a level of consumer fraud.  Both would

3   provide attorney's fees for prevailing in the claim.

4           THE COURT:  Yeah.  One thing I wanted to mention as

5   well on your Colorado -- at least your Colorado Consumer

6   Protection Act claim, there's an element of that claim

7   that's required, and if you -- if somebody had researched

8   that, it requires that there be some public impact on a

9   consumer.  And so usually a purely private interaction

10  between one party and another in a contract is not enough to

11  trigger liability under the Colorado Consumer Protection

12  Act, so typically those kinds of claims that are deemed to

13  be valid involve mass advertising and impact on, like, 500

14  people.  And, quite frankly, based on the allegations of the

15  complaint, you seem to be missing that element of the

16  Colorado Consumer Protection Act claim.

17          I was a little unclear on -- given the contract is

18  governed by Colorado law, how Florida Consumer Protection

19  Act claim would be -- whether this Court is entitled to look

20  at violations of Florida statutory law along with your

21  claim.  So -- but I'll just tell you that your Colorado

22  Consumer Protection Act claims seem to fail on the basis of

23  lacking the necessary element of impact on public consumers.

24  So that was my reaction to that particular claim.  With

25  that, why don't we turn to defense counsel.

1           MR. MEADOWS:  Thank you, Your Honor.  I just
2    stepped up to a new microphone.  I want to make sure you can
3    hear me.
4           THE COURT:  We can't hear you as well.  It might be
5    best if you return -- we heard you very well when you were
6    seated.
7           MR. MEADOWS:  All right.
8           THE COURT:  Just doing that for the court
9    reporter's help.
10          MR. MEADOWS:  How is that?  Is that better?
11          THE COURT:  It's a little better and if you could
12    speak up a little bit, that would be good.
13          MR. MEADOWS:  Your Honor, so to briefly address
14    what we just heard both from you at the beginning of the
15    hearing and then from Mr. Dogali, Colorado law is quite
16    specific about what's required to prove a breach of the
17    implied duty of good faith and fair dealing, and not only
18    was none of that addressed in plaintiff's brief or, really,
19    even in its amended complaint, it wasn't addressed in Mr.
20    Dogali's opening statement either.
21          There really is no allegation here, much less
22    evidence, that there's a reasonable expectation on the part
23    of Best Beach as to how TSYS's discretion would be exercised
24    under this agreement, much less that that reasonable
25    expectation has been violated to the extent that Best Beach

1   has been deprived of the essential benefits of this

2   contract.  And in that regard, I'll say quickly at the

3   beginning, TSYS is a payment processor.  Its primary job is

4   to facilitate Best Beach's acceptance of VISA and MasterCard

5   payments from customers.  And that essential benefit of the

6   contract has never been removed.  There has never been a

7   time over the period of this dispute where TSYS has not

8   processed VISA and MasterCard payments such that Best Beach

9   could not accept them.

10          THE COURT:  Well, let me ask you -- let me ask you

11   about that because, yes, they're able to get the money from

12   the people who are making the deposits, but if they can't

13   get access to the money to pay the property owners or pay

14   their operating expenses, then one-half of the whole credit

15   card processing concept is out the window.  It's great that

16   you facilitate the taking of the money, but part of the

17   whole processing system, which I don't understand and I

18   expect to be -- have that explained to me today -- is that

19   then Best Beach actually gets the money so they can operate

20   their business.  And if you -- yeah, if you say, well,

21   they're getting the money, no problem, we're processing it,

22   but then you're not giving the money to Best Beach, it does

23   seem like part of the whole processing agreement is failing

24   to accomplish the objective there.

25          MR. MEADOWS:  Well, Your Honor -- and I was going

1    to turn to that next.  That would be so if it were true, as

2    Mr. Dogali said at the beginning of his presentation, that

3    we have essentially deprived all available cash flow to Best

4    Beach.  In fact, that has never happened.  There have been

5    two funds holds put in place.  One lasted from about

6    mid-April to May 21st, after which time it was lifted; and

7    then second funds hold was put in place from June 22d to

8    July 31st.  And as we sit here today, that's been lifted as

9    well.  It was lifted on July 31st.

10          So what we're talking about is two temporary funds

11   holds put in place for the purposes of funding a reserve

12   account.  Now, why doesn't any -- why don't any of those

13   actions violate Best Beach's reasonable expectations?  One,

14   the contract expressly says -- allows us to take a reserve

15   account and to fund it through withholding some amount of

16   credit card funds.

17          I would agree with you, Your Honor, if we cut off

18   their revenue forever and never turned it back on, that's

19   probably a pretty good case for bad faith, but that's not

20   what's happened.  And we'll get into that in a little bit

21   more detail.

22          In addition, as Mr. Dogali acknowledged, this is an

23   ongoing -- or let me back up.  He didn't acknowledge this

24   part, I want to be fair.

25          This process that we're engaged in here, and which

1    has culminated with today's hearing, is just that; it is an

2    ongoing process.  There was never one fixed decision made

3    here.  Rather, Best Beach showed up on an automated

4    chargeback report generated with TSYS in April.  That was

5    because Best Beach was having an abnormally high number of

6    chargebacks.  Chargebacks are when customers seek to reverse

7    credit card transactions.  What that chargeback report

8    evidenced was that a lot of customers seemed to be disputing

9    the validity of their credit card and debit card

10   transactions with Best Beach.  That kicked off a process in

11   which TSYS said, It looks like we've got some exposure here.

12   Let's learn more to figure out what's going on.  And a hold

13   was put in place.  And a line of communication was opened

14   with Best Beach for exactly that purpose, to learn more.

15   What's going on?  Why are these chargebacks spiking?

16          Now we'll go through today the twists and turns of

17   that process.  But it was always a process that responded to

18   changing facts and circumstances, especially in our current

19   environment, COVID-19 world we thrive in now, which the

20   evidence will show has had a dramatic impact on Best Beach's

21   business, which is entirely located within the state of

22   Florida.  I think we all know that's an epicenter of the

23   COVID-19 issue, problem, and their business is 100 percent

24   isolated to the vacation rental industry which is so heavily

25   impacted by Corona virus that for a period of more than a

1    month the Florida government prohibited, flat-out prohibited

2    all vac- -- short-term vacation rentals within the state.

3         So this process has gone on.  As the facts and

4    circumstances have changed, our risk assessment, our

5    estimate of our own exposure, has changed and that is why

6    you've seen the hold lifted more than once.  That's why

7    you've seen, as our exposure estimate has changed, we

8    returned, as we sit here today -- over the last 10 days

9    we've returned about $2.5 million from the reserve account

10   to Best Beach.

11        Now, I think Mr. Dogali suggested that it --

12   there's some nefarious purpose to that, that what we're

13   trying to do is moot for today's injunctive proceeding.

14   That's not at all what's going on.  What's going on is as a

15   vacation rental company, I think it's kind of natural, and

16   the evidence will show, the peak season tends to be in the

17   summer; that's when people vacation.  And you'll see that

18   the volume of transactions that we process for Best Beach

19   has declined very substantially from May and June when, even

20   by Best Beach's own president's words, they experienced a

21   frantic and enormous pace of new reservations.

22        Now, as those reservations declined, our exposure

23   declines.  Why is that?  Because Best Beach takes deposits

24   of about $450 per vacationer against future vacation stays

25   that are not going to occur until some point in the future.

1    Sometimes that's many months from when the reservation is

2    made.  So as those amounts at issue have declined, so has

3    our exposure.  And in good faith, TSYS has returned the

4    amount of the reserve over and above its reasonable estimate

5    of its exposure.

6         Now as we sit here today, TSYS's estimate of its

7    exposure is about 2.3 million.  You heard Mr. Dogali say

8    that.  And I want to emphasize that because to be completely

9    honest, and I'm not trying to be flip about this, it's hard

10   to understand exactly what the injunction is that's being

11   sought here today.  But certainly it's not an injunction

12   that's consistent with a violation of duty of good faith and

13   fair dealing and I say that because as I understand the Best

14   Beach's current position, they simply disagree that

15   2.3 million is the right number, that that is an

16   overstatement of TSYS's risk and exposure.  In their view,

17   the right number's not 2.3 million, it's somewhere in the

18   mid-six figures.

19        Now we could debate all day what the right number

20   is and that's because assessing risk is a detailed

21   assessment that business professionals do and they exercise

22   judgment in the process.  There's no one right answer.  And

23   the duty of good faith and fair dealing doesn't exist to

24   give Courts a kind of roving license to second-guess

25   business decisions; rather, as you stated, it exists to

1    protect the reasonable expectations of the parties and the

2    essential benefit that they struck.

3            THE COURT:  Well, let me -- let me ask this

4    question, though.  I mean, let's -- so there could be

5    differences of opinion about what your exposure is, but my

6    understanding is that you have set this reserve, whether

7    it's 4.7 or 4 or 2.3, at a level that takes your risk to

8    zero, right?  And if whatever that number is, whether it's

9    4.7 or 4 or 2.3, puts -- and the argument is that at the

10   level of 4, certainly, that will put Best Beach out of

11   business.  I guess the question is:  Are you entitled to set

12   a reserve that puts your exposure at zero if there's a

13   realistic possibility that that level of reserve puts Best

14   Beach out of business?

15           And if that's the case, I'm not sure that that's

16   within the reasonable expectation of the parties that you

17   would exercise your discretion to set a reserve, minimizing

18   not -- extinguishing your risk but at the same time putting

19   Best Beach out of business.  So that's kind of what I'm

20   struggling with.

21           MR. MEADOWS:  I understand your question, Your

22   Honor.  If I could address that briefly in two parts.  A, on

23   the front-end, the contract doesn't have any benchmarks to

24   measure the assessment of the risk.  In other words, it

25   doesn't say, TSYS, you have discretion to take the reserve

1      and to address your exposure but you can't go beyond a

2      certain percentage of what your exposure is.

3              I will say, and the evidence will show this, when

4      we're talking about the reasonable expectations of the

5      parties, the contract does allow TSYS to terminate this

6      agreement for cause; to essentially completely walk away

7      from this deal if chargebacks ever exceed 1 percent of the

8      total monthly transactions, ever, in any one month.

9              The evidence that you'll see today will show that

10     for much of 2020, the monthly rate has been over 2 percent.

11     In fact, in April, when we established our reserve, it was

12     almost 10 percent.  It was almost 10 times the level that

13     allowed us to terminate for cause.  And I think it's very

14     difficult to argue -- and again this is another instance

15     which Best Beach hasn't addressed any of this -- that the

16     reasonable expectations of the parties are violated and the

17     essential benefit of the bargain has been denied when we are

18     seeing chargeback levels that would have allowed us to walk

19     away.

20             Now, secondly, driving them out of business:  The

21     evidence is going to show that that's not a realistic

22     possibility.  Best Beach is taking some positions with

23     regard to its finances that we've never understood and we

24     don't think are even remotely true, and you'll hear that

25     from our financial expert in addition to some other

1    evidence.

2              But let me say this, put these holds in

3    perspective.  As we sit here today, year-to-date, we've

4    processed a grand total of VISA and MasterCard transactions

5    of about $13 million for Best Beach.  At our peak, the

6    reserve was about 4.65, $4.7 million.  So roughly speaking

7    let's call that about a third of the total transaction

8    volume.  That, at the peak value of the reserve, just so

9    happens to be almost equal to what we processed for Best

10   Beach in June.  So when you look at it from that

11   perspective, we never thought we were driving them out of

12   business or really risking that.

13             We -- our estimate of our risk at its maximum

14   equaled what they processed in one single month.  And as we

15   sit here today, the 2.3 million we're withholding is less

16   than 20 percent of the total volume of transactions of VISA

17   and MasterCard that we've processed.

18             THE COURT:  But 20 percent is what they get as a

19   management fee.  All the -- 80 percent of what's processed

20   is owed to the property owners.  Am I wrong about that?

21             MR. MEADOWS:  I believe those are the rough

22   percentages that they've given.  Of course for purposes of

23   the TSYS, Best Beach contract, the question is simply what

24   is the amount that we're passing through to them from the

25   credit card funds?  How they divvy it up on the back end

1    really isn't part of our agreement.  They could strike any

2    deal they want with their property owners.

3            THE COURT:  Right, but you don't dispute that a

4    large percentage of the amount of money that's processed by

5    you is obligated to the property owners, whether it's, you

6    know, 80 percent or 60 percent.

7            MR. MEADOWS:  Ultimately, sure.  Some amount is --

8    and it could be 70 or 80 percent in that range is due to the

9    property owners.  But, again, to underscore, Your Honor,

10   this reserve was never intended to be permanent.  Nobody's

11   withholding Best Beach's money forever.  As I've said, as

12   the estimates of our exposure have changed, we have released

13   the hold and released money to Best Beach.

14           I can't guarantee anything, but I think as we sit

15   here -- I mean, this is clearly trending in a direction that

16   Best Beach should be very happy about.  It certainly appears

17   that the risk is going to continue to decline and that more

18   funds will be released from the reserve account.  Again,

19   can't guarantee that, but that's -- recent events certainly

20   point in that direction.  And to put a stop to that now is a

21   rather extraordinary use of the power at issue of a

22   preliminary injunction and I think not at all supported by

23   the evidence that you're going to see today.

24           This is an ongoing process and it should be

25   permitted to continue.  It's consistent with everybody's

1    contract rights and it's consistent with everyone's

2    reasonable expectations.  There can't be a reasonable

3    expectation that there would never be a reserve, that there

4    would never be withholding of funds, because the contract

5    allows us to do all of those things in appropriate cases.

6              THE COURT:  Okay.  Anything else?

7              MR. MEADOWS:  Not at this time, Your Honor.  Thank

8    you.

9              THE COURT:  All right.  So we'll hear, then, from

10   the first witness for the plaintiff.

11             COURTROOM DEPUTY:  I'm sorry, Your Honor, I've

12   gotten word from IT that Bridge is working now.  Do you want

13   me to connect it to the bench or wait until a break?

14             THE COURT:  Let's wait till a break.  It would be

15   good if we could toggle the image so that we could see the

16   testifying witness.

17             COURTROOM DEPUTY:  That's what I tried to do and he

18   said we're kind of stuck with this if there's -- what I

19   tried didn't do anything except to take his video completely

20   off.  But that was the only suggestion they had from IT.

21             THE COURT:  Okay.  Well, so we'll hear from

22   plaintiff's first witness.  We'll ask that the speakerphone

23   be placed close to -- I assume it's going to be Mr. DeVos;

24   is that correct?

25             MR. DOGALI:  It is Mr. DeVos, Your Honor.

1          THE COURT:  You're about to -- you're about the
2    size of an ant, Mr. DeVos, on my screen, so I will not be
3    able to see your facial expressions.
4          THE WITNESS:  Sure.  Could I move the computer
5    closer?
6          MR. DOGALI:  We can move our cameras a little
7    closer.
8          THE WITNESS:  Yeah, I'll do that right now.
9          THE COURT:  We can try that.  It's really a
10   function at our end that we're not getting a full screen
11   picture.  That's fine, Mr. DeVos.  But I do want to make
12   sure that you're speaking close enough to the microphone
13   that we hear you.
14         And the way I anticipate this going is that Mr.
15   DeVos adopts his declarations as testimony that he swears to
16   under oath and -- let me just ask generally this question:
17   Have you all come to an agreement on stipulated exhibits?
18         MR. DOGALI:  I think we just covered the issue, to
19   the extent that I don't object to any of the exhibits that
20   TSYS would propose to put in.  For purposes of this
21   temporary injunction, the rules of evidence -- federal rules
22   are often lax a bit on a temporary injunction hearing.  With
23   that in mind, I'm sure Your Honor would honor some limits,
24   anyway.  And with that said, the plaintiff has no objection
25   to TSYS's proposed exhibits.

1           THE COURT:  Okay.  And TSYS's position.

2           MR. MEADOWS:  We would agree, Your Honor.

3           THE COURT:  Okay.  Well, let's -- it is important,

4    though, for the record, that we formally admit any

5    exhibits -- and if you want to just say you move the

6    admission of exhibits -- I think plaintiff has 1 through 43,

7    and if you want to move their admission.  I'll ask defense

8    counsel if there's any objection, but then we'll put those

9    in the record.  Mr. Dogali.

10          MR. DOGALI:  Your Honor, sorry.  If I may find the

11   list.

12          THE COURT:  We're having trouble hearing you, sir.

13          MR. DOGALI:  Plaintiff moves into evidence all of

14   its Exhibits 1 through 36 and does not remove -- move in at

15   this time the remaining ones.  1 through 36.

16          THE COURT:  All right.  Any objection?

17          MR. MEADOWS:  No, Your Honor.

18          THE COURT:  Okay.  1 through -- Plaintiff's 1

19   through 36 are admitted.

20      (Plaintiff's Exhibits 1 through 36 received)

21          THE COURT:  I also think it's necessary to --

22   assuming he'll tie it up via his live testimony, the

23   declarations of James DeVos, are you moving the admission of

24   Mr. DeVos's written testimony?

25          MR. DOGALI:  Yes, sir, the plaintiff does that at

1     this time.

2              THE COURT:  Okay.  And with the understanding

3     you'll have an opportunity to cross-examine Mr. DeVos, any

4     objection from the defendant?

5              MR. MEADOWS:  No, Your Honor.

6              THE COURT:  Okay.  So the declarations of Mr. DeVos

7     is accepted.

8              So with that, why don't we turn it over to Mr.

9     Dogali to put on his witness.

10             MR. DOGALI:  Thank you, Your Honor.

11                       DIRECT EXAMINATION

12    BY MR. DOGALI:

13             Mr. DeVos, the court reporter is here, so you'll

14    state your full name.

15    A.   James M. DeVos.

16    Q.   And for the benefit of the record, what's the -- where

17    are we located today?

18    A.   We are in Panama City Beach, Florida.

19             THE COURT:  And I neglected -- Mr. Dogali, the

20    witness needs to be sworn.  So if we could have the clerk

21    deliver -- if you could, Mr. DeVos, please raise your right

22    hand.

23             JAMES DeVOS, PLAINTIFF'S WITNESS, SWORN.

24             THE COURT:  Could you state your -- and spell your

25    full name, please.

1          THE WITNESS:  James M. DeVos.

2          THE COURT:  And spell your last name.

3          THE WITNESS:  Capital D-e, capital V-o-s.

4          THE COURT:  Thank you.  Go ahead, Mr. Dogali.

5   BY MR. DOGALI:

6   Q.   And I think you mentioned we're located today in --

7   A.   Panama City Beach, Florida.

8          THE COURT:  Mr. Dogali, when you ask your question,

9   you're going to have to pull that mic towards you.  I'm

10  sorry, but we can't -- we're hearing Mr. DeVos fine, but I

11  think it's a directional microphone and we can't hear you

12  when you're asking your question.

13         MR. DOGALI:  Thank you, Your Honor.  I'll -- I

14  think I may have leaned away from it.  It might have been my

15  doing.  Human error.

16  BY MR. DOGALI:

17  Q.   In any event, Mr. DeVos, did you hear reference a

18  minute ago to introduction into evidence of your

19  declarations?

20  A.   I did.

21  Q.   Is that the document in front of you right now?

22  A.   That's what I have in front of me right now.

23  Q.   And subject to a correction to that affidavit, we'll

24  talk about the declarations that we'll talk about in a

25  moment, is it true and accurate to the best of your

                              Direct - DeVos

1     knowledge as you sit here today and do you adopt it as your
2     testimony?
3     A.    I do.
4     Q.    Now, I mentioned a correction.  I think there may be a
5     supplement, if you will.  If you turn to page 14 of the
6     declarations.  Hoping the judge and Mr. Meadows have it in
7     front of them.  This will be at paragraph 51, which is on
8     page 14.
9              THE COURT:  We have it.
10    BY MR. DOGALI:
11    Q.    Mr. DeVos, you'll see a table there in paragraph 51?
12    A.    I do.
13    Q.    What is the table?
14    A.    The table is a projection of our cash situation as it
15    relates between July 31st and August 16th of this year.
16    Q.    All right.  Does it print out that when you signed this
17    last Wednesday, there may have been some information
18    inaccurately there?
19    A.    Yes.
20    Q.    And what is that?
21    A.    The -- when I received an email from TSYS letting me
22    know that they were releasing a million dollars, in that
23    email they also indicated that they were releasing the holds
24    on future payments and unfortunately on oversight on my part
25    I missed that entire line.

                         Direct - DeVos

1              So what's missing from the second -- from the

2       second end of the table, which is Projected Additional

3       Prepayments, August 1 to 14, are the prepayments that will

4       be coming in for guests who are staying between September

5       1st and September 15th.

6       Q.   As you show it there, 1 million, what is that 1.1?

7       A.   That 1.1 million is the million dollar release of funds

8       on July 31st, and it's another $100,000 which I projected to

9       be coming in from a variety of different sources,

10      counter-deposits, American Express deposits, and so on.

11      Q.   If you are holding that document, you need to add

12      whatever would have been MasterCard and VISA?

13      A.   Yes.

14      Q.   And how much would you add there for that?

15      A.   I would add -- when I went and I looked at our

16      advanced -- at booking sort of coming in those first two

17      weeks of September, it works out to about $400,000 that will

18      be coming in.

19      Q.   That 1.1 is 1.5?

20      A.   That's correct.

21              THE COURT:  Mr. Dogali, we're still having trouble

22      hearing you when you question.  So if you could get closer

23      to that mic when you ask your question, that would be

24      helpful.

25      BY MR. DOGALI:

Direct - DeVos

1    Q.   Mr. DeVos, my question was:  So the 1.1 line item
2    should be 1.5, assuming the hold release was --
3    A.   That's correct.
4    Q.   And what does it do to your cash projection for August
5    15th?
6    A.   It reduces the deficit from 602,000 to about 202,000.
7    Q.   Still in the red?
8    A.   Correct.
9    Q.   Now, on the next page, at paragraph 54, what is that
10   table?
11   A.   If you -- that projects cash on hand from August 16th
12   through September 16th.
13   Q.   And does the same issue exist in this table?
14   A.   That certainly does, yes.
15   Q.   All right, so how does this table change to account for
16   the fact that the hold was apparently --
17   A.   Lifted.
18   Q.   -- lifted?
19   A.   Yes.  Well, if I look at -- if I look at the carryover
20   number, the carryover -- the negative carryover number goes
21   from 602,000 to 202,000.  And then when I look at projected
22   advanced payments from August 15th to September 14th, I
23   would increase that by about $120,000, so that the -- so
24   that the projected additional prepayments would be about
25   $150,000, which then -- which then changes the projected

1    cash on hand -- no, excuse me -- yeah, that changes from

2    projected cash on hand to a negative of about $2.2 million.

3    Q.   Instead of losing 2.72 --

4    A.   Yeah.

5    Q.   -- on September 15, you would be in the red 2.2?

6    A.   That's correct.

7    Q.   All right.  Now with that correction in mind, I think

8    perhaps the supplement, based on information from the next

9    Friday after that one last Friday afternoon, what happened

10   last Friday afternoon?

11   A.   Well, last Friday afternoon I received an email from --

12   from TSYS that they were releasing $1.4 million to us and

13   that it would be -- it would take one to three business days

14   to arrive at our bank account.

15   Q.   If you assume that whatever that -- it's 1.4

16   something --

17   A.   Yeah --

18   Q.   -- number is added back in to your August

19   performance --

20   A.   Uhm-hum.

21   Q.   -- what does that do to the cash projection for August

22   15th?

23   A.   For -- no, for September -- for August 15th, sorry.  I

24   have to go back to that table.

25   Q.   You were negative 202.

Direct - DeVos

1   A.   Yeah, I was negative 202, so I would be positive right

2   at about 1.2 or $1.3 million.

3   Q.   So you would -- if those holds and releases are in

4   place as TSYS indicated, you get through August 15 and have

5   one and a quarter left?

6   A.   Yes.

7   Q.   That release is through September?

8   A.   Well, it then changes the -- it then changes the

9   carryover number from -- from the prior table to roughly

10  $1.5 million.

11  Q.   What happens to the bottom line?

12  A.   The bottom line, we are still in the negative to the

13  tune of about $700,000.

14  Q.   In the 10 years you've been with TSYS, has there ever

15  been a hold or reserve account?

16  A.   No.

17  Q.   Right now is there a hold or reserve account in place

18  by American Express?

19  A.   No.

20       MR. DOGALI:  Your Honor, with that, thank you.  No

21  more questions for Mr. DeVos.

22       THE COURT:  All right, so his affidavit is

23  accepted -- or his declaration is accepted.  I have read it.

24  I may have a couple of questions, but why don't we go into

25  cross-examination.

1     MR. MEADOWS:  Thank you, Your Honor.  I want to
2  just be sure everybody can hear me.
3          THE COURT:  You can from the Court's side.
4          MR. MEADOWS:  Great.  Thank you.  All right.
5                    CROSS-EXAMINATION
6  BY MR. MEADOWS:
7  Q.   Good morning, Mr. DeVos.  How are you?
8  A.   I'm fine.  And you?
9  Q.   Doing well.  Thanks.  I want to be sure I have -- it's
10 DeVos, that's the correct pronunciation?
11 A.   It is.  It is.
12 Q.   Thank you.  All right.  Now, Mr. DeVos --
13 A.   And -- I'm sorry.
14 Q.   Oh, okay.  I want to ask you -- start out by asking you
15 about a section of your declarations that starts at page 9
16 with the title The TSYS Hold.
17        And so you were first notified by TSYS on April
18 14th, 2020, that TSYS was going to be placing a hold on the
19 Best Beach account, correct?
20 A.   Yes.
21 Q.   And you received a notification -- an email, I should
22 say, from Ms. Heidi Keryan on that day, correct?
23 A.   Yes.
24 Q.   And Ms. Keryan's email also attached a letter from TSYS
25 informing you about the hold, right?

Cross - DeVos

1    A.    Yes.

2    Q.    And you were surprised on April 14th when you got this

3    notification from Ms. Keryan, weren't you?

4    A.    Yes.

5    Q.    In fact, as of April 14th, when you received this

6    notification, you didn't even know that the hold was

7    something that TSYS could place on your account, did you?

8          Let me rephrase that.  As of the date you got this

9    notification, you didn't even know that TSYS had the right

10   under the contract with Best Beach to impose a hold on

11   funds, did you?

12   A.    Not sure how I would answer it.  Let me think about

13   that for just one second, because our relationship with TSYS

14   goes back 10 years.

15   Q.    I'm asking as of the date that you were notified that

16   there would be a hold placed, so April 14th of this year,

17   when you received that notification, as of that day you

18   actually didn't know that TSYS even had the right under the

19   contract to impose a hold, did you?

20   A.    Yes, that's correct.

21   Q.    You also didn't know that TSYS had the right under the

22   contract with Best Beach to create what's called a reserve

23   account, did you?

24   A.    That is correct.

25   Q.    And, in fact, I think you made reference to it a moment

1    ago, TSYS has been Best Beach's payment processor since

2    sometime about 2010, right?

3    A.    Yes.

4    Q.    And you only became the president of Best Beach

5    Getaways in 2012; is that correct?

6    A.    That is correct.

7    Q.    So obviously when TSYS and Best Beach entered into

8    their merchant processing agreement, you were not the

9    president of the company at that time.

10   A.    That is correct.

11   Q.    And the person who was the president of Best Beach at

12   that time, that is, in 2010, was Mr. Underhill; is that

13   right?

14   A.    Yes.

15   Q.    And I should say that's Gerrie Underhill.  He's your

16   partner and part owner of Best Beach Getaways, right?

17   A.    He is.  He is, yes, that's correct.

18   Q.    And Mr. Underhill decided not to put in any kind of

19   affidavit or declarations in support of Best Beach's motion

20   for injunction, fair?

21   A.    That's correct.

22   Q.    Now you know Mr. Underhill, don't you?

23   A.    I've known Mr. Underhill since 1995, yes.

24   Q.    Okay.  There we go.

25           You speak with him frequently, right?

41

Cross - DeVos

1    A.    Every day and sometimes twice a day.

2    Q.    Right.  And so far as you know, he's perfectly capable

3    of testifying if he wants to, right?

4    A.    Oh, yes, he is.

5    Q.    Now I want to go back to Ms. Keryan's email to you on

6    April 14th.  I believe it's Exhibit -- Defense Exhibit C.

7    If you have access to that, have it in front of you.

8    A.    I think I have it.  Okay.

9          THE COURT:  So just for the record, Counsel, do you

10   want to go through the same process of admitting your

11   exhibits as well?

12         MR. MEADOWS:  I guess that's a good point, Your

13   Honor.  As I take it there's no objection to them, so if

14   there's no objection, we would move for the Court's

15   admission of our exhibits which are labeled A through -- A

16   through SSS.

17         THE COURT:  Okay.  Any objection?

18         MR. DOGALI:  No, Your Honor.

19         THE COURT:  Okay.  Defendant's Exhibit A through

20   SSS are admitted into evidence for purposes of this

21   proceeding.

22      (Defendant's Exhibits A through SSS received)

23         MR. MEADOWS:  Thank you.

24   BY MR. MEADOWS:

25   Q.    All right.  So, Mr. DeVos, I have referred you to our

42
Cross - DeVos

1   Exhibit C.  Are you with me?

2   A.   I am.  I have -- Mr. Dogali gave me the book of your

3   exhibits and I extracted Exhibit C.  I have it in front of

4   me now.

5   Q.   Great, thank you.  And so in that email that Ms. Keryan

6   sent to you on April 14th, she mentions that TSYS had done a

7   review of merchant segments possibly impacted by the

8   COVID-19 government stipulations.  Do you see that?

9            THE COURT:  So -- sir, your Exhibit C has multiple

10  pages.  Starts --

11           MR. MEADOWS:  I'm sorry, Your Honor, good point.  I

12  am referring to -- I believe it might be numbered --

13           THE COURT:  You didn't Bates number --

14           MR. MEADOWS:  Bates No. 929, ending with 929.

15           THE COURT:  Okay.  929, it's -- 929 --

16           THE WITNESS:  Page 3?  Okay.

17           THE COURT:  So page 3 of this; is that what you're

18  referring to?

19           MR. MEADOWS:  Yeah, I believe on the bottom --

20  about halfway down page 3, you see the email from Ms. Keryan

21  to Mr. DeVos.

22           THE COURT:  Okay.

23           MR. MEADOWS:  Sorry for the confusion.

24           THE COURT:  Thank you.

25  BY MR. MEADOWS:

Cross - DeVos

1    Q.   All right.  So to restate my question, Mr. DeVos, Ms.

2    Keryan tells you in that email that within TSYS, there had

3    been a review of merchant segments possibly impacted by the

4    COVID-19 government stipulations; do you see that?

5    A.   I'll get there in a minute.

6    Q.   Okay.

7    A.   Yes, okay.

8    Q.   She goes on to say that your processing account --

9    "your" meaning Best Beach -- had triggered for review which

10   included an evaluation of processing activity, correct?

11   A.   Yes.

12   Q.   And she specifically mentions credit/debit card sales,

13   volume, refund, and chargebacks.  Do you see that?

14   A.   Yes.

15   Q.   And she goes on about a sentence later, she says,

16   Additionally your account was triggered due to a recent

17   spike in chargebacks.  Do you see that?

18   A.   Yes.  Yes.

19   Q.   Do you have an understanding as to what a chargeback

20   is?

21   A.   I do.

22   Q.   And fair to say a chargeback is the reversal of a

23   credit or debit card transaction initiated by the card

24   holder, right?

25   A.   Right.  That would be right.

44
Cross - DeVos

1    Q.   I'm sorry, I didn't hear your answer.

2    A.   Yes.   Correct.

3    Q.   Thank you.   Now, I want to go back to the references in

4    the email to COVID-19.   You don't dispute, do you, that at

5    this time frame, again mid-April of this year, Best Beach's

6    business was being impacted by the COVID-19 pandemic, do

7    you?

8    A.   I do not dispute that at all, no.

9    Q.   In fact, as of mid-April of this year, there was a

10   complete ban on short-term vacation rentals imposed by the

11   State of Florida, right?

12   A.   Yes.   Yes.

13   Q.   And I think you even say in your declarations that

14   while that order was in place in Florida, the governor had

15   essentially canceled all of your guests' vacations by

16   operation of law, fair?

17   A.   Fair.

18   Q.   And, in fact, isn't it also true that as a measure to

19   deal with the impacts of the Corona virus on your business,

20   Best Beach applied for and received a paycheck protection

21   program loan?

22   A.   We did.

23   Q.   And that that loan was about half a million dollars --

24   maybe a little bit more than a half million dollars, right?

25   A.   Yes, that is correct.

Cross - DeVos

1   Q.   And Best Beach applied for that loan because it

2   anticipated that the Corona virus was going to impact its

3   business pretty significantly, right?

4   A.   That is correct.

5   Q.   Go back to chargebacks for a minute.  I want to ask

6   you, Mr. DeVos, does Best Beach track the number of

7   chargebacks that its customers initiate on VISA and

8   MasterCard?

9   A.   Historically we haven't really had to, and more often

10  than not, the numbers were very small, and really it was

11  during the pandemic that the issue escalated.

12  Q.   The issue escalated, meaning during the pandemic you

13  saw a pretty significant spike in chargebacks, right?

14  A.   And -- well, there were two things there.  One was

15  chargebacks, the other was refunds because we end -- we had

16  to refund the guest when we couldn't accommodate their stay

17  during the governor's short-term rental ban.

18  Q.   Thank you for that distinction.  Let's be sure we draw

19  that out for the benefit of the Court.  I want to talk about

20  the distinction between a refund and chargeback.

21          Let's start with a refund.  That's when a Best

22  Beach customer comes to your company -- comes to Best Beach

23  and asks for its money back, correct?

24  A.   That's when we approve giving them their money back,

25  yes.

Cross - DeVos

1   Q.   Good point.  A chargeback, however, really only is

2   initiated if a customer's asked for a refund and Best Beach

3   declines to give it, fair?

4   A.   Fair.

5   Q.   And, in fact, we'll talk about this somewhere later,

6   but you've said in your declarations that generally

7   speaking, Best Beach does decline to refund guests'

8   deposits, correct?

9   A.   When -- yes.

10  Q.   All right.  Back to the issue of chargebacks.  I'd

11  asked you earlier if Best Beach tracks the number of

12  chargebacks and I think you said that historically it hasn't

13  been much of an issue.  During this year, 2020, have you

14  tracked the number of chargebacks on your VISA and

15  MasterCard transactions?

16  A.   Actually, we have made a request of TSYS's chargeback

17  department to receive a report.  We are still waiting to

18  receive it.

19  Q.   Very well.  But I want to ask -- I take it that my

20  answer to your question then is no, that Best Beach, itself,

21  doesn't track the number of chargebacks on its account.

22  A.   No, we do not.

23  Q.   Do not.  Thank you.  Well, with kind of following up on

24  your statement about asking for a chargeback report, can I

25  refer you to Defense Exhibit B, please.  B as in boy.

Cross - DeVos

1    A.    Okay.

2    Q.    Let me know when you're with me.  Obviously I can't

3    tell when you've got it in front of you, Mr. DeVos.

4    A.    It's in front of me.

5    Q.    Okay, great.  Now, I want to -- well, I'll represent to

6    you -- and to be fair, this is a TSYS document and -- have

7    you ever seen this before?

8    A.    I have not.

9    Q.    All right.  Could I refer you to the very last page.  I

10   hope it ends with Bates No. 1460.

11   A.    No, the one where -- mine says page 5 of 5.

12   Q.    Oh, well, okay, that works, too.  This is the

13   difficulty of remote hearing.

14   A.    Okay.

15   Q.    The page that I'm referring to definitely is 5 of 5.

16   And at the top it says Trailing CB Risk.

17   A.    It does, yes.

18   Q.    Great.  I take this -- you've never seen this

19   particular page either.

20   A.    That's correct.

21   Q.    I want to refer you to -- well, on the left-hand side,

22   there's a column that says Month ID.  Do you see that?

23   A.    Uhm-hum.

24   Q.    And I want to represent to you that if you look at

25   those months, you'll see starting with the first entry,

1    2020-08, that's April -- I'm sorry, August of 2020, and then

2    it goes sequentially from there, month-to-month, by year.

3    Are you with me?

4    A.    Uhm-hum.  I am now.

5          THE COURT:  Mr. Dogali, rather than saying

6    "uhm-hum" -- or, sorry, Mr. DeVos, rather than saying

7    "uhm-hum" or "hhm-uhm," if you could say "yes" or "no."

8          THE WITNESS:  I'm sorry.  My apologies.

9          THE COURT:  It's easier for your court reporter.

10   Thank you.

11         THE WITNESS:  To get a yes.  Understand.

12   BY MR. MEADOWS:

13   Q.    Thank you.  All right.  So, now about halfway across

14   the columns, there's a column titled CB End number -- I

15   should say hash tag.  Do you see that?

16   A.    I do.

17   Q.    And I'll represent to you this is TSYS's internal

18   tracking of number of chargebacks on the Best Beach account

19   for VISA and MasterCard transactions.

20         And by the way, just to level set, we agree, don't

21   we, that TSYS only processes VISA and MasterCard

22   transactions for Best Beach, correct?

23   A.    Yes.

24   Q.    We don't process your AmEx transactions -- I should say

25   American Express transactions, right?

Cross - DeVos

1    A.   That's correct.

2    Q.   We don't have anything to do with any check -- payments

3    by check.

4    A.   That's correct.

5    Q.   All right.  Thank you.

6         So going back to this chargebacking number column,

7    as I represented to you this is TSYS's internal tracking of

8    the number of chargebacks on the Best Beach account by

9    month.  And I'd ask you to scan that and let me know:  Do

10   you have any reason to doubt the accuracy of the numbers in

11   that column?

12   A.   No, I do not.

13   Q.   Now, as reflected in that column, if you'd start with

14   me, please, for the month of February of this year, and

15   that's about -- that's the line that's about halfway

16   down --

17   A.   I'm there.

18   Q.   Okay.  And if you go over to the right, to the

19   chargebacking number column, you'll see that there's a

20   number 2 --

21   A.   Yeah.

22   Q.   -- so Best Beach had two chargebacks in all of February

23   of this year, fair?

24   A.   Yes, sir.  Yes.

25   Q.   Now, that number of chargebacks per month increased to

Cross - DeVos

1   22 in March, right?

2   A.   Yes.

3   Q.   And March is the month in which the Florida governor

4   imposed an executive order banning short-term vacation

5   rentals, right?

6   A.   Yes.   March 27th.

7   Q.   Right.   And then the number of chargebacks on the Best

8   Beach account increased again in this April all the way up

9   to 68, correct?

10  A.   Yes.

11  Q.   And then it went up in May, it even -- it went up

12  again, this time up to 70 chargebacks for the month, right?

13  A.   Uhm-hum.   Yes, well, I'm confirming what I'm seeing on

14  your -- what I'm seeing on the chart that you provided.

15  Q.   Right.   Let's focus on April for a moment, if you

16  could, please.

17  A.   Yes.

18  Q.   Do you see there's a column -- it's the third from the

19  left with the -- it says TRANS, T-R-A-N-S, and then there's

20  a hash tag.

21  A.   Third -- oh, sorry, third from the left.   Yes.

22  Q.   Right.   And so I'll represent to you that that

23  number -- the number in that column represents the total

24  number of VISA and MasterCard transactions processed by TSYS

25  in that month.

Cross - DeVos

1    A.    Yes.

2    Q.    Do you have any reason to doubt the accuracy of that

3    696 figure in that -- in that cell?

4    A.    I do not.

5    Q.    All right.  So if we compare -- and we will go back

6    over it, we saw a moment ago that for April, there were 68

7    chargebacks for the month, you remember that, right?

8    A.    I do.

9    Q.    And there were 696 total transactions, we just agreed

10   about that, correct?

11   A.    Yes.

12   Q.    And so if you then go a little further to the right,

13   there's a column, Chargeback in Number Ratio.  Do you see

14   that?

15   A.    Yes.

16   Q.    And for April, the value entered there is 9.8 percent,

17   right?

18   A.    Chargeback -- oh, sorry.  Yes.

19   Q.    And so what that represents is that for the month of

20   April for Best Beach's VISA and MasterCard transactions,

21   nearly 10 percent were subject to chargebacks, correct?

22   A.    Yes.

23   Q.    You agree with me, Mr. DeVos, that 10 -- that

24   9.8 percent is an extremely high chargeback ratio.

25   A.    I'm not sure how to answer that question because I

52
Cross - DeVos

1     don't know what the average is.
2     Q.   Okay.  Well, let me ask you about your expectations.
3     That might be another question you'll have difficulty
4     answering, but with a chargeback ratio of 9.8 percent for a
5     given month, did you expect that TSYS, upon seeing a number
6     like that, might take some action to protect its interests?
7     A.   I don't know how to answer that question either.
8     Q.   Okay.
9     A.   I'm not TSYS.  I don't know how to answer that
10    question.
11    Q.   That's fair.  Let me ask you, then, from your own
12    knowledge and understanding, Mr. DeVos:  Are you aware that
13    under Best Beach's contract with TSYS, TSYS had the right to
14    terminate the agreement for cause if the chargeback ratio
15    for any one month exceeded 1 percent?  Is that something you
16    were aware of?
17    A.   I was not -- I was not aware of that.  And in my -- in
18    any of my conversations with Ms. Keryan was that ever
19    brought up.
20    Q.   Well, the contract is something that you -- I take it
21    that Best Beach maintained a copy of the contract somewhere
22    in its files, didn't it?
23    A.   Yes.
24    Q.   And that you certainly -- nothing was stopping you as
25    the president of the company from -- from taking the

1    contract, reading it over.

2    A.    No.

3    Q.    Right?

4    A.    Nothing was stopping me, correct.

5    Q.    And we can -- the contract is Exhibit O.  You're

6    welcome to -- I think we probably should go ahead and take a

7    look at if you don't mind, please.

8    A.    Bear with me just a minute.  I've got to get your

9    Exhibit O.

10          Okay, I now have your Exhibit O in front of me.

11   Q.    Thank you.  Could I refer you -- towards the bottom in

12   the middle, it will say page 3 of 6.

13   A.    I am -- I have it.

14   Q.    Great.  And in particular, there's a Section 11 on that

15   page titled Term, termination.  Do you see that?

16   A.    Yes.

17   Q.    And Section 11.2 -- I'm sorry, Section 11.2B -- b as in

18   boy -- if you'll permit me, it says Termination for cause by

19   bank, merchant bank, or processor or merchant bank or

20   processor's designated representative may terminate this

21   merchant agreement in its sole and absolute discretion

22   effective immediately upon written electronic or oral notice

23   to merchant if bank reasonably determines that any of the

24   following conditions exist.  Do you follow me there?

25   A.    Yes.

1    Q.   Okay.  And then if you look down to section 5, Roman

2    Numeral V, there it says, At any time during the term of

3    this merchant agreement merchant has had a monthly ratio of

4    chargebacks to transactions exceeding 1 percent, or

5    chargebacks are in excess of 3 percent of any monthly dollar

6    amount of transactions.  Do you see that?

7    A.   Yes.

8    Q.   So with that in front of you, I want to go back to the

9    question I asked you a few minutes ago.  We saw that the

10   chargebacks ratio for April for Best Beach was 9.8 percent.

11   You agree with me that 9.8 percent is almost 10 times the

12   level that Section 11 designates as worthy of termination

13   for cause?  Fair?

14   A.   Well, I put the other exhibit away so I'm not a hundred

15   percent sure about that, but I'll -- I'll take your word for

16   it.

17   Q.   Okay.  And by the way, Exhibit B, which has the data on

18   chargebacks that we looked at a moment ago, that might be

19   the one you want to keep handy.  We probably will refer to

20   that a few times.

21   A.   I'll bring that -- I'll grab that.  Bear with me a

22   second.

23   Q.   Of course, sir.

24   A.   Didn't you say V in --

25   Q.   B.  B as in boy.

Cross - DeVos

1    A.    Sorry.

2    Q.    No worries.

3    A.    Okay.

4    Q.    Okay.  So I'm sorry if I'm covering old ground here,

5    but we talked about that the chargeback ratio for April,

6    according to Exhibit B, was 9.8 percent and that's almost 10

7    times what the contract says justifies TSYS in terminating

8    for cause.  Are we in agreement on that?

9    A.    I have to go back and review April.  Let me look at

10   something.

11          The -- your -- we're in Roman Numeral V -- B-5,

12   correct?

13   Q.    Yes, that's correct.

14   A.    1 percent -- 3 percent of volume -- well, it says the

15   monthly volume of chargebacks is 6.4 percent for April and

16   it says chargebacks are in excess of 3 percent of any volume

17   of monthly transactions.  So that doesn't sound like 10 --

18   Q.    To be clear, the column, the 6.4 percent that you're

19   referring to, that's in the column labeled Chargeback in

20   Dollar Ratio; is that right?

21   A.    Yes.  Yes.

22   Q.    And the 6.4 percent number there would correspond to

23   the 3 percent threshold in Section 11 that we looked at

24   earlier --

25   A.    Yes.

Cross - DeVos

1   Q.   -- right?

2   A.   Yes.

3   Q.   So even if you view the chargebacks for April in terms

4   of the ratio of total dollars processed, you're still more

5   than double the level that would allow TSYS to terminate for

6   cause, right?

7   A.   Yes, that's correct.  But it certainly is less than 10

8   times.

9   Q.   Well, and we're -- just to be sure, we might be talking

10  apples and oranges here.  There's two ways to look at the

11  ratio.  The one is the ratio of dollars charged back to

12  total dollars processed, right?

13  A.   Yes.

14  Q.   And that's the 6.4 percent, correct?

15  A.   Yes.

16  Q.   And then the other -- another way to look at the

17  chargeback ratio is just the total is number of chargebacks

18  as a ratio of the total number of transactions processed,

19  right?

20  A.   Yes.

21  Q.   And the contract addresses termination rights looking

22  at the ratio both ways, correct?

23  A.   Yes, correct.

24  Q.   And either way you look at it, for April, TSYS was --

25  could have terminated this agreement for cause, right?

Cross - DeVos

1    A.   Yes.

2    Q.   Now, looking just at the chargeback in ratio -- in

3    number ratio column in Exhibit B, do you see that for March,

4    that ratio is 2 percent?

5    A.   Yes.

6    Q.   So that is more than double the chargebacking number

7    ratio that justifies termination for cause, right?

8    A.   That's correct.

9    Q.   And then if we look up to May, you're at the chargeback

10   ratio of 2.5 percent, correct?

11   A.   Yes.

12   Q.   And then even in July of this year, chargeback ratio

13   2.5 percent, do you see that?

14   A.   That's correct.

15   Q.   So going back to the question I originally asked you:

16   Again focusing on April, I think I asked you a chargeback

17   ratio of 9.8 percent is an extremely high chargeback ratio.

18   Having now looked at all this data and the contract, can we

19   agree that 9.8 percent is an extremely high chargeback

20   ratio?

21   A.   Yes.

22   Q.   And, in fact, Best Beach agreed -- I mean, Best Beach

23   is a party to this contract, right?

24   A.   We are.

25   Q.   Right.  And so Best Beach agreed that a chargeback

1    ratio of 10 percent would be so high that it would be well

2    beyond the level at which TSYS could walk away from this

3    contract entirely, right?

4    A.    We agreed, according to the terms of the contract, that

5    anything above 1 percent in numbers of transactions or

6    dollar amount would give TSYS the right to terminate the

7    agreement.

8    Q.    Right.  Now, TSYS, of course, didn't terminate the

9    agreement.  Are we in agreement about that?

10   A.    Yes.

11   Q.    In fact, over the entire period of this dispute --

12   really all of 2020, there was never a time where TSYS

13   stopped processing your VISA and MasterCard transactions,

14   right?

15   A.    That is correct.

16   Q.    Now, if TSYS had terminated -- had terminated this

17   agreement for cause, you would not have been able to accept

18   VISA or MasterCard payments from your customers unless and

19   until you found a substitute payment processor, right?

20   A.    That is correct.

21   Q.    That would have caused some very significant disruption

22   to your business in the spring and summer of this year,

23   wouldn't it?

24   A.    In the spring of this year?  Not really.

25   Q.    At any time this year.  If TSYS --

                          Cross - DeVos

1     A.    Oh --

2     Q.    Let me rephrase --

3     A.    Without -- without the payment processor, we would --

4     we would have had difficulty doing business; that is

5     correct.

6     Q.    Right.  But that's not something TSYS did to Best

7     Beach.  It didn't walk away from the deal on very little

8     notice leaving you unable to take VISA and MasterCard

9     payments, right?

10    A.    Correct.

11    Q.    Now, I want to ask you:  When you -- after you received

12    Ms. Keryan's April 14th notification about the hold and the

13    reserve account, do you recall asking to speak with her by

14    phone?

15    A.    I did.

16    Q.    And ultimately the two of you did speak by phone; do

17    you recall that?

18    A.    We did.

19    Q.    In fact, you have spoken to Ms. Keryan on the phone

20    more than once, haven't you?

21    A.    More than once, but probably less than five times.

22    Q.    All right.  There was never a time when Ms. Keryan

23    refused to speak to you on the phone, was there?

24    A.    No.

25    Q.    There was never a time when she refused to respond to

1    an email from you, was there?

2    A.    No.

3    Q.    And certainly at times, in the interest of getting the

4    funds hold removed, you emailed information to Ms. Keryan

5    that you were asking her to consider; do you recall that?

6    A.    I did.

7    Q.    That happened more than once, right?

8    A.    Yes.

9    Q.    And there was never a time where Ms. Keryan told you,

10   please stop emailing, or told you to leave her alone,

11   anything like that, right?

12   A.    Correct.

13   Q.    Now, we talked some about -- I'm sorry, give me one

14   moment.

15          Well, let me back up another question in that

16   series.  Do you recall at several points, Mr. DeVos, that

17   you would email Ms. Keryan and ask her to update you on what

18   the total amount of the funds hold was?

19   A.    Yes.

20   Q.    And there was never a time where she refused to answer

21   that question either, was there?

22   A.    No, that's correct.

23   Q.    We talked a little bit earlier -- or we touched on the

24   vacation rental ban in Florida.  And that vacation rental

25   ban was in place from March 27th through May 18th of this

61

Cross - DeVos

1    year; is that right?

2    A.    I think the 17th -- May 17th it was -- it was removed

3    starting May 18th.

4    Q.    Well, let's clear that up to be sure because in

5    paragraph 29 of your declarations, sir, it says on March 27,

6    2020, the Florida governor issued the COVID-19 executive

7    order stopping termination rentals.  Is it the 27th or the

8    17th that it started?

9    A.    What I was saying -- well, if you look at what I said

10   on page 9, he lifted the order effective May 18th.

11   Q.    Right.  Okay.  But I may have missed what you said.  I

12   apologize.  I just wanted to be sure the ban was in place

13   from March 27, 2020, to May 18, 2020, correct?

14   A.    Yes.

15   Q.    All right.  Thank you.  Now, for a significant portion

16   of that period that the ban was in place -- the short-term

17   vacation rental ban was in place, TSYS also had a hold in

18   place on the Best Beach account, right?

19   A.    Yes.

20   Q.    And do you recall that on May 19, the day after the

21   Florida governor lifted the vacation rental ban, you emailed

22   Ms. Keryan to let her know that the ban had been lifted?

23   A.    Yes.

24   Q.    All right.  So -- and then do you further recall that

25   it was just two days after that on May 21st, that TSYS

1    lifted the hold on the Best Beach account?

2    A.    Yes, I do.

3    Q.    Now, is it consistent with your recollection that as of

4    the date the hold was lifted on, again, May 21st, at that

5    time, TSYS was holding about $1.9 million in Best Beach

6    funds?

7    A.    I have to be honest, I don't remember what the number

8    is.

9    Q.    That's totally understandable.  To refresh your

10   recollection, I would refer you to paragraph 36 of your

11   declarations.  And there you say the amount was about

12   2 million.  We'll go with that.  Is that -- is about

13   2 million the right number?

14   A.    Yes, that is correct.

15   Q.    Now I want to ask you, Mr. DeVos, how that 2 million

16   compares to the value of the transactions that TSYS

17   processed for Best Beach in April and in May of 2020.

18   Offhand, do you happen to know how much TSYS processed in

19   April?

20   A.    According to the TSYS statement, it was $517,000.

21   Q.    Which when you say TSYS statement, what are you

22   referring to?

23   A.    I'm referring to the statement that I get from TSYS

24   every month.

25   Q.    Is that an exhibit -- is it marked somewhere?  I don't

Cross - DeVos

1    know what you're referring to.

2         MR. DOGALI:  I don't think it's an exhibit.  No.

3    BY MR. MEADOWS:

4    Q.   Okay, well, we'll deal with that later.  Let me see if

5    we can put a number on it this way, Mr. DeVos.  Let's go

6    back to Exhibit B.  B as in boy.  Looking at the same page

7    we've been looking at.

8    A.   Okay.  All right.

9    Q.   And on Exhibit B -- and, again, we're looking at the

10   same page, which is page 5 of 5, titled Trailing CB Risk.

11   A.   Yes.

12   Q.   For April, do you see that the sales column says

13   $696,062?

14   A.   I do.  I do.

15   Q.   Is that -- is that consistent with the total dollar

16   volume of funds processed by TSYS in that month?

17   A.   I -- I'm going to -- can I put that -- my answer to

18   that on hold for just a second?  And you're going to hear

19   exactly what I have to say.  Did we not submit --

20   Q.   Well --

21   A.   Sorry.  Never mind.  I'm sorry, never mind.  I'll

22   accept your number.

23   Q.   So we're in agreement on the $696,062 number?

24   A.   Yeah.

25   Q.   All right.  And then for May, the entry in the total

1   sales column is just over 3.5 million.  Do you see that?

2   A.    Yes.

3   Q.    And so do some simple high-level math with me here.  If

4   you add April and May together, you get something in the

5   range of $4.2 million worth of transactions processed by

6   TSYS for those two months, correct?

7   A.    Yes, that is correct.

8   Q.    And the roughly $2 million hold -- reserve account, I

9   should say, that TSYS established by the end of May was less

10  than half of the total volume of processing in those two

11  months; fair to say?

12  A.    Fair to say.

13  Q.    Okay.  Now, with sales increasing from 700,000 to

14  3.5 million from April to May, that's a pretty stunning

15  month-over-month increase; wouldn't you agree with me?

16  A.    Given -- no, I can't agree with you, no.

17  Q.    Okay.  Well, let's maybe go back to your declarations,

18  because there, and in particular in paragraph 38, you

19  declared, As soon as the executive order was lifted, Best

20  Beach Getaways received new reservations and deposits at a

21  frantic pace for the near term --

22  A.    Yes.

23  Q.    -- for 2020 -- I'm sorry, sir, let me finish and I'll

24  certainly allow you to answer.

25  A.    Okay.

Cross - DeVos

1    Q.    In paragraph 38 of your declarations, it says, As soon
2    as the executive order was lifted, Best Beach Getaways
3    received new reservations and deposits at a frantic pace.
4    Correct?
5    A.    That is correct.
6    Q.    And that frantic pace is part of the reason why you --
7    we see the big increase in sales from April to May; is that
8    fair to say?
9    A.    Absolutely.  Absolutely.
10   Q.    And, in fact, in your declarations, you also referred
11   to this increase from April to May to June as an enormous
12   increase in sales.  Do you recall that?
13   A.    Yes.
14   Q.    In paragraph --
15   A.    Yeah.
16   Q.    That's in paragraph 40.  I'm sorry, I'm going to try to
17   not talk over you.  I apologize for that.
18   A.    No, it's fine.
19   Q.    And, in fact, if we look back to Exhibit B again -- I
20   told you we were going to keep looking at this -- so staying
21   true to my word, you --
22   A.    You did.
23   Q.    -- your total sales number for June went up even
24   further.  Now that month is $4.396 million.  Do you see
25   that?

Cross - DeVos

1    A.    Yes, I do.

2    Q.    Is it fair to say that Best Beach's sales in June of

3    this year were the highest it's ever had in its history?

4    A.    Yes.

5    Q.    Now, you recall that -- we talked about earlier TSYS

6    lifted its first hold, I believe it was on May 2 -- was it

7    May 21st or somehow I might have that wrong.

8    A.    I think you have it right.  May 21st.

9    Q.    Okay, good.  May 21st.  And then that hold got

10   reimposed on June 22d; is that right?

11   A.    That's correct.

12   Q.    And so that -- the hold was reimposed during this

13   period of highly increased sales that you referred to in

14   your declarations as frantic, correct?

15   A.    Correct.

16   Q.    And then looking -- I think this is important, I want

17   to refer back to paragraph 38 of the declarations again.  It

18   says, As soon as the executive order was lifted, Best Beach

19   Getaways received new reservations and deposits at a frantic

20   pace for the near term as well as for later 2020 and even

21   into 2021.  Correct?

22   A.    Yes, that's correct.

23   Q.    And just so the Court fully understands, these deposits

24   that you referred to in paragraph 38, those are the deposits

25   that the vacationers pay when they make a booking with Best

1    Beach Getaways, correct?

2    A.   Yes.  That is the nonrefundable advance payment.

3    Q.   Nonrefundable advance payments.  And if you book a

4    vacation that's more than 30 days out with Best Beach, you

5    pay a deposit of about $450, right?

6    A.   Yes.  Yes.

7    Q.   But if you make a reservation for a nearer term,

8    meaning within the same month that you book, again the

9    deposit is the total amount of the rent, correct?

10   A.   It's the total amount of the booking, yes, within 30

11   days.  If --

12   Q.   Gotcha.  But as you say in paragraph 38, this -- amid

13   this frantic pace of new reservations, many of them were for

14   several months out from the date on which the deposit -- the

15   reservations were made, right?

16   A.   Some were, yes.

17   Q.   So for a lot of these new reservations that were being

18   made, it would be impossible to tell whether the customers

19   would seek refunds or chargebacks for several months after

20   the reservations were made, correct?

21   A.   Correct.

22   Q.   And certainly -- you know, we've been focusing on this

23   time frame of May and June of this year for the purposes of

24   these last few questions, so let's kind of look at May

25   and -- look at this from May and June forward.

1      Over the following months, you know, July, August,
2  September, October, of this year, Best Beach is unable to
3  predict what's going to happen with the Corona virus, I take
4  it; is that fair to say?
5  A.   It is fair to say.
6  Q.   And certainly none of us can exclude the possibility
7  that there's going to be a new wave of infections of Corona
8  virus in Florida, can we?
9  A.   We cannot.
10 Q.   We can't exclude the possibility that Best Beach would
11 receive a new wave of requests for cancellations, can we?
12 A.   No, we can't predict the future, no.
13 Q.   And similarly, due to the unpredictable impacts of the
14 Corona virus, it's certainly possible that there will be
15 another spike in Best Beach's chargebacks; fair to say?
16 A.   Once again, I can't predict the future.
17 Q.   Well, you understand, sir, that for purposes of
18 assessing its risk on the Best Beach account, TSYS is trying
19 to make the best assessment it can of what might happen in
20 the future, isn't it?
21 A.   You'll have to ask them.
22 Q.   Well, I'm asking your understanding of what TSYS was
23 doing in analyzing your account.  You had all these emails
24 that -- with Ms. Keryan, you understood that TSYS was trying
25 to assess what its exposure might be in the future, right?

Cross - DeVos

1          MR. DOGALI:  Objection, Your Honor, the --

2          THE COURT:  Objection's sustained.  He doesn't know

3    what was in TSYS's mind.  TSYS can testify --

4          MR. MEADOWS:  Your Honor, I was trying to ask him

5    about his understanding of what TSYS was doing and that's --

6          THE COURT:  The objection's sustained.  You are

7    just -- you know, let's get the evidence in, all right?

8    BY MR. MEADOWS:

9    Q.   All right.  Now, on July 6th of this year, there was

10   the -- there was a hold in place by TSYS, correct?

11   A.   That's correct.

12   Q.   And that was the hold that had been imposed on June

13   22d, correct?

14   A.   Yes.

15   Q.   And on June 6th -- and I'll refer you to paragraph 41

16   of your declarations -- you make reference to an email that

17   you received from TSYS.  Do you remember that?

18   A.   You say July 6th?

19   Q.   I'm sorry, thank you for clarifying.  Yes, July 6th.

20   A.   Yes.

21   Q.   And on -- in that July 6th email, Ms. Keryan had

22   written to you and she says in her email, As we continue to

23   re-assess the exposure on your merchant credit facility, I

24   wanted to reach out to you with some additional requests for

25   information.  Do you see that?

1     A.    Yes, I remember it fairly clearly.

2     Q.    All right.  And -- by the way, after the time that Ms.

3     Keryan sent you this email on July 6th, TSYS was holding

4     right at about $3 million in the reserve; do you recall

5     that?

6     A.    No, to be honest, I do not.

7     Q.    I'll refer you to Exhibit K, please.

8     A.    Hold on.  I have Exhibit K in front of me.

9     Q.    Thank you.  And I believe, sir, that it's on page 10.

10    I know there are multiple emails in this exhibit.  And I'm

11    hopeful that page 10 has an email at the top from Ms. Keryan

12    to you, July 6th of this year at 2:43 p.m.

13              THE COURT:  So can I ask defense counsel --

14              THE WITNESS:  Okay, yes, I see it now.

15              THE COURT:  Let me interrupt for a second.  Why is

16    it that all of your pages aren't Bates-stamped?  Here you've

17    got a Bates-stamped just on the first page.

18              THE WITNESS:  Mine says page 1.

19              THE COURT:  Right.

20              MR. MEADOWS:  Your Honor, what I'm told is that we

21    produced the -- these documents in native and I believe that

22    was per a request from plaintiff's counsel.  That's my

23    understanding.

24              THE COURT:  So you didn't Bates-stamp anything

25    other than the first page.

1          MR. MEADOWS:  Yeah.  My understanding is that in

2     native you can only Bates-stamp the first page of a

3     multi-page exhibit.  I'm -- unfortunately I will not be able

4     to answer any technical questions about why that is.

5          THE COURT:  And there is no page 10.  It's just

6     page 1, 2 -- page 1, 2, page 1, 2.  So what page am I

7     supposed to be looking at?

8          MR. MEADOWS:  It's -- it's easier to start from the

9     back, I believe, Your Honor.  It's -- should be the second

10    to the last page and at the top, like I said, there's an

11    email that's July 6th, 2020, at 2:43 p.m.  That would be the

12    best way to identify it.

13          THE COURT:  Okay.  Starts at, As of today we are

14    holding 3.5.

15          MR. MEADOWS:  Yes.

16          THE COURT:  I got it.

17    BY MR. MEADOWS:

18    Q.   So, Mr. DeVos, do you have that email in front of you?

19    A.   I do.

20    Q.   Is this the page that we're looking at to refresh your

21    recollection that on July 6th you reached out to Ms. Keryan

22    to ask how much TSYS was holding as of that date?

23    A.   Yes.

24    Q.   And she responded that TSYS was holding just over

25    $3 million, correct?

Cross - DeVos

1    A.   She did.

2    Q.   Now, as we talked about a moment ago in Ms. Keryan's

3    earlier email -- the one that kicked off this entire string,

4    she asked Best Beach for some additional information

5    because, as she said, she was looking to re-assess TSYS's

6    exposure, correct?

7    A.   Yes.

8    Q.   And in her email to you on that day, there was a bullet

9    pointed list of all the information she was asking you for,

10   correct?

11   A.   Are we talking about the email on July 6th?

12   Q.   Yes, sir.

13   A.   Yes.

14   Q.   And you ultimately did supply that information to Ms.

15   Keryan, didn't you?

16   A.   I did.

17   Q.   And you got that information to her in response to her

18   requests on July 24, right?

19   A.   Yes.

20   Q.   So almost three weeks after she made the request,

21   correct?

22   A.   July 24th, July 6th, that would be 18 days.

23   Q.   18 days.  Now in that 18 days that it -- between her

24   request and the provision of the information she was asking

25   for, are you aware that the funds hold grew from 3 million

1    to about -- I think it was about 4.65 or $4.7 million?

2    A.    I think it was 4.4, but I may be wrong.

3    Q.    Okay.  Well, so we're all on the same ballpark, we'll

4    go with that for right now.  Now we just established that

5    you responded to her information requests on July 24.  And

6    on July 31st, about a week after she got that information

7    from you, TSYS again lifted the funds hold, correct?

8    A.    Yes.

9    Q.    And TSYS also released $1 million from the reserve

10   account to Best Beach, right?

11   A.    Correct.

12   Q.    Now, do you recall in your efforts to compile the

13   information that Ms. Keryan asked for on July 6th, that you

14   involved Ms. Klanjac in that process?

15   A.    I did.

16   Q.    And you wanted Ms. Klanjac to review -- you were

17   preparing some information that you were going to ask Ms.

18   Keryan to take a look at, correct?

19   A.    That is correct.

20   Q.    And you wanted Ms. Klanjac to take a look at that

21   information before you sent it on to TSYS, right?

22   A.    Absolutely.

23   Q.    Now, did you, in fact, send that information to Ms.

24   Klanjac to have her look at it?

25   A.    I did.

1    Q.    How did you do that?

2    A.    How did I do that?

3    Q.    Yeah, how did you get her the information?

4    A.    I emailed it to her -- I emailed her the report.

5    Q.    And Ms. Klanjac is someone I think you might have

6    mentioned in your declarations.  She's been Best Beach's

7    outside accountant for many years, right?

8    A.    Yes.  I believe four, maybe five.

9    Q.    Okay.  And so Ms. Klanjac's email address is something

10   that you've got in your contacts, correct?

11   A.    I do.

12   Q.    It's not unusual for you to communicate with Ms.

13   Klanjac about Best Beach business matters, right?

14   A.    It is not unusual.

15   Q.    I know you addressed this, we were kind of up to July

16   31st in our timeline here.  At that time we had the return

17   of the million dollars and a lifting of the hold.  I think

18   you clarified -- I think you addressed this in the beginning

19   of your testimony about this past Friday, which I think was

20   August 6th -- August 7th, you knew that TSYS was making an

21   additional release of money from the reserve account,

22   correct?

23   A.    I received that information at 3:40 p.m. on Friday.

24   Q.    That was good news from your perspective, wasn't it?

25   A.    Of course.

Cross - DeVos

1    Q.   And it's something you wanted to share with other

2    people within Best Beach, I take it, right?

3    A.   I'm not sure I understand the question.

4    Q.   Well, let me ask it this way:  Your son, Matt DeVos, he

5    works at Best Beach, doesn't he?

6    A.   He does.

7    Q.   He's the -- is his title senior operations manager or

8    something to that effect?

9    A.   Director of operations.

10   Q.   Director of operations.  Did you let your son, Matt,

11   know, that TSYS was releasing an additional 1.5 million or

12   so?

13   A.   To be honest, I don't recall if I did or not.  I

14   haven't -- I have not been having communications with my

15   team about the conditions that we've been under with TSYS's

16   holds of our funds.

17   Q.   When you say your team, by the way, how many people are

18   you talking about?  How many people work at Best Beach

19   Getaways?

20   A.   We have about 25 people at Best Beach Getaways, but I

21   have a core management team of six people.

22   Q.   Six people.  And your son, Matt, is one of those core

23   six people, I take it?

24   A.   He is.

25            THE COURT:  How much longer do you think you're

Cross - DeVos

1    going to have here?

2              MR. MEADOWS:  Your Honor, I think a good estimate

3    would be about 20 minutes.

4              THE COURT:  Okay.  We're going --

5              MR. MEADOWS:  Frankly, I've not been keeping track.

6    I don't know how long we've been going.

7              THE COURT:  Well, it's 11:00.  We took about 45

8    minutes to do our opening, and so you've been going about an

9    hour and 15.

10             COURTROOM DEPUTY:  He, himself, has been going --

11             MR. MEADOWS:  I --

12             COURTROOM DEPUTY:  He started at 9:59, so he's been

13   going for 58 minutes.

14             THE COURT:  So you've been going to 58 minutes.

15   Thank you very much, Courtroom Deputy, but the court

16   reporter needs a break so we're going to take a break for 10

17   minutes.  Does that work?

18             MR. MEADOWS:  Certainly.

19             THE COURT:  So we'll start back up at -- let's do

20   10 after.  That will be 12 minutes.

21        (Recess taken 10:58 a.m. to 11:11 a.m.)

22             THE COURT:  We're back on the record.  We're back.

23             MR. DOGALI:  My apologies, Your Honor, we're all

24   here.

25             THE COURT:  Okay.  We are back on the record.  If

1    we could start up again, please.  And I just want to tell

2    defense counsel you've been going about an hour.  You have

3    another 20 minutes here, and then you want to cross-examine

4    their accountant, and then you want to have redirect of your

5    own witnesses.  Your two hours are being consumed, so . . .

6        MR. MEADOWS:  Thank you, Your Honor.  I think we

7    can wrap this up fairly quickly.

8        THE COURT:  Okay.

9    BY MR. MEADOWS:

10   Q.   All right, Mr. DeVos, I want to switch gears a little

11   bit and ask you about Best Beach's refund policy, which is

12   addressed starting on page 5 of your declarations.  Are you

13   with me?

14   A.   I'll get there.

15   Q.   Okay.  Sure.

16   A.   Apologies, I'm there now.

17   Q.   Okay.  Thank you.  Now, to try to shortcut through some

18   of this, it's fair to say that Best Beach has a no-refunds

19   policy with respect to its vacation rentals, correct?

20   A.   Correct.

21   Q.   And I think as you say in your declaration, Best Beach

22   enforces that no-cancellations policy, correct?

23   A.   Correct.

24   Q.   In fact, paragraph 16, you say Best Beach Getaways

25   routinely denies such requests for refunds as we have an

1    obligation to enforce the reservation agreement.  Fair?

2    A.    Yes.

3    Q.    Now, your Best Beach's policy of refusing refunds has

4    continued even through the impacts of the Corona virus,

5    correct?

6    A.    It -- please repeat that.  I didn't get all of that.

7    Q.    Your policy of enforcing -- strictly enforcing the

8    no-refunds policy has continued through the Corona virus

9    pandemic, correct?

10   A.    Yes.

11   Q.    In fact, do you recall giving a declaration in this

12   case earlier on June 26th, 2020?  It's Exhibit LL.

13   A.    Uhm-hum.  I see Exhibit L.

14            MR. DOGALI:  LL.

15   BY MR. MEADOWS:

16   Q.    LL.  Yeah, that's a better way to say it.

17   A.    Would that be at the back end, then?  Not in --

18   Q.    It's sequentially.

19            MR. DOGALI:  I think what happened, it might be one

20   of the exhibits that was produced on Saturday and I do not

21   have hard copies of those.

22   BY MR. MEADOWS:

23   Q.    All right.  Let's try to move through it because

24   obviously we are short on time.

25            So, Mr. DeVos, let me go at it this way.  We talked

1    about your enforcement of the no-cancellations policy.  Best

2    Beach enforced that no-cancellations policy even during the

3    period in which the Florida governor banned short-term

4    vacation rentals, didn't it?

5    A.    No.

6    Q.    Well, the reason I was referring you to Exhibit LL --

7    and I'll try to read it.  If we need to find it, then we

8    need to find it, because it was a declaration you gave in

9    the case on June 26th, prior to the transfer of this case to

10   the District of Colorado.  I want to read you -- a quote to

11   you and see if you remember saying this in a sworn

12   declaration.  And here you are referring to the governor's

13   vacation rental ban.  And what you said was, Effectively,

14   for the period between the two orders, the Governor canceled

15   our guests' reservations.  Some of these guests requested

16   refunds.  Notwithstanding some sympathies relating to the

17   COVID-19 situation, Best Beach Getaways continued to

18   routinely deny the guests' refund requests, as our property

19   owner clients would expect.

20         Does that ring a bell as something that you gave in

21   a sworn declaration?

22   A.    On June 26th?

23   Q.    It was in opposition to our motion to transfer this

24   case to the District of Colorado, if that helps you.

25   A.    I don't have that in front of me.  Apologies for

Cross - DeVos

1    that.

2    Q.    But doesn't it jog with your recollection --

3    A.    And --

4    Q.    Go ahead.

5    A.    Is there -- will you allow me the ability to walk

6    through the logic of all that?

7    Q.    Well, I want to first establish the fact.  I mean, from

8    the quote that I just read --

9    A.    -- the document --

10   Q.    -- it seemed to be that you were testifying that even

11   during the period in which short-term vacation rentals were

12   illegal, Best Beach continued to deny refund requests made

13   by affected guests.  True?

14   A.    For outside the period of the short-term rental ban,

15   yes.

16   Q.    But during -- but your testimony now is that while the

17   short-term rental ban was in effect, you did honor the

18   refund requests?

19   A.    We gave guests two options:  One was to refund them

20   with a -- with a processing fee; the other was to reschedule

21   their vacation.

22   Q.    All right.  So I'll move on, but I want to ask one more

23   time, because the declaration on June 26th does say that for

24   the period between the two orders, the governor canceled our

25   guest reservations.  Some of these guests requested refunds.

1    Notwithstanding some sympathies related to the COVID-19
2    situation Best Beach Getaways continued to routinely deny
3    the guest refund requests.  Is the statement that I just
4    read not true?
5    A.    The statement is true but the circumstances are not.
6    If we were talking about the period in time in which there
7    was a short-term rental ban, we offered the guests two
8    options:  One, get a -- take a refund with the processing
9    fee; two, reschedule your vacation.  If they were scheduled
10   for some period of time later on in the year and wanted to
11   cancel, we did not -- we told them that their advance
12   payments were not refundable.
13   Q.    A lot of your guests took umbrage with the policy --
14   the no-refunds policy this year; isn't that fair to say?
15   A.    Yes.
16   Q.    Was that a yes?
17   A.    A lot -- a lot of our guests who want to cancel take
18   umbrage with our no-refund policy, that is correct, and not
19   just this year.
20   Q.    Well, let's focus on this year because I'm talking
21   about people who are affected by the COVID-19 pandemic.
22   You've had a lot of customers who, citing the pandemic, have
23   wanted to cancel their vacations, and by and large you've
24   told them, Tough luck, we're not giving you a refund, fair?
25   A.    Outside of the short-term rental ban, fair.

Cross - DeVos

1   Q.   Now, when -- I think we covered this earlier, but to be
2   clear, when you deny a refund to a guest who requests them,
3   that guest's only recourse is to file a chargeback, right?
4   A.   Yes.
5   Q.   And a lot of your -- we've been through this.  We saw
6   that there were a lot of chargebacks in March and April and
7   June, right?
8   A.   Yes.
9   Q.   And on at least a few occasions, Best Beach has
10  challenged the validity of those chargebacks, right?
11  A.   Yes.
12  Q.   And as you say in your declaration at paragraph 17, the
13  guests' credit card companies routinely overrule our
14  decision and grant refunds anyway, correct?
15  A.   Correct.
16  Q.   So you're -- when you challenge these chargebacks,
17  you're generally losing, right?
18  A.   I'm sorry, I am not sure how to answer that.  Are you
19  talking about this year or are you talking about over time?
20  Q.   I'm talking about this year, and your statement that,
21  The guests' credit card companies routinely overrule our
22  decision and grant refunds anyway.
23  A.   Yeah.  This year, yes.
24  Q.   Yeah.  So this year when you challenged the
25  chargebacks, the credit card companies have ruled against

Cross - DeVos

1    you.

2    A.    They often do and many of them we have not received

3    termination on back from March and April --

4    Q.    Okay --

5    A.    -- and April and May.

6    Q.    Isn't it true that in many instances the credit card

7    companies have ruled against you when you challenged

8    chargebacks because Best Beach does not disclose its

9    no-refund policy in compliance with VISA and MasterCard

10   operating rules?

11   A.    I don't know how -- is it true?  I don't know how to

12   answer that because I don't know -- I don't know the

13   proper -- I don't know -- I don't know -- when I receive

14   a -- when I receive a denied letter, a denied letter doesn't

15   explain why.

16   Q.    Well, have you done anything to figure out why it is

17   that the credit card companies are routinely ruling against

18   you when you challenge chargebacks?

19   A.    Say that one more time.

20   Q.    Sure.  Have -- have you done anything to try and figure

21   out why it is that VISA and MasterCard are routinely ruling

22   against you when Best Beach challenges chargebacks?

23   A.    We -- yes.

24   Q.    And so -- well, then, let me ask my previous question

25   again:  Is it your understanding that VISA and MasterCard

1    have concluded that Best Beach does not disclose its

2    no-refund policy on its website --

3    A.    No.

4    Q.    -- as the -- as the operating rules require?

5    A.    I'm sorry, ask that one more time because I had two

6    answers in my head when you asked that.

7    Q.    Okay.  Sure.  Isn't it your understanding that VISA and

8    MasterCard have been overruling your chargeback challenge

9    because they had found that Best Beach is not disclosing its

10   no-refund policy on its website in compliance with VISA and

11   MasterCard's rules?

12   A.    No.

13   Q.    What is your understanding, then?

14   A.    I don't have an understanding, considering the fact

15   that our no refund policy, No. 1, is on our website and, No.

16   2, it's prominently displayed in the rental agreement which

17   the guests sign.  And up until this year -- and up until

18   this year, it has not been a significant impact on our

19   business.

20           Once it became a significant impact, I asked our

21   attorney to help me redraft our language for our rental

22   agreement so that it made it much clearer.

23           THE COURT:  Can I interrupt.  We've had --

24   BY MR. MEADOWS:

25   Q.    Sir --

1          THE COURT:  Stop for -- stop, stop.  We've had

2     somebody join, Samuel Hewitt.  Mr. Hewitt, who are you?

3          MR. MEADOWS:  Your Honor -- you're on mute, Sam.

4     Your Honor, Mr. Hewitt is our expert witness.  We cued him

5     up 15 minutes prior to when we thought it would be

6     necessary, as we talked about Friday.

7          THE COURT:  Okay.  But as your expert rule

8     against -- on sequestration doesn't apply so he's entitled

9     to be here.  So, okay, go ahead.

10          MR. MEADOWS:  Okay.  All right, thank you, sir.

11     BY MR. MEADOWS:

12     Q.  Well, let me ask you this way, Mr. DeVos:  Are you

13     aware that VISA and MasterCard have rules for how merchants

14     who accept their payments have to disclose no-refund

15     policies for online transactions?

16     A.  I am now.

17     Q.  When did you become aware of that for the first time?

18     A.  When I reviewed the testimony of Heidi Keryan's boss.

19     Q.  Mark Fenton?  You reviewed his declaration?

20     A.  Yes, correct.

21     Q.  Okay.  And so that couldn't have been more than about a

22     week ago, right?

23     A.  That is correct.

24     Q.  So prior to that, you didn't know at all -- I'm sorry,

25     go ahead.

Cross - DeVos

1    A.   It actually was much less than a week ago.  Sorry.

2    Q.   Okay.  No, no.  Thanks for the clarification.

3         So just to be 100 percent clear, prior to that,

4    you, as the president of Best Beach Getaways, did not know

5    that VISA and MasterCard have rules governing the disclosure

6    of no-refund policy for the merchants who accept their

7    payments?  You didn't know that?

8    A.   That is correct.

9    Q.   All right.  And so as we sit here right now, your --

10   are you aware that Best Beach's website in the sequence of

11   steps that it takes to book a reservation still doesn't

12   comply with the VISA and MasterCard disclosure rules?

13   A.   I am not aware.

14   Q.   You're not aware of that?

15   A.   Our rental agreement is on our website.

16   Q.   The rental agreement, by the way, is not provided to

17   guests who book vacations with you until after their card is

18   charged for the deposit, correct?

19   A.   That is correct.

20   Q.   I want to ask you about Best Beach's finances briefly,

21   Mr. DeVos.  Best Beach has an account with the online

22   brokerage E*TRADE, does it not?

23   A.   We do.

24   Q.   And as we sit here right now, there's about

25   $1.8 million in that E*TRADE account, correct?

Cross - DeVos

1    A.    There is.

2    Q.    And in the past in communication with TSYS, you have

3    included the value of that E*TRADE account on the Best Beach

4    balance sheet; do you recall that?

5    A.    Yes.

6    Q.    Now, do you recall that Best Beach initially filed this

7    lawsuit around May 28th or 29th of this year?

8    A.    Sounds about right, yes.

9    Q.    Now, from that time forward, Best Beach has -- has

10   intended that it's at risk of going out of business,

11   correct?

12   A.    Yes.

13   Q.    Now, over that same time, sir -- again, we'll take it

14   from late May forward -- has Best Beach done anything to try

15   to reduce its expenses?

16   A.    Business expenses?

17   Q.    Yes.  Reduce its expenses, yeah.

18   A.    Yes.

19   Q.    Are you aware that even as late as July of this year,

20   Best Beach continues to pay the monthly country club dues of

21   its -- of your partner, Mr. Underhill?

22   A.    Yes.

23   Q.    Are you aware that just in July of this year, Best

24   Beach paid a $260,000 tax bill for -- that Mr. Underhill had

25   personally?

Cross - DeVos

1   A.    Yes.

2   Q.    And are you aware that your personal tax bill was paid

3   from the Best Beach account in July of this year?

4   A.    Yes.

5   Q.    And are you aware that together those two tax payments

6   to the IRS for you, for Mr. Underhill, total more than

7   $300,000?

8   A.    I am.

9   Q.    Are you aware that even through July, Best Beach

10  continued to pay Mr. Underhill's heating bill -- his power

11  bill, I should say?

12          MR. DOGALI:  Your Honor, I object to the line of

13  questioning on the basis of relevance.  I'm not sure where

14  TSYS is quite audacious to say if you weren't -- if you were

15  more reasonably spending your money, I could take more of

16  your money.

17          I'm not sure how it connects to the fact that TSYS

18  has been diverting so much of the Best Beach Getaways' cash.

19          THE COURT:  I'll overrule it, but I think you made

20  your point.

21          MR. MEADOWS:  Thank you, Your Honor.

22  BY MR. MEADOWS:

23  Q.    A related point, but it's a much bigger amount, Mr.

24  DeVos.  Are you aware that there was a withdrawal from -- or

25  a transfer, I should say, from the Best Beach checking

1    account in July to something called CMOL, cash management

2    online?

3    A.    I am.

4    Q.    And it was a transfer of about $1.3 million, correct?

5    A.    Yes.

6    Q.    And we --

7    A.    Yes.

8    Q.    You've given TSYS no indication in this litigation of

9    what that transfer was for, have you?

10   A.    I don't know that the question was asked, but I'm happy

11   to give it to you now.

12   Q.    What was it for?

13   A.    Yes, that is -- CMOL is BB and C cash manager online.

14   It's used to pay our owners electronically for the owners

15   fee who have an electronic transfer account and don't want

16   checks.  And --

17   Q.    That --

18   A.    -- that owner, it happens every month through CMOL.

19   Q.    Are you aware that the amount that was transferred in

20   CMOL in July was much, much higher than we've seen in any

21   prior month during 2020?

22   A.    Yes, I am.

23   Q.    Let me ask you -- let's go back to the E*TRADE account

24   for a moment, Mr. DeVos.  Do you review the statements from

25   the E*TRADE account?

1    A.   Do I review them?  Typically no.

2    Q.   Typically no?  There's a lot of trading that goes on in

3    that account.  Are you aware of that?

4    A.   I am.

5    Q.   Are you aware --

6    A.   It's -- my business partner and I have phone

7    conversations about that fairly regularly.

8    Q.   I see.  Well, then, are you aware that on May 28th of

9    this year, which is the day before Best Beach filed this

10   lawsuit, Best Beach spent more than a million dollars to

11   acquire about 30,000 shares of a company called Micron

12   Technology?

13   A.   Yes.

14   Q.   And I take it you're also aware that on July 23d, which

15   is the day before Best Beach filed an emergency motion

16   before this Court, that Best Beach spent, looks like about

17   more than $2 million to buy shares of Amazon.  Are you aware

18   of that?

19          MR. DOGALI:  Your Honor, I renew the objection, but

20   it's a little different as to the E*TRADE account for the

21   reason that it isn't even liquid cash as Mr. Meadows was

22   referring to before.

23          THE COURT:  Well, but if they've got in excess of

24   $1 million in an E*TRADE account, shouldn't that be in

25   their -- I think it probably ought to be in their financial

Cross - DeVos

1    statement as available cash and they could liquidate it.  It
2    might take a couple of days.  But I'll allow it.
3    BY MR. MEADOWS:
4    Q.   So just -- could I have an answer to my question, Mr.
5    DeVos?  Are you aware that on July 23d, Best Beach spent
6    over $2 million to buy shares of Amazon?
7    A.   No.
8    Q.   Now, at the beginning of your testimony, you and your
9    counsel made some corrections and updates to the financial
10   charts that appear on pages 14 and 15 of your declaration.
11   I'm sure you remember, right?
12   A.   I do.
13   Q.   Now, I'm not going to ask you about those corrections,
14   but I do want to ask you the value of the Best Beach E*TRADE
15   account is not reflected in any of the balances in the
16   charts on pages 14 or 15 of your declaration; is it?
17   A.   No.
18   Q.   So just to be very clear, on page 14, there's the
19   chart, and there's a number for cash on hand, 2.1 million,
20   right?
21   A.   Yes.
22   Q.   And that does not include -- well, let me back up.
23        The value of the E*TRADE account as of 7-30-20 was
24   about $1.8 million, right?
25   A.   Sounds about right.

Cross - DeVos

1   Q.   Sounds about right?  And that $1.8 million just got

2   left off of the cash balance of 2.1, fair?

3   A.   Yes.

4   Q.   Mr. DeVos, over this time since filing the lawsuit when

5   Best Beach is in desperate financial straits per its

6   allegations, have you sought -- has Best Beach sought

7   private financing of any kind to help it through this

8   period?

9   A.   No.

10  Q.   Haven't applied for a loan, have you?

11  A.   Nope.

12  Q.   Not a credit facility, not anything, have you?

13  A.   None.  No.

14  Q.   What about you and Mr. Underhill?  You're the owners of

15  the business, right?

16  A.   Yup.

17  Q.   And have either of you considered -- or have either of

18  you made a capital contribution to the company this year?

19           MR. DOGALI:  Your Honor, I object again as to

20  relevance for the reason that this is not only how Best

21  Beach spends its money, but how individuals might make a

22  contribution to it to make up for a shortfall caused by

23  TSYS --

24           THE COURT:  Yeah, I --

25           MR. DOGALI:  I have only one client --

Cross - DeVos

1          THE COURT:  The objection's -- the objection's

2     sustained.  You're getting a little far afield, counsel,

3     so . . .

4          MR. MEADOWS:  Okay.  Your Honor, could I just have

5     one moment to verify that I'm about done?

6          THE COURT:  Sure.

7          MR. MEADOWS:  Mr. Underhill -- I'm sorry, Mr.

8     DeVos, please excuse me, no further questions subject to

9     redirect and the Court's rulings.  Thank you.

10          THE COURT:  Okay.  I had a couple of questions --

11          THE WITNESS:  Thank you.

12          THE COURT:  I had a couple of questions for Mr.

13     Dogali -- or for Mr. DeVos before Mr. Dogali directs.

14          Tell me about the E*TRADE account.  Why wasn't it

15     on the financial statement and -- I mean, is that not

16     $1.8 million that, worst-case scenario, could be liquidated

17     and utilized to fulfill the company's obligations?

18          THE WITNESS:  It -- the account is a trade -- it's

19     a trade account that my partner uses from funds that he had

20     and I earned years back and really is not subject to being

21     part of the company.  We pay tax on it, but it's a -- an

22     account which we have set aside from prior earnings.  It

23     really is not part of our ongoing business operation.

24          THE COURT:  Well, but from an accounting

25     perspective, I mean, are you saying that you've commingled

1    your personal funds and accounts to avoid -- I don't know

2    why you've done that, but why would you do that?

3           THE DEFENDANT:  We set the funds aside.  We did not

4    distribute them.  We put them into an account that we could

5    use to trade on the stock market that my partner primarily

6    does, and we kept it -- we kept it in the company because we

7    each own part of it and we each own part of the company.

8           THE COURT:  Well --

9           THE WITNESS:  But we haven't commingled any funds.

10   We've kept it separate.

11          THE COURT:  Are they assets of the company?

12          THE WITNESS:  Yes.

13          THE COURT:  Okay.  So worst-case scenario -- I

14   mean, if you were to go into bankruptcy, somebody would view

15   that as assets of the company, right?  You made a conscious

16   decision --

17          THE WITNESS:  Say again.

18          THE COURT:  -- not to distribute and you're

19   hopefully making profit on your E*TRADE.  That's a branch of

20   this company that's doing that, right?

21          THE WITNESS:  I -- I guess I would have to answer

22   in the affirmative.

23          THE COURT:  Okay.  Let me see if I had any other --

24   in terms of -- there was a -- I think it was Exhibit B that

25   they showed the percentage of chargebacks going up

1      dramatically.  And I'm trying to understand why that would

2      be the case.  And is it the case because the number of

3      rentals went down as people cut back on their vacations and

4      then the number of requests for refunds, which were then

5      denied by you pursuant to your policy, went up well in

6      excess of your historic -- the history, right?  I mean,

7      these were dramatic changes --

8                 THE WITNESS:  Yes.

9                 THE COURT:  Is that basically what might account

10     for the big numbers of chargebacks there in March, April,

11     and May of 2020?

12                THE WITNESS:  March and April.  Yes, Your Honor.

13     It's -- if you book -- again, you can -- you can -- you can

14     tie all of this back to the -- to the two things:  One, the

15     pandemic; two, the governor's short-term -- ban on

16     short-term rentals.  Once the governor lifted the ban,

17     people wanted heavily to go on vacation.

18                THE COURT:  And I had one other question that I was

19     going to ask, but it seems to have escaped me.  Okay.  With

20     that, those were my questions.

21                Mr. Dogali, go ahead.

22                MR. DOGALI:  Actually, Your Honor, we are -- the

23     plaintiff would hope to have a very, very brief rebuttal at

24     the end and if there's an opportunity for a brief rebuttal

25     case, there will not be redirect right now.

1          THE COURT:  Okay.  I'll ask defense counsel if you

2     have any follow-up to my questions.

3          MR. MEADOWS:  Very -- well, actually, no, Your

4     Honor, I don't.  I'm sorry.

5          THE COURT:  Okay.  Then, Mr. Dogali, if you want to

6     call your next witness, please.

7          MR. DOGALI:  Plaintiff calls Sherry Klanjac to be

8     sworn.

9          THE COURT:  Yes.

10          COURTROOM DEPUTY:  Please raise your right hand.

11          SHERRY KLANJAC, PLAINTIFF'S WITNESS, SWORN

12          COURTROOM DEPUTY:  Please state and spell your full

13     name for the record.

14          MR. DOGALI:  He asked you to state your full name.

15          THE WITNESS:  Sherry Klanjac.

16          THE COURT:  And if you could spell that, please.

17          THE WITNESS:  S-h-e-r-r-y.  Last name is K, as in

18     kitten, l-a-n, as in nothing, j-a-c.

19          THE COURT:  Okay.  Mr. Dogali.

20                         DIRECT EXAMINATION

21     BY MR. DOGALI:

22     Q.   Ms. Klanjac, you have in front of you the declaration

23     you signed in the case?

24     A.   Yes, I do.

25     Q.   And does it reflect, subject to some correction or

1  supplementation as I went through with Mr. DeVos, your

2  accurate testimony as of today?

3  A.  Yes, it does.

4          MR. DOGALI:  I don't remember whether we moved for

5  both declarations into evidence.  If we did not, I would

6  move Ms. Klanjac in at this time.

7          THE COURT:  Any objection, defense counsel?

8          MS. PEURACH:  No objection.

9          THE COURT:  Okay.

10  BY MR. DOGALI:

11  Q.  Ms. Klanjac, then, turn --

12          THE COURT:  So just so the record's clear, the

13  declarations of both Mr. DeVos and Sherry Klanjac are

14  admitted into evidence subject to cross-examination.

15  BY MR. DOGALI:

16  Q.  Turn, if you would, to page 3 of your declaration.

17  That reflects both of the tables that Mr. DeVos talked

18  about?

19  A.  Yes, it does.

20  Q.  Now, the first line item, the cash on hand, 731.20, why

21  does that not include the E*TRADE account?

22  A.  Because it's pretty clear in all accounting, the

23  accounting that short-term investments and equity security

24  would be reflected as a current asset rather than -- they're

25  not a cash equivalent, it is an equity secure.

Cross - Klanjac

1    Q.    Let me ask you if you have knowledge from your review

2    of the financial statements over the years of how much that

3    Best Beach Getaways pays every year approximately in credit

4    card processing fees?

5    A.    Overall the credit card processing fees are over

6    $220,000 total per year.

7    Q.    That's fair to say that's reflective of about

8    90 percent of that is VISA?

9    A.    Probably so, yes.

10           MR. DOGALI:  I don't have any more questions for

11   the witness, Your Honor.

12           THE COURT:  Okay.  Defense counsel.

13           MS. PEURACH:  Yes, Your Honor.  Alex Peurach for

14   TSYS.

15           THE COURT:  Okay.  And just -- the video is showing

16   your co-counsel rather than --

17           MS. PEURACH:  Let me move that.  That's probably a

18   little weird.  Let me get that moved around.  Okay.  Can you

19   all see me?

20           Ms. Klanjac, can you see me?

21           THE WITNESS:  Yes, I can.

22                       CROSS-EXAMINATION

23   BY MS. PEURACH:

24   Q.    Hi, I'm Alex Peurach.  I have just a few follow-up

25   questions for you in response to the admission of your

Cross - Klanjac

1    declaration and the testimony you just gave.

2         So I understand --

3         THE COURT:  Let me stop for one second.  Stop.

4         Ms. Klanjac, if you could pull that tabletop

5    microphone.  You're looking up at the screen when you answer

6    and you just need to be close to that mic.  It would -- it

7    pulls towards Mr. Dogali when he was questioning, but you

8    just need to try and speak into that so it's clear to

9    everybody.  All right.  Go ahead.

10        MS. PEURACH:  Thank you.

11   BY MS. PEURACH:

12   Q.  So I understand in your declaration, you included two

13   charts of cash flow projections.  One for the projections of

14   cash on hand as of August 16th, right?

15   A.  Yes.  You mean in the affidavit, itself?

16   Q.  Yes.

17   A.  Yes.

18   Q.  And that's at paragraph 10?

19   A.  Yes.

20   Q.  And then you also included a cash flow projection for

21   projecting cash on hand for Best Beach as of September 15th,

22   2020; is that right?

23   A.  That's correct.

24   Q.  And that's at paragraph 12, right?

25   A.  Correct.

Cross - Klanjac

1    Q.   And in submitting your declaration into evidence,

2    you've submitted both of those cash flow projections subject

3    to the adjustments that Mr. DeVos made earlier this morning;

4    is that right?

5    A.   That's correct.

6    Q.   I just want to make sure that we're clear.  So starting

7    with the cash on hand estimate as of July 31st, 2020, you

8    projected $2,132,632, right?

9    A.   Correct.

10   Q.   And as you've just testified, that did not include the

11   value of the E*TRADE account as of July 31st, right?

12   A.   No, it did not.

13   Q.   Are you aware that the value of the E*TRADE account

14   that Best Beach has as of July 31st was $1,889,085.71?

15   A.   I don't have that information in front of me, but it

16   sounds accurate.

17   Q.   Okay.  Now I'd like to direct your attention to

18   paragraph 8 of your declaration.

19   A.   Yes.

20   Q.   In that paragraph, you state that you prepared several

21   reports and spreadsheets for Best Beach, one of them being a

22   projected balance sheet for 2019; is that right?

23   A.   That is correct.  That's what I put.

24   Q.   And that's Exhibit 26?

25   A.   Yes.

Cross - Klanjac

1   Q.   Can we look at Exhibit 26 real quick.  Let me know when

2   you get there.  I know it's a little cumbersome.

3   A.   Oh, I see it.  All right.

4   Q.   And so is Exhibit 26 the balance sheet that you

5   prepared?

6   A.   Yes, it is.

7   Q.   Okay.  And Exhibit 26 is the balance sheet for Best

8   Beach as of -- for the year ended December 31st, 2019,

9   right?

10  A.   Correct.

11  Q.   And that -- in the assets category includes Best

12  Beach's E*TRADE account, right?

13  A.   Yes, it is an asset.

14  Q.   Are you aware that this balance sheet that includes the

15  E*TRADE account was provided by Best Beach to TSYS in

16  connection with TSYS's ongoing review of Best Beach's

17  reserve account?

18  A.   Yes, at some point I think you were provided with this.

19  Q.   Okay.  Now I want to look back at the projections that

20  you included in your declarations.  So you can move that big

21  binder to the side for a moment, probably it will be a

22  little easier for you.

23        So if you look at the first cash flow projection

24  that you prepared -- or you included in your declaration

25  projecting cash on hand as of August 16th, 2020, Mr. DeVos

1    testified to adjustments to the line item for the projected

2    additional prepayments that Best Beach expected to receive

3    between August 1st and August 14th.  Do you remember that?

4    A.    Yes.

5    Q.    You testified that that 1.1 figure did not take into

6    account TSYS's release of the funds hold as of July 31st,

7    2020, right?

8    A.    What I understood him to say was that he included

9    1,100,000 where -- and the number should have been

10   1,500,000, which would have included additional releases

11   from TSYS.

12   Q.    Right.  So I want to go over that number.  So that's

13   exactly right.  So what I heard him say was the mistake in

14   this figure here in your declaration is that the

15   $1.1 million reflects the $1 million that TSYS released on

16   July 31st, plus $100,000 that Mr. DeVos estimated Best Beach

17   would receive from AmEx during that period; is that right?

18   A.    It wouldn't be just AmEx, it would be like AmEx and

19   cash and any other miscellaneous money to have coming in

20   from other websites.

21   Q.    So is it fair to call this $100,000 from sources other

22   than TSYS processing?

23   A.    Yes.

24   Q.    Okay.  So when he testified earlier, he said that in

25   light of TSYS's release of the hold of future funds, it

Cross - Klanjac

1    should include an additional $400,000 in funds that would be

2    processed by TSYS; is that right?

3    A.    I think he was referring to the hold, that there was an

4    extra $400,000 that was released by TSYS.

5    Q.    So are you aware that TSYS released a million dollars

6    in funds as of July 31st, 2020?

7    A.    I am now, yes.

8    Q.    Okay.  Does that $1.1 million figure in your

9    declaration include the release of those funds?

10   A.    Yes, it does.

11   Q.    Okay.  So what Mr. DeVos said earlier was that he would

12   add $400,000 to that figure to reflect the fact that that

13   incoming fund between August 1st and August 14th were no

14   longer being held by TSYS; is that right?

15   A.    Yes, I believe so.

16   Q.    So, in other words, those are projections of an

17   additional $400 in prepayments to Best Beach from August 1st

18   to August 14th, right?

19   A.    Yes.

20   Q.    Okay.  I just want to talk about that projection.  If

21   you could turn to Exhibit BB.  This is a cash flow

22   projection that was provided by Best Beach to TSYS.  Just

23   let me know when you get there.

24   A.    Yes.  Can I correct something?  After I'm looking at

25   this, I think the 400,000 must be some advanced deposits or

Cross - Klanjac

1    something else.  I'm not really sure.  But it's brought the

2    number up to 220,000 including the release of the

3    $1 million.

4    Q.   I'm trying to figure out what this $400,000 projection

5    includes.  And let me -- we'll walk through why.  So let's

6    look at Exhibit BB, which is the cash flow projection that

7    Best Beach provided TSYS.  Do you have it in front of you?

8    A.   I do not have it in front of me.

9    Q.   Okay, let me know when you get it.

10              MR. DOGALI:  If we can have just one moment, I

11   might be able to -- unfortunately I think that's in another

12   room.

13              THE COURT:  Go ahead and get that.  It's the second

14   set of notebooks -- or the second notebook.  It was provided

15   to me in a black binder.

16              MS. PEURACH:  This might be where LL was earlier.

17   I think it's in the same binder.

18              MR. DOGALI:  Thank you, Your Honor.  I believe the

19   double letter exhibits are the ones that arrived Saturday.

20   I don't have copies of those -- hard copies.  I can't -- I

21   can show it to the witness as a PDF, if you like, on my

22   laptop.

23              THE COURT:  All right.

24              MS. PEURACH:  I can -- and I can try, Your Honor,

25   to walk through this document with representations, but I

1    would hate for the witness not to have the benefit of seeing
2    it in front of her.
3            THE COURT:  Well, if she can pull up the document
4    in a PDF, that might solve the problem.
5            MR. DOGALI:  It's marked as Exhibit BB, as in boy?
6            MS. PEURACH:  B as in boy.  BB.  Yes.
7            MR. DOGALI:  I'm showing that to her now.
8    BY MS. PEURACH:
9    Q.   Ms. Klanjac, do you have Exhibit BB in front of you?
10   It's two different charts of projected cash flows for 2020
11   and, I think, 2021.  I would like to direct your attention
12   to the 2020 projections.
13   A.   All right, I'm looking at it now.
14   Q.   Okay.  Did you prepare this document?
15   A.   No, I did not.
16   Q.   Have you ever seen this document before?
17   A.   Yes, I have.
18   Q.   Have you reviewed this document?
19   A.   I did.
20   Q.   Have you verified it for reliability?
21   A.   I believe that this is the one that I noticed -- and
22   I'm not a hundred percent, but I believe this is the one
23   that there was a second version and it was slightly
24   different.  It was -- there was an error somewhere in it.
25   Q.   Do you recall what that error was?

Cross - Klanjac

1    A.    I would have to pull up my laptop and I just noticed

2    that my battery is dead.  I had it on earlier so it will

3    need a little bit of time.

4    Q.    Let me ask you this:  The question I have relates to

5    the projection of guest payments in August of 2020 in

6    Exhibit BB.  Do you recall if the error related to that

7    figure?

8    A.    I don't -- I don't -- I don't remember.  I just don't

9    remember.

10   Q.    Ms. Klanjac, Exhibit BB, the cash flow projection from

11   2020 includes projected guest payments for August of 2020

12   of -- do you see $1,320,661?  Do you see that?

13   A.    I'm looking for it.

14          This looks like it starts July, August, September,

15   October, November, December.  Is that correct?  So --

16   Q.    That's how I read it, yes.

17   A.    So the second column?  The 1,320,661, yes, I do see

18   that.

19   Q.    Okay.  So that's the estimate of Best Beach's cash flow

20   for August 2020, right, from nonrefundable guest payments?

21   A.    Correct.

22   Q.    So if you were estimating the projected payments to

23   Best Beach for the first half of August, wouldn't it be fair

24   to divide that number by two?

25   A.    No, I think -- I believe -- and I could be mistaken,

1    but I believe this is guest payments, but it doesn't take

2    into account the hold.

3    Q.   And I'm not talking about the hold, I'm talking about

4    the amount of cash coming to Best Beach in August were

5    repayments or deposits.

6    A.   All right, I'm not trying to be -- right.  And I'm not

7    trying to split hairs, but I don't know exact -- I had to

8    rely on them for the two-week period that -- when the

9    advanced deposits would be coming in.

10   Q.   And did they represent to you that that would have been

11   $400,000?

12   A.   Yes.

13   Q.   And here looking at Exhibit BB, the August projections

14   are 1.32 million; isn't that right?

15   A.   Correct.

16   Q.   Okay.  And about half of that would be about $660,000,

17   not $400,000, right?

18   A.   Correct.

19            THE COURT:  And I'm -- counsel, I've lost you.

20   Where -- I'm looking at Exhibit BB --

21            MS. PEURACH:  Sure.

22            THE COURT:  -- which column and which line?

23            MS. PEURACH:  Sure, Your Honor.  So the cash flow

24   projection for 2020 that Best Beach provided, unfortunately

25   it doesn't have the month listed at the top, but it's

Cross - Klanjac

1    represented to be as you see July through December.

2              THE COURT:  Okay.

3              MS. PEURACH:  So the first column is July -- I had

4    to write it on top by hand myself.  The first is July, the

5    second is August.  I'm referring to that second August

6    column right now.

7              THE COURT:  Okay.  I see it.

8              THE WITNESS:  The nonrefundable guest payments of

9    1.32.

10             THE COURT:  I got it.

11             MS. PEURACH:  Okay.

12   BY MS. PEURACH:

13   Q.   Ms. Klanjac, just turning back to your declaration

14   again, and just some of the adjustments that were made

15   earlier today as a result of Mr. DeVos's testimony, he

16   testified that it also -- and, of course, does not reflect

17   the release of the $1.48 million of Best Beach's processing

18   funds this past Friday; is that right?

19   A.   Repeat the question.

20   Q.   Sure.  So -- and I -- just to be clear, I'm not trying

21   to fault you in any way.  I know your declaration was

22   submitted the 6th.  On August 7th, are you aware that TSYS

23   released approximately $1.48 million of Best Beach's

24   processing funds?

25             MR. DOGALI:  I object, Your Honor.  I think it's

1    actually August 8th, Friday afternoon.  No, I'm sorry, I'm
2    sorry.  The defendant is correct.
3              MS. PEURACH:  It was the 7th, yes.
4              THE COURT:  Objection's overruled.
5              MR. DOGALI:  It's not an objection --
6    BY MS. PEURACH:
7    Q.   Ms. Klanjac --
8    A.   I -- I saw that this morning.  They told me that.
9    Q.   So the declaration does not reflect the release of
10   those funds; is that right?
11   A.   Yes.  No, it does.  It does because that's what he
12   added in the million-some-odd dollars on August 1st.
13   Q.   That was per his oral adjustment this morning, correct?
14   A.   Correct.
15   Q.   Okay.  I just want to be sure what the figures that we
16   have on paper versus the figures that have been adjusted
17   orally.  I just want to go over the projections for
18   prepayments in your chart for -- prepayments coming in
19   August 15th to September 14th.  And that's reflected on
20   paragraph 12 of your declaration, correct?
21   A.   Correct.
22   Q.   Okay.  So here there is a line item for additional
23   prepayments of $30,000, but if I understood Mr. DeVos
24   correctly earlier, that didn't account for TSYS's release of
25   the funds hold and so that figure should actually be

1 adjusted to $120,000; is that right?

2    MR. DOGALI:  No --

3    THE WITNESS:  I wrote down $150,000.

4 BY MS. PEURACH:

5 Q. Is it $150,000 or $120,000 that projection --

6 A. 150 would be your final.  120 plus 30.

7 Q. Okay.  So it was $120,000 incoming from TSYS through

8 the processing funds; is that right?

9 A. Yes.

10 Q. Okay.  Just bear with me one second.  Okay.  Okay.

11    So it should be increased to 120 K to $150,000.  So

12 let's look back real quick at Exhibit BB, which we were just

13 looking at, the cash flow projections for July through

14 December 2020, if you could.

15 A. All right.

16 Q. So here now, this projection from your chart in your

17 declaration that we're looking at covers the second half of

18 August and the first half of September, right?

19 A. Correct.

20 Q. And in Exhibit B, for August, the projection is

21 $1.32 million; right?

22 A. Correct.

23 Q. And the projection for September is $1.233 million;

24 isn't that right?

25 A. Correct.

Cross - Klanjac

1    Q.    And so based on these estimates, the cash flow for the

2    second half of August, about half of 1.32 million would be

3    about $660,000, right?

4    A.    That's half, yes.

5    Q.    And then the same for September, half of the projected

6    1.23 million would be about $615,000, right?

7    A.    Yes.

8    Q.    And so totaling that together, that's about

9    $1.275 million of anticipated nonrefundable guest payments

10   between August 15th and September 14th, correct?

11   A.    I don't really know the timing of these breakdowns.

12   They -- I asked Mr. DeVos to look in the reservation system

13   and give me that information.

14   Q.    Okay.  So you would agree, would you not, that between

15   August -- in August of 2020, the anticipated nonrefundable

16   guest payments is 1.32 million, right?

17   A.    Yes.

18   Q.    And the anticipated nonrefundable guest payments for

19   September is 1.233 million, right?

20   A.    Correct.

21   Q.    Okay.  In your report, Ms. Klanjac, you refer to the

22   company's historical refund rate.  Do you recall --

23   A.    Yes.

24   Q.    -- referencing that?

25         And that's at paragraph 13.

Cross - Klanjac

1   A.   Yes.

2   Q.   And you referenced that the refund rates historically

3   have been no more than 2 1/2 percent, right?

4   A.   Correct.

5   Q.   And in doing so, you cite to Exhibit 27; is that right?

6   A.   Correct.  Correct.

7   Q.   Take a quick look at Exhibit 27, please.

8   A.   All right.

9   Q.   Is Exhibit 27 a spreadsheet of Best Beach's refunds and

10  chargebacks for 2019?

11  A.   Yes.  I assume so, yes.

12  Q.   And did you prepare this document?

13  A.   No, I did not.

14  Q.   Do you know who prepared it?

15  A.   Mr. DeVos.

16  Q.   Did Mr. DeVos provide it to you?

17  A.   Yes.

18  Q.   How did he provide it to you?

19  A.   I assume email.

20  Q.   Did he provide you with the 2020 rates via email, too?

21  A.   I don't really remember.  And, I mean, without, you

22  know -- I don't remember.  Without searching my email, I

23  really couldn't give you an answer.

24  Q.   Do you recall one way or another receiving information

25  on the 2020 refund of chargeback rates versus 2019?

1    A.   I looked through the TSYS statements.

2    Q.   So you -- so the only report you recall from Best Beach

3    is this 2019 report; is that fair?

4    A.   I just don't remember.  But I've gone through -- I did

5    go through the TSYS statements myself.

6    Q.   Okay.  And then in your report, however, you cited the

7    2019 refund and chargeback rates, right?

8    A.   Correct.

9    Q.   You don't refer to 2020 refund and chargeback rates for

10   Best Beach, do you?

11   A.   No.

12   Q.   You'd agree, would you not, that we weren't facing the

13   Corona virus in 2019, were we?

14   A.   No, we weren't.

15   Q.   So 2019 looks a lot different than 2020, doesn't it?

16   A.   The first half of the year, yes, it does.

17   Q.   Ms. Klanjac, just switching gears:  Did anyone from

18   Best Beach ask you to speak to anyone at TSYS about Best

19   Beach's financial condition?

20   A.   No.

21   Q.   Mr. DeVos never asked you to talk to anyone about

22   TSYS's -- about Best Beach's financial state or the reserve

23   account?

24   A.   No.

25   Q.   Mr. Underhill never asked you to speak to anyone at

Cross - Klanjac

1    TSYS either?

2    A.   No.

3    Q.   Had you been asked to speak to somebody at TSYS, would

4    you have made yourself available to do so?

5    A.   I'm not sure.  I -- I'm not sure.  Yes, I suppose.

6    Q.   Just give me one more second to look back through my

7    notes.  Trying to be quick here.

8            I just want to ask you about one more category of

9    your projections and then we can wrap up, Ms. Klanjac.  Your

10   declaration included projected cash payments due from Best

11   Beach to owners; isn't that right?

12   A.   Yes, it does.

13   Q.   Okay.  And looking at your projections of the cash

14   payments due on August 15th, in your report you projected

15   $3,549,578, right?

16   A.   I don't see that number.

17   Q.   It is in the chart on paragraph 10 of your --

18   A.   Oh, I see it.  I see it.

19   Q.   Do you see it now?

20   A.   Yes, I do see it.  The first one.

21   Q.   It's at $3,549,578, right?

22   A.   That's correct.

23   Q.   How did you arrive at that figure?

24   A.   That -- they had the information at this time to figure

25   out how much they were going to owe the owners for July, so

Cross - Klanjac

1    that would be paid in August.  And then it's the sales tax

2    in addition to the payments to owners and so I added them

3    together.

4    Q.   Okay.  And if you could turn again to Exhibit BB, the

5    cash flow projections prepared and provided to TSYS for

6    2020.  The second column relates to August.

7    A.   Right.

8    Q.   And it also includes the -- you know, the -- under

9    Expenses Paid Guests Stays, the total cash payments that

10   Best Beach would owe for August, do you see that?

11   A.   Yes.

12   Q.   And I'll represent to you that in adding those columns,

13   sales tax through payments due to owners, the total is

14   $3,059,434, so $500,000 less than what you projected now --

15   or here in litigation.  Do you know that?

16   A.   No, I didn't realize that.

17   Q.   And then if you look at your projection of the cash

18   payments due on September 15th in paragraph 12 of your

19   declaration, that projection is $1,836,442.  Do you see

20   that?

21   A.   Yes.

22   Q.   Okay.  And if you look back at Exhibit B, totaling your

23   projections for September cash payments due, sales tax

24   through payments due to owners, the total is actually

25   $1,598,667, so about $240,000 less.  Do you see that?

Cross - Klanjac

1  A.   I think one of the differences is that as time goes on,

2  they can look in their -- their other software system and

3  figure out more precisely what these numbers are going to

4  be.  And so I asked them to give me the most recent numbers.

5  We talked about it when we were doing the charts on the

6  affidavits.

7  Q.   So your testimony, the figure in the affidavit is the

8  correct figure as opposed to the figure in Exhibit BB for

9  cash --

10  A.   I would think it was done -- this is done more

11  recently.

12       MS. PEURACH:  All right.  I have no further

13  questions of Ms. Klanjac.

14       THE COURT:  Okay.  Redirect, Mr. Dogali.

15       MR. DOGALI:  No, Your Honor, no redirect.

16       THE COURT:  Now I did have a question or two.  I

17  guess when -- what's your understanding as an accountant of

18  when someone puts a hold -- I understand that something like

19  80 percent of the transactions are processed through TSYS.

20  So when TSYS puts a hold on releasing funds, does that --

21  was the effect to completely eliminate any cash flow to the

22  company other than the 20 percent they were getting from --

23       THE WITNESS:  Can you repeat that for me?

24       THE COURT:  Yes.  Does that eliminate any cash

25  coming to the company other than what they're getting from

1     AmEx and discover and checks?

2             THE WITNESS:  Effectively, yes, it did.

3             THE COURT:  Okay.  And so when they -- when the

4     reserve amount got up to $4.75 million, just so that I

5     understand what was happening, that was $4.75 million that

6     otherwise would have gone to Best Beach to pay for

7     operations, to reimburse -- or to pay the property owners

8     and to operate their business that would have been coming

9     in, but was not because TSYS was holding it?

10            THE WITNESS:  That's correct.  That's exactly

11    right.

12            THE COURT:  Okay.  And of that -- of that

13    $4.75 million, if there was a -- of that, TSYS was only

14    entitled to a relatively small percentage to keep for

15    themselves for processing fee, maybe 200,000 to -- probably

16    not 400,000, but maybe $200,000; is that right?

17            THE WITNESS:  That's correct.

18            THE COURT:  And of the -- of that $4.7 million,

19    even if the chargeback number had gone up to 10 percent of

20    that, that -- that's what -- you know, 400,000, 500,000,

21    600,000 would have been liable for chargebacks, not the full

22    4.75 million.  Am --

23            THE WITNESS:  That's correct.  That's exactly

24    right.

25            THE COURT:  So they were holding back 100 percent

1    of all the money that should have gone to the company to

2    build up a reserve for a period of time, right?

3         THE WITNESS:  Yes.  Exactly.

4         THE COURT:  And then over the past couple of

5    months, they've released in tranches maybe a million dollars

6    and then and then another million, and so we're now down in

7    the $3 million range for the reserve; is that your

8    understanding?  And I've got the numbers --

9         THE WITNESS:  Yes, I think it's -- I think they've

10   released 2.5 million -- or thereabouts, 2 to 2.5 million

11   have been released and they have the rest.

12        THE COURT:  Okay.  And --

13        THE WITNESS:  Those weren't released until just the

14   last week or two.

15        THE COURT:  Okay.  All right.  Those are the

16   questions I have.  I'll ask defense counsel if you have any

17   follow-up and then Mr. Dogali if he has any follow-up.

18        MS. PEURACH:  Not for this witness, Your Honor.

19   Thank you.

20        THE COURT:  Okay.  Mr. Dogali, any follow-up to my

21   questions?

22        MR. DOGALI:  No, sir, Your Honor.  Thank you.

23        THE COURT:  Okay.  We're at -- let me just ask Mr.

24   Dogali, that was your witness list.  Do you have any more

25   evidence or witnesses that you'd like to present in support

1    of your motion for preliminary injunction?

2              MR. DOGALI:  No, sir.  It's -- so long as Ms.

3    Keryan and -- and Mr. Fenton are testifying and are subject

4    to cross as we discussed, then there's no further witnesses

5    in the plaintiff's case.

6              THE COURT:  Okay.  Well, so just -- just so that

7    I'm clear on this, you're not closing, then, what you may be

8    doing is supporting your case with some affirmative

9    questioning of the defense witnesses; is that correct?

10             MR. DOGALI:  Yes, sir, in lieu of our procedure,

11   which seems to be working fairly well, not calling them on

12   the direct case and simply reserve them would be, I think,

13   the most sufficient way to go as requested.

14             THE COURT:  Yeah, that makes sense.  So I won't --

15   we won't entertain a Rule 50 motion, defense counsel, just

16   so that we're clear on that, because Mr. Dogali's case is

17   not closed, but we will start with the defense case after we

18   take a break.  We've been going about an hour and 20 since

19   the last -- I think, maybe an hour and 10 since the last

20   break and it's 12:20.  We're going to take a lunch break

21   here in Colorado.  I'd like everybody to be back at maybe

22   five of the hour, which -- so five of 1:00 in Colorado, five

23   of 3:00 in -- on the East Coast.  Is that all right with

24   everyone?

25             MR. DOGALI:  Yes, Judge.

                        Direct - Keryan

1            MS. PEURACH:  Yes, Your Honor.

2            THE COURT:  All right.  We'll be in recess until

3    12:55 Denver time.

4         (Recess taken 12:20 p.m.)

5                         AFTERNOON SESSION

6         (In open court at 12:59 p.m.)

7            THE COURT:  Okay, we're back.  Counsel for

8    defendant, TSYS, you're up.

9            MS. PEURACH:  Good afternoon, Your Honor.  We will

10   be proceeding with calling Heidi Keryan as a witness, and I

11   believe you have her declaration.

12           THE COURT:  I do.  If she could stand and be sworn,

13   please.

14           COURTROOM DEPUTY:  Please raise your right hand.

15            HEIDI KERYAN, DEFENDANT'S WITNESS, SWORN

16           COURTROOM DEPUTY:  Please state your full name and

17   spell your full name for the record.

18           THE WITNESS:  Heidi Keryan, H-e-i-d-i, K-e-r-y-a-n.

19                         DIRECT EXAMINATION

20   BY MS. PEURACH:

21   Q.   Ms. Keryan, do you have before you the declaration that

22   you submitted in this case?

23   A.   I do.

24   Q.   And do you adopt the contents of that declaration as

25   your testimony here today?

                              Cross - Keryan

 1    A.    Yes.

 2    Q.    And do you swear to the truth of the contents of your

 3    declaration under penalty of perjury?

 4    A.    Yes.

 5              MS. PEURACH:  Your Honor, we would like to move to

 6    admit the declaration of Ms. Keryan into evidence.

 7              THE COURT:  Any objection?

 8              MR. DOGALI:  No objection.

 9              THE COURT:  It's admitted.

10              MR. DOGALI:  No objection, Your Honor.

11              THE COURT:  It's admitted.

12              MS. PEURACH:  Thank you, Your Honor.  And

13    consistent with the practice that we have adopted for this

14    hearing, we will proceed with the contents of that

15    declaration as Ms. Keryan's direct examination testimony and

16    reserve the right for a redirect.

17              THE COURT:  Okay.  So that's accepted and will be

18    considered her direct testimony.  I have read it.  And so

19    we'll proceed with cross-examination by Mr. Dogali.

20                          CROSS-EXAMINATION

21    BY MR. DOGALI:

22    Q.    Hi, Ms. Keryan.  If I may, I'm Andy Dogali.  I

23    represent, as you surmised, figured out, Best Beach Getaway.

24              THE COURT:  Mr. Dogali, you've got to slow down,

25    pull that mic closer to you, and speak up because for some

Cross - Keryan

1    reason, it's a little staticky, so slow down, speak up, and
2    then we should be good.  Go ahead.
3    BY MR. DOGALI:
4    Q.    I'll try my best, Your Honor.
5              Ms. Keryan, have you become aware over the course
6    of dealing with Best Beach Getaways and Jim DeVos of any
7    reason to believe that that firm's cash on hand until the
8    last few weeks ever went below an amount that might be
9    needed to fund any chargebacks or refunds that happened or
10   were demanded?
11             MS. PEURACH:  Objection, Your Honor.  Speculation.
12             THE COURT:  Overruled.
13             THE WITNESS:  Sir, could you ask me that one more
14   time.  I just -- please, I want to make sure I understand.
15   BY MR. DOGALI:
16   Q.    During the time that you've dealt with -- well, I'm
17   sorry, strike that.
18             Did you have any experience in connection with Best
19   Beach Getaways before April of this year?
20   A.    No, sir.
21   Q.    Since that time, have you become aware of any occasions
22   on which the cash available to Best Beach Getaways was -- on
23   account was insufficient to fund any chargebacks or refunds
24   that might have been made?
25   A.    No, but there was a concern around liquidity given

Cross - Keryan

1  COVID and how much exposure the business was carrying with
2  advance travel deposits.
3  Q.   That concern that you had never manifested in the form
4  of Best Beach Getaway's cash on hand being lower than the
5  potential demanded refunds or chargebacks, though, right?
6  A.   Well, I would have to go back and look at my notes, but
7  I'm pretty sure there was concerns around that particularly
8  because of the escrow account or -- that Mr. DeVos defined
9  as a trust account not being a legally established trust
10 account, specifically for the funds being used for specific
11 purposes and so there was concern around that.
12 Q.   Best Beach Getaways never represented to you that that
13 was a legally established trust account, though, right?
14 A.   They referred to it as a trust account, and it wasn't
15 until recently that we got confirmation that it was not a,
16 like, legally established trust account.
17 Q.   Are you saying back in April and May you actually
18 thought that account was a formal trust account?
19              MS. PEURACH:   Objection, misstates testimony.
20              THE COURT:   Overruled.
21              THE WITNESS:   We did question whether or not it was
22 a trust account.   Mr. DeVos referred to it as a trust
23 account, but, you know, in dealing with other, I guess,
24 businesses in the same industry, we've run into situations
25 where, you know, businesses were referred to an account like

1    this as a trust account, but it's not, and so there aren't

2    the same protections in place.

3    Q.   You actually thought it was a legally created trust

4    account, though, right?

5    A.   I didn't know one way or the other.

6    Q.   You never thought it was actually a formally

7    established escrow account either, like with an escrow

8    agent, did you?

9    A.   I didn't know one way or the other.  I didn't have

10   documentation to show me, I guess, is the best answer.

11   Q.   What were the assumptions you made about whether it was

12   a formal trust account or an escrow account at the time you

13   were performing your analyses?

14   A.   You know, when I wrote up my analysis, I believe I

15   noted that we believed it was a trust account, but we did

16   not have documentation.  And my management team, you know,

17   asked that I request clarification around that, but we

18   weren't sure one way or the other.

19   Q.   Is there a note somewhere that you made that says you

20   thought it was an actual trust account?

21   A.   There may have been.

22   Q.   Do you remember right now whether such a note exists?

23   A.   I'm pretty certain I referred to it as a trust account

24   because that's how the merchant referred to it.  But, again,

25   I wasn't certain.  I didn't have documentation around

Cross - Keryan

1      that.

2      Q.   Was the real risk here always that -- effectively that

3      Mr. Underhill and Mr. DeVos might have run off with the

4      money and there wouldn't have been enough cash on hand to

5      pay chargebacks on the refund?  That's the real risk, right?

6      A.   Well, the risk to TSYS is every payment that we

7      processed through that merchant credit facility and the fact

8      that all of those payments are taken, you know, as early as

9      30 days in advance or up to over a year in advance, and TSYS

10     is liable for all of those transactions.  That's our risk.

11     Q.   That same risk is exactly the same one that existed for

12     all 10 years, right?

13     A.   No.  The merchant's processing has been growing and the

14     risk has been growing.  Additionally, you know, I feel like

15     you're referring to historical data, but we can't -- you

16     know, there's a global pandemic going on right now and we

17     can't really use historical data.  In fact, if you look at

18     the processing, I believe it was April they had a 9, almost

19     10 percent chargeback rate, which was way outside any type

20     of historical norm, as well as the refund spiking as well as

21     their processing dropping.

22            So, you know, at the time of our review which was

23     related to COVID impacts, we had to take a different

24     perspective because there's lot of unknowns around that.

25     Q.   Well, when you were acting as the analyst for this risk

1    and you assessed it, did you ignore historical data 2010
2    through 2019?
3    A.    No.
4    Q.    What part of the historical data have to do with your
5    analysis?
6    A.    Looking at it to be able to see that the processing
7    volume, the refunds and the chargebacks were outside of
8    those normal kind of parameters.  We used it as a gauge, I
9    guess.
10   Q.    So you examined the baseline data in terms of number of
11   transactions, but not the historic best practices of Best
12   Beach Getaways?
13   A.    I guess I'm not sure what you mean by best practices.
14   Again, yes, we looked at historical data, but at the time of
15   my review, they -- you know, all of those kind of historical
16   trends were not happening.  Their processing volume was down
17   significantly, their refunds had spiked and, most
18   importantly, chargebacks were spiking, and so that's why we
19   decided to place a hold and start gathering more
20   information.
21   Q.    Well, the fact that from 2010 to 2019, Best Beach
22   Getaways never allowed its cash balance to get anywhere near
23   something that might create a chargeback or refund risk, did
24   that best practice of Best Beach Getaways play any role in
25   your analysis?

1          MS. PEURACH:  Objection --

2          THE WITNESS:  Well, we haven't -- oh, sorry.

3          THE COURT:  Go ahead.

4          THE WITNESS:  We -- we didn't have a lot of

5    historical data in terms of liquidity information, so I

6    can't speak to that piece.  But, again, when you look at the

7    processing history, you know, there was one item that I used

8    as a part of my analysis and that was some of the chargeback

9    ratios were well above 1 percent.  1 percent is something

10   that the card brands consider excessive.  And so, you know,

11   those were definitely pieces that are noteworthy.

12         And because, actually, of those chargeback ratios,

13   I went out and did some -- just some searches through Google

14   on reviews of the business and found a lot of negative ones

15   that just indicated that the refund policy is a point of

16   contention with customers.  So those were some other, I

17   guess, data points that led to more analysis and more

18   reasoning about why there was concern of why we wanted to

19   place the hold.

20   Q.   Do you have your declaration in front of you?

21   A.   Uhm-hum.

22         THE COURT:  If you could -- if you could -- hold on

23   one second.  If you could, rather than saying "uhm-hum" or

24   "hhm-uhm," you need to say "yes" or "no."  It's just hard

25   for our court reporter to interpret the "uhm-hum."  Okay?

1      THE WITNESS:  Okay.  Sorry.

2      THE COURT:  That's all right.  Go ahead.

3  BY MR. DOGALI:

4  Q.   Can you refer to paragraph 23.

5  A.   Okay.  I'm there.

6  Q.   The discussion here at paragraph 23, is that what you

7  were just talking about in terms of your doing some web

8  surfing and finding bad reviews with Best Beach Getaway?

9  A.   Yes, sir.

10 Q.   And your Exhibit H is a reflection of that?

11 A.   Exhibit --

12 Q.   According to your declaration, the first sentence is, I

13 researched and considered other information such as Best

14 Beach's online reviews which I noted were primarily

15 negative.  Those reviews are attached here as Exhibit H.

16 Right?

17 A.   Yes.

18 Q.   So Exhibit H is the -- the -- reflects whatever the

19 searches was -- were that you were performing?

20 A.   Yeah.  They were reviews and complaints on the Better

21 Business Bureau, from Google, from Yelp, and I think some

22 travel like review websites.

23 Q.   Why does -- why does Exhibit H contain nothing other

24 than Best Beach Getaways -- excuse me, Better Business

25 Bureau?

Cross - Keryan

1    A.   I'm not sure.  I didn't put this together, but we did

2    look at other websites.

3    Q.   If you go to BBB, Better Business Bureau, you know when

4    you go there all you're going to see are negative reviews,

5    right?  That's why people contact Better Business Bureau.

6    Right?

7    A.   That's -- I would disagree with that respectfully, sir.

8    I used to work at the Better Business Bureau and I know a

9    lot of businesses would have positive reviews.

10   Q.   Now, why does this best -- Better Business Bureau

11   review that you performed go back two years and extend all

12   the way through the end of July?  If you were apparently

13   performing this a couple of months ago, right?

14   A.   I -- you know, those, to me, as a part of my analysis

15   and assessment speak to what is, in my opinion, a rigid

16   stance of the business when it comes to the refund policy.

17   It's a pattern that has been there historically, and I think

18   it's part of what impacted the chargebacks so significantly.

19   In fact, I had two phone conversations with Mr. DeVos where

20   I talked about chargebacks in the process and I gave some

21   food for thought on the fact that, you know, it's a

22   pandemic, I understand a nonrefundable deposit policy;

23   however, this might be a time to just, you know, maybe be a

24   little more gentler with that.  And, you know, the response

25   was that, We have a contract and that's what matters.

Cross - Keryan

1    And so, you know, I think these reviews, this

2    historical pattern of a business practice speaks to why the

3    chargebacks increased so significantly.  It's important.  If

4    you're able to resolve issues with your customers, it's not

5    going to turn into a chargeback.

6    Q.   Well, my question was only if you performed this web

7    surfing in May and June, which is the way the declaration

8    provides, why does the --

9    A.   Yeah.

10   Q.   -- Better Business Bureau only -- exhibit go back two

11   years and include July?  That's all I asked.

12   A.   Why does it go back two years?

13   Q.   Yes.  First.

14   A.   Because, again, it's the same pattern.  That's not only

15   present now post-COVID, it was present pre-COVID, and it has

16   to do with the nonrefundable payments that Best Beach

17   Getaways accepts.

18   Q.   The practices of Best Beach Getaways, how it actually

19   goes about doing its business and did for 10 years,

20   apparently played no role in your analysis other than

21   empirical data relating to it, but whatever these folks

22   reported for a two-year period did; is that fair?

23   A.   We used many different sources of information and data

24   as a part of our reviews and this was one component.

25   Q.   In any event, you don't know why July is in here and

Cross - Keryan

1    you don't know why the web surfing you said you did beyond

2    Better Business Bureau is not in here.

3    A.   I mean, July is, I believe, the most recent reviews

4    that were on the Better Business Bureau so, in my mind,

5    those are relevant.  But no, I'm not sure why the other

6    website reviews are not in here.

7    Q.   Well, according to your declaration, you were doing

8    this web surfing in May and June before there was a June 22

9    reimposition of a hold, correct?

10   A.   Yes.

11   Q.   Whatever is in this exhibit relating to July has

12   nothing to do with your decision on June 22, right?

13   A.   Oh, I'm sorry, I understand your question now.  Yes, so

14   when I did that analysis that you're speaking of, I referred

15   it -- and referred to it in my write-up to management, and

16   typically they would just go themselves and do their own

17   like web search or whatever as a part of this, I guess,

18   getting documents over for our -- our presentation.

19        This is -- that's the time period mid-July is what

20   got these screenshots together.  So that's why there's a

21   discrepancy there.  I'm sorry.

22   Q.   Can you turn to paragraph 9 of your declaration.

23   A.   I'm there.

24   Q.   Yeah.  And the predicate to this question is, how much

25   of your scope of employment or activities for TSYS cases

1    relate to the hospitality industry?

2    A.   I'm sorry, I didn't hear the first part.  How much of

3    our what relates to hospitality?

4    Q.   Your personal services for TSYS, how much of your

5    activities relate to the hospitality industry?

6    A.   I apologize, I can't give you like a specific

7    percentage.  We -- I'm a part of a team called Periodic

8    Review.  We have about 4,000-ish merchants that fall within

9    that pool.  I specifically have about 500 of those that are

10   just randomly assigned.

11        I -- you know, I hesitate to guess how many in my

12   pool are within the hospitality industry, but since COVID,

13   I've touched, I don't know, probably more than 10 specific

14   accounts and completed credit reviews on them.

15   Q.   Are there other members of the periodic review team

16   that -- that specialize, if you will, in the travel industry

17   or hospitality?

18   A.   No, sir.

19   Q.   Do you know whether Best Beach Getaways' practices in

20   relation to cash management historically are consistent with

21   their competitor's practices or better?

22   A.   I don't.

23   Q.   When you were -- in paragraph 9, you refer to no

24   particular formula or "one-size fits all" approach to

25   assessing risk, correct?

133

Cross - Keryan

1     A.    Correct.

2     Q.    We try to evaluate each merchant according to his

3     specific business structure and account taking into --

4              THE COURT:  So, Mr. Dogali, when you read, you go

5     extra fast.  You need to slow down, consciously slow down

6     when you're reading.  And please repeat that.

7     BY MR. DOGALI:

8     Q.    Ms. Keryan, the second sentence of paragraph 9 is your

9     testimony --

10    A.    Uhm-hum.

11    Q.    -- correct?

12    A.    Yes.

13    Q.    What aspect of this merchant's business structure and

14    circumstances played any role in your analysis other than

15    raw data about its number of chargebacks and refund demands?

16    A.    Well, the business model, for one, which we consider

17    high risk because of how far out payments are collected.

18    The financial position based on the financial statements

19    that were provided to us.  Those -- those were the two

20    biggest pieces -- well, and geographically, too, where they

21    were located -- sorry, are located in Florida, you know,

22    what's -- what is happening there.  Those are the pieces

23    that -- oh, sorry.

24    Q.    I didn't mean to interrupt you, ma'am.  I really

25    didn't.

Cross - Keryan

1    A.    I was just going to say those are the pieces outside

2    of, you know, their processing history and some of the other

3    things we mentioned.

4    Q.    When you refer to the business model, I think if I'm

5    not mistaken we already established that you don't really

6    know how Best Beach Getaway's business model compares to

7    others in its industry, the short-term vacation rental

8    industry.  That's fair, right?

9    A.    That's fair that I may not know specifically, but this

10   account has gone through many, many sets of eyes by managers

11   who have far more decades of experience than I do and are

12   able or have dealt with other businesses in the same type of

13   industry to make those type of comparisons.  So, you know, I

14   may not know all the ins and outs but I have a lot of people

15   above me who have a lot more experience than I do who look

16   at this account with me.

17   Q.    Which of them do you know that has specific experience

18   in relation to the short-term vacation rental industry?

19   A.    I would say my director and the management teams of

20   our, like, parent company in London.

21   Q.    Do you know any individual names other than Mr. Fenton?

22   A.    So we just started a merger, so I don't know the last

23   name, but there is a specific individual that was working

24   with me, more so than others, as a part of the kind of

25   parent company credit group, and his first name is Keith.

Cross - Keryan

1   Q.   Does Keith or anyone else in the company ever tell you

2   anything about Best Beach Getaway's business model that

3   indicated to you there was something about it that was

4   inferior in comparison to its industry or its competitors?

5   A.   We would never have a conversation about inferiority.

6   We just do an analysis based on the data and what's given to

7   us, so --

8   Q.   Let's assume, then, that the business model of Best

9   Beach Getaways is the norm and it's not superior, then,

10  across the vacation rental industry.  Did you reach the same

11  conclusions when you performed risk assessment?

12          MS. PEURACH:  Objection, relevance, Your Honor.

13          THE WITNESS:  Oh, yes.

14          THE COURT:  Overruled.

15  BY MR. DOGALI:

16  Q.   Was your answer "Oh, yes"?

17  A.   Uhm-hum.

18          THE COURT:  Yes?

19  BY MR. DOGALI:

20  Q.   Now --

21  A.   Yes.  Sorry.  Yes.

22  Q.   So in all of those occasions where you looked at the

23  vacation rental industry player, did you impose --

24  A.   Yes.

25          THE COURT:  We didn't hear the question.  Mr.

1    Dogali, repeat that question, please.

2    BY MR. DOGALI:

3    Q.    When you examined the risks of -- relating to merchants

4    in the short-term vacation rental industry --

5    A.    Uhm-hum.

6    Q.    -- did you end up actually imposing a 100 percent hold

7    on all of them?

8    A.    On the ones that have red flags, yes.

9    Q.    That have -- I'm sorry?

10   A.    Red flags.  Like -- like triggers that would have

11   prompted us to review that merchant's account, yes.

12   Q.    It would impose 100 percent holds on any others?

13   A.    Outside of this industry?

14   Q.    Outside of Best Beach Getaways, within the industry.

15   A.    Yes.

16   Q.    How many?

17   A.    Yes.

18   Q.    How many?

19   A.    Of just my accounts?

20   Q.    Start there, yes.

21   A.    Related to COVID, I want to say at least 15 different

22   merchant accounts that I implemented a hold because they

23   were triggered.

24   Q.    Now, as you understand it in the vacation rental

25   industry, how many 100 percent holds were imposed on

1    merchants company-wide across TSYS?

2            MS. PEURACH:  Objection, Your Honor.  Relevance and

3    foundation.

4            THE COURT:  Overruled.

5            THE WITNESS:  So for our site, Broomfield where I'm

6    at, as a part of my -- I can only speak to my team, there's

7    another risk group that was doing their own COVID-related.

8    But for the periodic review team, I believe there was at

9    least five other kind of travel-related merchants that we

10   placed 100 percent holds on because they were triggered.

11   Q.   So you know about 15 and you believe there was another

12   five?

13   A.   Yes.

14   Q.   Are they in Florida?

15   A.   I -- one of mine is, yeah.

16   Q.   Now, I want to make sure I understand that you -- you

17   had this individualized no-one-size-fits-all analysis of all

18   of those.  With that in mind, how many did you personally

19   analyze in the vacation rental industry, again where a 100

20   percent hold was not imposed?

21   A.   I hesitate to give specific information because I've

22   had so many, but in the travel industry, I think maybe three

23   or four.

24   Q.   In the vacation rental travel industry?

25   A.   Yes, sir.  Yes.

Cross - Keryan

1    Q.   So is it fair to say that when you started the risk

2    assessment process for members of the vacation rental

3    industry --

4    A.   Uhm-hum.

5    Q.   -- the default was a 100 percent hold and then you were

6    looking for criteria that might talk you out of it; is that

7    fair?

8    A.   No.   I'm sorry, I don't think that's a fair statement

9    because we have a general process that we follow to review

10   merchants and complete credit reviews, but every business is

11   so different that there's no -- there's no one -- one

12   decision -- there's -- check box that we check off this list

13   it's, okay, we're going to place a hold on this one.

14   There's, you know, general things we look for, but there's

15   no general, I guess, one size -- yeah, one size fits all.

16   We can't --

17   Q.   So --

18   A.   -- the --

19   Q.   So the ones you know about, the three or so did not

20   receive a 100 percent hold and 15 or so did.   What was

21   different about those three or so?

22   A.   I can think of one in particular, and they -- even

23   though their volume was dropping and their refunds were

24   going up, they had absolutely no chargebacks whatsoever.

25   They had a legally established trust fund to pay out their

1    property owners.  And they have a lot of like liquidity

2    strength and their financial position was, you know, just

3    really strong.

4    Q.   If somebody gives liberal refunds, if somebody agrees

5    to refund everybody, there's zero chargeback, right?

6    A.   Well, I think it speaks to the merchant's willingness

7    to work with their customers, right, because a refund is

8    initiated by the merchant and the chargeback is initiated --

9    Q.   I --

10   A.   I'm sorry.

11   Q.   It's really based -- if a merchant agrees to refund

12   everybody, there's zero chargebacks, right?

13   A.   Right.

14   Q.   Now, can you look at paragraph 10.  It refers to your

15   Exhibit A.

16   A.   Yup.

17   Q.   Exhibit A is the so-called Top 5 Report.

18   A.   Yes.  We get that on a weekly basis.

19   Q.   And explain to me, if you will, what is a Top 5 Report?

20   A.   So this is a report that our risk team sends up and

21   it's top five for chargebacks where merchants -- the top

22   five merchants at our site on our platform that is receiving

23   chargebacks that week.

24   Q.   What is the universe from which these five are

25   drafted?

Cross - Keryan

1    A.    I'm sorry, what is?

2    Q.    What is the universe of merchants which leads to the

3    extraction of these five -- or identification of these five

4    as the top?

5    A.    So there's a few different categories within that

6    report.  It can be the top five based on the dollar volume

7    of chargebacks, the top five based on the number of

8    chargebacks -- and this is for our whole -- our whole

9    platform, all, you know, six-figure amount of merchants that

10   we have here in Broomfield.

11   Q.    So this doesn't include at all -- it's not limited at

12   all to -- to companies that, by their very nature, receive

13   prepaid funds as part of their business model, right?

14   A.    The report isn't limited to any specific business

15   model, no.

16   Q.    And it will go across all market segments as well,

17   right?  This will be manufacturers and all kinds of service

18   companies and everybody?

19   A.    Yes, sir.

20   Q.    What are the filters that led to the creation of this

21   particular Top 5 Report?

22   A.    I don't know.  I don't -- like I said, it comes from

23   our risk team, they compile the data, and they send it over

24   to the periodic review team, which is what I'm a part of.

25   Q.    Can you turn to the next exhibit in your collection,

1  which is Exhibit B.  Did you create this?

2  A.   I pulled the report, but we have a system like a portal

3  you can go to to pull the information.

4  Q.   So you go to a portal where the data is stored and

5  extract the report you want?

6  A.   Yes.

7  Q.   Based on whatever filters you put in, correct?

8  A.   No.  We just put in -- there are -- you'll see under

9  the merchant's name and their MID number, a group number,

10  and that's the -- the -- I guess identifier for the data

11  that are housed.

12  Q.   You see the bottom section called Profitability and

13  Processing History, and about four lines up --

14  A.   Uhm-hum.

15  Q.   -- the six-month average CB percent.  What is that,

16  chargebacks?

17  A.   Yes, sir.

18  Q.   Where it says 1.66 percent, what is that?

19  A.   So that is over the course of the last six months, the

20  average chargeback ratio -- I'm not sure if that's based off

21  of the dollar amount or the number of chargebacks, but it's

22  referring to chargebacks.

23  Q.   Can we tell from this report whether that's 1.66

24  percent of some universe like transactions or dollars or

25  something?

Cross - Keryan

1    A.    Yeah, let me check.  It doesn't look like it reports it

2    anywhere else.  I can -- I have a data warehouse pulled up

3    if you want me to play with it and figure that out, but it

4    doesn't look like on this report it gives more detail to

5    that percentage.

6    Q.    Would -- okay, whatever the universe may be, 1.66

7    percent is a rolling average of chargebacks over a 6-month

8    period?

9    A.    Yes.

10   Q.    That six-month period included April?

11   A.    Yes.

12   Q.    So the months you described during which the

13   chargebacks percentage was 9.8, is included in the

14   six-months that come to 1.66?

15   A.    Yes.

16   Q.    Now, that April rate of 9.8 percent chargeback, isn't

17   it true that the month of April is the lowest transactions

18   in the history of the company?

19   A.    They -- not in their history, no.

20   Q.    How far back do you go to find the lower number of

21   transactions?

22   A.    I mean, if -- if you look at the report, there was

23   November of 2019, December of 2019.  I mean, there's

24   multiple --

25   Q.    Are you including cancellations, refunds and chargeback

Cross - Keryan

1    as transactions?

2    A.    No.    That sales column is just what they processed.

3    Q.    You understand that during the month of April of this

4    year --

5    A.    Uhm-hum.

6    Q.    -- it was against the law for Best Beach Getaways to

7    accept a reservation?  Do you understand that?

8    A.    Yes.

9    Q.    Wouldn't that be the reason the transaction number is

10   low for that month and creates a 9.8 percent chargeback

11   percentage?

12            MS. PEURACH:  Objection.  Calls for speculation.

13            THE COURT:  Overruled.

14            THE WITNESS:  Can you ask that question one more

15   time, sir?

16   BY MR. DOGALI:

17   Q.    Yeah.  I'm asking whether you were aware that in April

18   of this year, they couldn't accept any reservations because

19   it was prohibited and, that being the case, wouldn't that

20   explain why the transactions that month were lower, zero

21   reservations, and creates a skewed 9.8 percent chargeback

22   rate?

23   A.    Yes, that is correct.  However, when you go and look

24   at -- even when you go and look at just the dollar amount

25   and take out the ratio, you can tell that the chargebacks

Cross - Keryan

1    had spiked regardless of the volume going down, and that's a
2    red flag to us.
3    Q.   So the 9.8 percent had significance, plus the fact that
4    it was measured against different transaction figures over
5    which Best Beach Getaways had no control does not matter to
6    you?
7    A.   It's one component of, you know, a review that includes
8    countless different pieces of information.
9    Q.   In your individualized review of merchants when you
10   perform a risk assessment, you mentioned the geographic
11   region of Best Beach Getaways is one of those factors,
12   right?
13   A.   Correct, yes.
14   Q.   Do you mean by that that Best Beach Getaways performs
15   its business predominantly within the state of Florida, or
16   entirely within the state of Florida, is that what you mean?
17   A.   I don't believe they're entirely in the state of
18   Florida.  They're primarily in the state of Florida is my
19   understanding, and the only reason I mentioned geographic is
20   because of COVID.
21   Q.   Let me tell you that all 453 are in the state of
22   Florida, and is that what you meant by geography that makes
23   them high risk in comparison to others?
24   A.   Well, again, primarily I'm referring to COVID and the
25   increase in cases there, but also, you know, there are

Cross - Keryan

1    hurricanes that go through.  In fact, if you look at their
2    process history, I believe it was in 2018 there was another
3    time that their -- oh, here we go -- yeah, third quarter
4    2018, their business was impacted because of a hurricane
5    that caused a short-term shutdown.  So that's another reason
6    why the geographic location, you know, is another component
7    or another thing that we look at.
8    Q.   You understand there to be any meaningful difference
9    between merchants in this industry that are located in the
10   Panhandle region of Florida versus those that are in Miami?
11   A.   In -- I believe -- you know, there are different
12   locations, so perhaps if you're referring to COVID perhaps
13   cases are slightly different.
14   Q.   Do you know whether, in fact, in the Panhandle of
15   Florida, COVID rates are far lower than they are in south
16   Florida?
17   A.   I was looking at that data the other day.  They are
18   lower than Miami, yes, but the cases are still rising and,
19   you know, there's just -- there's a lot of unknowns around
20   that.  And, look, my job -- all my job is is to gather the
21   information, do a data-driven assessment, identify dimension
22   to TSYS's risk exposure, and make a recommendation off of
23   it.
24   Q.   Are you aware of any market or business or economy or
25   cultural differences that exist between the Florida

Cross - Keryan

1    Panhandle and the rest of the state?

2              MS. PEURACH:  Objection, relevance.

3              THE COURT:  Yeah, you're getting a little far

4    afield, Mr. Dogali.  Sustained.

5    BY MR. DOGALI:

6    Q.   Is it fair to say that you grouped Florida merchants

7    collectively without regard for where they are within the

8    state of Florida?

9    A.   No, I don't think that's fair because, again, our

10   credit decision isn't based on the one fact that they are in

11   Florida, it's a -- something that's noteworthy, it's

12   mentioned in our review, but it's not that we are, you know,

13   placing holds or establishing reserves on merchants because

14   they are in Florida.  Again, there are other merchants that

15   are located in Florida that we did not place a fund hold on,

16   so that one piece of information does not create the

17   decision.  It's just one piece of -- of a larger whole.

18   Q.   I understand that there are -- that you -- many --

19   according to you, many factors go into your analysis and one

20   of which is geography.  So what I intended to ask was simply

21   to the extent geography is one of those, did you

22   differentiate between regions within the state of Florida

23   for any purpose?

24   A.   No.

25   Q.   Do you know whether different regions of Florida have

Cross - Keryan

1    different seasonal peaks and valleys?

2              MS. PEURACH:  Objection, relevance.

3              THE COURT:  Mr. Dogali, I get the point.  She just

4    said she didn't differentiate, you know, the Panhandle --

5              MR. DOGALI:  Thanks, Your Honor.

6              THE COURT:  -- truck drivers, the folks who eat

7    bagels down in Miami.  She didn't look at that.  So I've got

8    the point.  Objection sustained.

9    BY MR. DOGALI:

10   Q.   Ms. Keryan, right now you're aware there's a hold of --

11   a reserve of approximately $2.3 million in place?

12   A.   Yes, sir.

13   Q.   How long does TSYS propose to keep that reserve in

14   place?

15   A.   We -- right now we plan to re-assess again in two

16   weeks.  We know that we've kind of started -- like past the

17   peak season for Best Beach, at least based on that

18   historical information.  And the information that the

19   merchant has given us shows that, you know, we're getting to

20   a point where risk is starting to diminish pretty quickly,

21   so our plan is to re-assess again in two weeks.  We are

22   going to ask for, you know, an up-to-date report thing and

23   see where we're at and to make a decision based off of that

24   information.

25   Q.   Well, as -- as the principal of Best Beach Getaways

Cross - Keryan

1   sits here and tries to predict his company's future and

2   wherewithal and make some business plans --

3   A.   Uhm-hum.

4   Q.   -- what is he supposed to assume about how long you're

5   going to be hanging on to his $2.3 million?

6   A.   Well, it's -- again, it's a data-driven assessment.

7   We -- Mr. DeVos provided me information July 24th, and from

8   that information, even though I have follow-up questions I

9   was able to tell that we had passed that peak and I was able

10  to get approval based off of that data to remove the funds

11  hold and release 1 million back.

12       I got more information from Mr. DeVos on August --

13  or, I'm sorry, I'm sorry, July 31st, and based off of that

14  information, I was able to secure approval from management

15  to release $1.5 million.  So, you know, that reserve target,

16  it's always -- it's fluid, it's always moving.  And the

17  information Mr. DeVos has provided us is extremely valuable

18  in our assessment because without it, we have to make more

19  conservative assumptions.  And so I -- you know, my hope is

20  that we can keep -- you know, keep that communication open

21  and that data sharing so that we have the information that

22  is needed to make the most, you know, fair decision.

23       THE COURT:  Mr. Dogali, how much more do you think

24  you have with this witness?

25       MR. DOGALI:  I would think quite a bit.  30

1    minutes, probably.

2         THE COURT:  Okay.

3    BY MR. DOGALI:

4    Q.   Do you have available to you the Plaintiff's Exhibit 9?

5    Do you have it available to you?

6    A.   Yes.

7    Q.   What is it?  Dated April 14 hold notice?

8    A.   Yes, sir.

9    Q.   Your declaration refers to this at paragraph 14.  Can

10   you take a look at that.  You indicated that the decision to

11   implement a reserve and a hold was not a final decision.  Do

12   you see that?

13   A.   Yes, sir.

14   Q.   When you sent this letter, this is -- the second

15   paragraph says, TSYS is placing a 100 percent fund hold

16   effective April 14th, 2020, until further notice.

17   A.   Uhm-hum.

18   Q.   Do you understand that a reader of this is supposed to

19   think there's something tentative or preliminary or

20   temporary about "until further notice"?

21   A.    Well, I think under that paragraph that's why there's

22   that additional kind of note there that we can reconsider

23   with the requested information.  And, you know, I believe

24   it's the next day I got on the phone with Mr. DeVos, who was

25   very responsive, and I explained the process to him and I

1    told him that this is an ongoing assessment and that we

2    needed that -- that information to drill down on our

3    exposure, understand his business operations and so forth.

4           So I -- if it wasn't clear in that email, I

5    certainly felt like I had answered all of Mr. DeVos's

6    questions and explained the process to him the following

7    day.

8    Q.   When you sent this on April 14th, was it one of several

9    that went out the same day to different merchants?

10          MS. PEURACH:  Objection, relevance.

11          THE COURT:  Yeah, sustained.  Doesn't matter.

12   BY MR. DOGALI:

13   Q.   The document attached to the letter which is the

14   merchant card processing agreement?

15   A.   Yes, sir.  We always send that out when we have a

16   notification like this.

17   Q.   The very bottom of this document has a footer that

18   indicates that it's a version -- version 2.029.  "V" 2.209.

19   Is that a version number?

20   A.   That's a good question -- I believe so.  I think so,

21   yes.

22   Q.   When you sent the -- do you remember that you also sent

23   a hold notice on June 22?

24   A.   When we -- yes.  Yes, I remember.

25   Q.   The June 22 hold notice attached version 3.509.  Which

Cross - Keryan

1    one of those is Best Beach Getaways supposed to follow?

2              MS. PEURACH:  Objection, Your Honor.  Relevance.

3    There hasn't been any dispute in this case thus far about

4    which contract's governing the dispute here.  And Ms. Keryan

5    is not in the legal department or involved in that part of

6    the decision.

7              THE COURT:  Well, repeat the question again.  I was

8    a little confused by the question.  Go ahead, Mr. Dogali.

9              MR. DOGALI:  Yes, Your Honor.

10   BY MR. DOGALI:

11   Q.   Ms. Keryan, you sent two hold notices to the -- the

12   letter to Best Beach Getaways, one on April 14, one on June

13   22.  They each attach a different version of the contract.

14   A.   Uhm-hum.

15   Q.   The question was:  Which version is the Best Beach

16   Getaways expected to follow?

17             THE COURT:  Well, the objection's overruled.

18             THE WITNESS:  So I will take responsibility for

19   that.  You know, all I can say is with COVID and just kind

20   of the unprecedented impacts to our -- you know, the

21   periodic review team's merchants and, in turn, my merchants,

22   we were really busy, to put it simply, and so that was user

23   error.  However, with that said, both of these agreements,

24   when it comes to the terms for the reserve accounts, all of

25   our agreements had that in the same place, which is Section

                          Cross - Keryan

1    13.  So I apologize that there was different ones sent out.

2    That was certainly not intentional.

3    BY MR. DOGALI:

4    Q.   Which one was wrong?  Was version 2 and change supposed

5    to be attached to both or the version 3 and change?

6    A.   I believe it was the second one, the version 3.

7    Q.   Is that version still in effect today?

8    A.   I would assume so.  There's been no change to the

9    contract or anything.

10   Q.   Is there anything implementing applying this contract

11   part of your activities for TSYS?

12   A.   Reviewing the contract, no.  We just have tried to

13   implement something in periodic review to -- when we're

14   sending the notification to try to include the merchant

15   processing agreement for reference.  But reviewing the

16   contract, no.

17   Q.   And I don't want to ask you about too many provisions

18   of it, only one or two.  Can you examine and -- we'll start

19   with -- which one would you prefer, the 2 version or the 3

20   version?

21   A.   I have no preference.

22   Q.   We started in Exhibit 9, that's the 2 version, I think

23   this particular paragraph is the same.  The very first page

24   on the first column, that small font --

25              THE COURT:  So I need to know exactly where you

Cross - Keryan

1    are.  You're on which page of Exhibit 9?  These two

2    aren't --

3              MR. DOGALI:  1 of 6.

4              THE COURT:  Okay.  I'm there.

5    BY MR. DOGALI:

6    Q.   And the left column, there's a section that says With

7    Respect to MasterCard Transaction.  Do you see that, ma'am?

8    A.   I'm sorry, you're on the first paragraph?

9    Q.   First page.

10   A.   First page.

11   Q.   Left column about two-thirds of the way down, you see

12   with respect to MasterCard transactions.

13   A.   Yes.  Sorry.

14   Q.   There is a subparagraph C.  Do you see that?

15   A.   Yes.

16   Q.   It says, Processor may not have access directly or

17   indirectly to any accounts for funds or funds due to a

18   merchant, and/or funds withheld from a merchant for

19   chargeback arising from or related to performance of the

20   merchant agreement.  Do you see that?

21   A.   Yes.

22   Q.   Doesn't that mean TSYS cannot impose a hold on

23   MasterCard charges?

24   A.   Honestly, sir, this is the first time I have seen this

25   so I have not read our contracts in full.  And I don't know

1    how to answer that question.  I don't know.  This is

2    something I'm not a subject matter expert in, this contract.

3    Again, the only thing --

4    Q.   The --

5    A.   The only thing -- just to be clear, I'm sorry, I don't

6    mean to interrupt you.  The only thing that my team and I

7    look at when we're pulling this -- the NPA to send to our

8    merchants is Section 13.

9    Q.   When you imposed the 100 percent hold, did you make any

10   effort to differentiate between VISA charges and MasterCard

11   charges?

12   A.   No, because we process for both for this merchant.

13   Q.   Are you -- you mentioned Section 13, paragraph 13, of

14   the agreement is something you deal with because you put it

15   in the hold notice, right?

16   A.   I mean, "deal with" in the sense that we just go to the

17   page and make sure that that language is there so we can

18   reference it in our letter.  That's the process.

19   Q.   Does Section 13 of this contract even contemplate that

20   there will ever be a 100 percent hold?

21   A.   I don't believe there's specific language because it's

22   up to the discretion of TSYS is my understanding.

23   Q.   What is your understanding of -- strike that.

24        Before you sent the April 14 letter, no reserve

25   account existed, right.

Cross - Keryan

1    A.    Correct.

2    Q.    What is your understanding of any protocols that are in

3    place of conditions TSYS needs to meet prior to first

4    creating a -- a reserve account?  Do you know?

5    A.    We review the account, we pull the data warehouse to

6    see the processing history, we'll review the website, we'll

7    look to see if we have any past reviews or financial

8    statements.  But, again, you know, COVID is --

9    Q.    That -- this contract --

10             THE COURT:   Don't -- don't speak over each other.

11   Ms. Keryan, you just need to answer the question, stop, and

12   then let Mr. Dogali ask his next question.

13   BY MR. DOGALI:

14   Q.    Do you know what procedures are required of TSYS to

15   establish a refund account in the first instance?

16   A.    Post-COVID?

17   Q.    Any time.

18   A.    Well, I ask because it's kind of different post-COVID

19   than it was pre-COVID.

20   Q.    Did the contract change post-COVID from pre-COVID?

21   A.    No, but my understanding is that it's up to TSYS's

22   discretion to place a hold or implement a reserve account

23   and --

24   Q.    Okay.

25             THE COURT:   I want to ask a question here because I

Cross - Keryan

1    don't want to forget it.  When you are making your

2    assessment on whether to recommend placing a hold in, do you

3    take into account how a hold might affect the business's

4    ability to meet its obligations?

5              THE WITNESS:  Of course.  Of course.  That's

6    something that's really important.  We didn't have -- I

7    guess our concerns were lessened by the fact that we could

8    only hold VISA and MasterCard transactions.  We were not

9    processing for American Express, we were not processing for

10   Discover.  We know that the merchant has other sources of

11   revenue outside of that, like cash and check and ACH and

12   such --

13             THE COURT:  How much other than MasterCard and

14   VISA?  They only had like 20 percent, right?  80 percent of

15   their income was coming in through VISA and MasterCard,

16   right?

17             THE WITNESS:  Based off of 2019's numbers, that was

18   our assumption, yes.

19             THE COURT:  Okay.  Did you -- was there any

20   communication with them prior to you sending your letter on

21   April 14th announcing you were placing a 100 percent funds

22   hold to ask them what that would mean for their business?

23             THE WITNESS:  No.

24             THE COURT:  So when you say of course you took it

25   into account, if you didn't ask them how it would affect

1    their business, how can you say that it -- it -- how were

2    you taking it into account?

3            THE WITNESS:  I guess that's the assumption that we

4    operated under that they had other revenue sources.

5            THE COURT:  Okay, all right.  Go ahead, Mr. Dogali.

6    BY MR. DOGALI:

7    Q.   The letter that you sent on April 14 and on June 22,

8    did you draft the language of it or was it given to you?

9    A.   The letters that I sent -- did I draft the language?

10   Q.   Yes.

11   A.   It's -- no.  I altered -- or modified certain pieces,

12   but it's kind of a template that we use.

13   Q.   Do you see in the first sentence, it says TSYS is an

14   unsecured creditor?

15   A.   Yes, sir.

16   Q.   And then on the second to the last sentence, the bottom

17   paragraph, it again says TSYS is an unsecured creditor.  Do

18   you see that?

19   A.   Yes, sir.

20   Q.   Do you -- are you -- are you agreeing on behalf of TSYS

21   that TSYS is an unsecured creditor of Best Beach Getaways?

22   Is that what you intended there?

23           MS. PEURACH:  Objection.  Misstates the testimony.

24           THE COURT:  Well, let her answer to the extent she

25   knows.

1          THE WITNESS:   TSYS -- my understanding is that TSYS

2     is an unsecured creditor because the merchant account is a

3     credit facility.

4     BY MR. DOGALI:

5     Q.    What does that mean?

6     A.    That means that we are moving money between card

7     holders and businesses, but that that money is given to our

8     businesses in advance, such as the case with Best Beach.

9     You know, we are giving them funds for services that have

10    not been provided.  It's considered a -- I guess a

11    provisional credit.

12          And so, you know, we are the ones that -- TSYS is

13    the one that's on the hook if there is ever an instance

14    where -- like with chargebacks, we make the customer whole

15    first and then we go to our merchants to recoup that money.

16    And there's no guarantee that that money is going to be in

17    the account.  That's why these reviews are so important and

18    that is why it's my understanding that we are an unsecured

19    creditor, unless there's a situation where we have a reserve

20    account in place where they're more secured.

21    Q.    Your understanding is by creating a reserve account

22    you've converted TSYS from an unsecured creditor to a

23    secured one, right?

24    A.    Yes.

25    Q.    And in the contract, you cite paragraph 13 each time

1    because you want the merchants to know about that reserve

2    account language.  Paragraph --

3    A.    Yes.

4    Q.    -- 14 is the paragraph about security interest.  Do you

5    have any information about why that -- all of those parts of

6    paragraph 14 do not apply here?

7    A.    I do not know about that portion of the contract, no.

8    Q.    Do you recall that on May 11, you actually recommended

9    that the reserve -- that the hold be lifted and the reserve

10   funds be released and Mr. Fenton overturned your

11   recommendation and said no.  Do you remember that?

12   A.    Yes.  Yes.

13   Q.    Was your recommendation wrong?

14   A.    It was based on inaccurate information.  I thought our

15   exposure was a lot less than it truly was and that's what my

16   recommendation was based off of.  And I think if I remember

17   correctly, Mark -- Mr. Fenton, my director, pointed that out

18   in his response that he believed our exposure was well above

19   what I was estimating and he was correct.

20   Q.    What would -- what was the variable within your

21   assessment that caused you to get it wrong?

22   A.    So we used something internally called Future Delivery,

23   or FDX.  It's an acronym that refers to exposure for future

24   goods or services.  So that first executive conservative --

25   executive concurrence or analysis that I sent up was based

1    on FDX data.  I did believe it was 84.

2           And without getting, you know, into the weeds,

3    those -- that figure gave me X amount of exposure, which I

4    believe was 1.9 or somewhere thereabouts.  However, once we

5    got information and data from the merchant, it showed us

6    that our estimates were way off and that there was

7    significantly more exposure than I had estimated.

8    Q.   What was the 84 days?  What is that?

9    A.   So 84 days was the average FDX days used as a part of a

10   risk calculation that I believed was on average how many

11   days in advance payments were being collected.

12   Q.   What -- if that period of time gets extended from 84

13   days to 184 days, the dollars at risk for TSYS don't change,

14   do they?

15   A.   Oh, yeah, they do.  So 84 days is 2 1/2 months, so

16   essentially we're saying 2 1/2 months worth of processing

17   we're at risk for.  If it goes up to 184 days, that is a

18   four -- I don't know, five, six months worth of processing

19   instead.  So the larger that FDX date, the more exposure

20   TSYS has because it's capturing more transactions, if that

21   makes sense.

22   Q.   I'm almost done.  On the --

23          THE COURT:  Mr. Dogali, we can't hear you.  You

24   have to speak clearly into the microphone.

25          MR. DOGALI:  Oh.

Cross - Keryan

1    BY MR. DOGALI:

2    Q.   On May 21, you gave notice to Best Beach Getaways that

3    the hold was being lifted, correct?

4    A.   Yes.

5    Q.   You have Exhibit F, as in Frank, available to you?

6    A.   Yes.  I'm there.

7    Q.   The first paragraph, second line, Based on our exposure

8    figure, we are fully secured at this time.  Do you see that?

9    A.   Yes.

10   Q.   What did you mean by "fully secured at this time"?

11   A.   Based on the information we have that -- or, I'm sorry,

12   that we had that resulted in the 1.9 million risk estimates,

13   we were fully secured against that.

14   Q.   That means you have now protected TSYS entirely against

15   that level of risk, right?

16   A.   What we assumed to be our risk at that time.  And that

17   was before additional information that was provided by the

18   merchant demonstrated a higher exposure.  But at that time,

19   what we believed our exposure to be, yes, we believed we

20   were fully secured.  That's why the hold was removed.

21   Q.   And by fully secured, do you mean you had eliminated

22   the risk for TSYS, right?

23   A.   What we believed to be -- sorry.  Yes, what we believed

24   to be the risk, we were fully secured.

25              THE COURT:  All right, I'm going to ask another

1    question because I guess I get to ask questions when I . . .

2            When you -- when you say your exposure, I mean, at

3    one point you're up to in excess of $4 million in supposed

4    exposure, that is why you had the hold, that's why the

5    reserve went up to that amount.

6            THE WITNESS:  Uhm-hum.

7            THE COURT:  But my understanding is is that you're

8    on the hook when people ask for chargebacks.  So why -- No.

9    1, why are you putting a hold on 100 percent of their cash

10   flow?  Couldn't you build that reserve by putting a hold on

11   50 percent, so allowing them to get some money to operate?

12   And, 2, why -- why such a -- when you say $4 million is your

13   exposure, if the --

14           THE WITNESS:  Uhm-hum.

15           THE COURT:  If the chargeback number goes up to 20

16   percent, it's going to have to -- it's going to have to be a

17   much, much higher percent for them ever to hit $4 million in

18   chargebacks.  I looked at your chargeback chart and the

19   chargebacks, even at the 10 percent level, were less than

20   $100,000, I think.  Maybe I'm misrecollecting.  But why --

21   how is your exposure in excess of $4 million?

22           THE WITNESS:  If I may, Your Honor, can I refer to

23   the data warehouse on Exhibit E?

24           THE COURT:  Okay.

25           THE WITNESS:  Just to give you some figures.

1          THE COURT:  Yes.

2          THE WITNESS:  So when you look at the processing

3   volume, especially in May, June, and July, please understand

4   it's not just chargebacks we are on the hook for, it is

5   every single transaction that comes through the account.

6   With that in mind, and based on the merchant's payment

7   terms, which again is more than a year -- up to a year in

8   advance for the deposit and 30 days in advance for the final

9   payment, you can start to see, based on the volume, that

10  it's more than just one month's worth of processing --

11         THE COURT:  Now, I'm -- you're looking at which

12  exhibit?  Exhibit?

13         THE WITNESS:  Sorry, Exhibit B, on page -- page 2.

14  It has the months and the sales --

15         THE COURT:  Exhibit B, as in boy?

16         THE WITNESS:  Yes.

17         THE COURT:  Okay.  All right.  I have it.

18         THE WITNESS:  So, again, take just June's

19  processing and, keeping in mind that every single

20  transaction that comes through the merchant account TSYS is

21  liable for, all of those payments are collected in advance.

22  So those services were not provided that month.

23         And then when you consider, too, that payments are

24  collected up to a year in advance and you start looking back

25  historically, you can see how that risk kind of starts

1    accumulating over time.  Though, if anything, I wondered

2    sometimes if we are undersecure.  Even the most recent

3    reports that were provided to us from the merchant, there

4    was data missing that had been there previously for the

5    months May through October of 2021, and so -- but we based

6    decisions off of the information that our merchants provide

7    to us, but, yeah, I -- sorry.  I hope that answers your

8    question.

9         But, yeah, when you look at this processing volume,

10   that's what we are liable for.  It's not just the

11   chargebacks.  The chargebacks are an indicator of a

12   potential problem.  But it's not just the chargebacks, it's

13   every single transaction that's coming through this account

14   and all of these transactions are collected well in advance

15   of 30 days to up to a year, and when you start considering

16   all the prior months processing volume, that's where it

17   starts accumulating and the aggregate amount of liability is

18   what our -- or what TSYS's exposure is.

19        THE COURT:  So when you say it's not just the

20   chargebacks, it's every transaction, is it because --

21        THE WITNESS:  Uhm-hum.

22        THE COURT:  -- in theory every transaction could be

23   subject to a chargeback?  I mean, that's the only time that

24   you have to pay the credit card company, is if there's a

25   chargeback, right?

Cross - Keryan

1       THE WITNESS:  Yes.  Every transaction can turn into

2   a chargeback.  And, mind you, when a chargeback is

3   initiated, it doesn't hit the merchant's bank account first.

4   TSYS, as a processor, funds that chargeback first and then

5   we go back to the merchant, and there's no guarantee that we

6   are going to, I guess, recoup.  And so that's where that

7   risk comes in.  It's those advanced payments that put

8   certain companies into a high-risk model -- or at least with

9   TSYS we use a high-risk, it really comes down to how far in

10  advance payments are being collected.

11      THE COURT:  Okay.  And then to answer my other

12  question, which is:  Why do you have to put a hundred

13  percent hold?  Why couldn't you build whatever the reserve

14  amount is over time with, say, a 50 percent hold to give it

15  some liquidity in terms of the cash going to Best Beach?

16      THE WITNESS:  I think the best way to answer that

17  is -- well, the initial decision is just normal course of

18  business; it's standard business practice.  After that, once

19  we received information from the merchant, I think -- you

20  know, our exposure was so high that we wanted to build that

21  reserve fund.  But my recommendation was in line with

22  management who looked at it with me --

23      THE COURT:  Is there ever a circumstance where a

24  less than 100 percent hold is placed on somebody where you

25  feel there's a need for reserve but you can build it over

Cross - Keryan

1    time?

2         THE WITNESS:  Yes, sir, Your Honor, yes.

3         THE COURT:  Was there -- that ever discussed with

4    the folks at Best Beach?

5         THE WITNESS:  Not with the folks at Best Beach, but

6    I had some conversations with my manager.  And, you know,

7    this is an account -- this isn't an account where we made a

8    decision in May and then like we're going to place a hold

9    and not monitor them until, you know, whenever.  This is an

10   account we knew would have enhanced monitoring and that we

11   would -- we would be, I guess, touching it a lot and getting

12   updated information.  And we did it -- you know, once we

13   started getting bank account statements and that type of

14   information, we were keeping a close eye on our exposure to

15   kind of the cash flow.  And I don't think we had any

16   significant concerns about them being in a position where

17   our hold would cause them to go out of business.  We are

18   mindful and recognize that we are impacting their cash flow,

19   but it was never an intention to put them in a position

20   where they couldn't survive.

21        And now here we are past the peak exposure and we

22   have been releasing funds as appropriate, being mindful,

23   too, and knowing that their cash reserve towards the end of

24   the year is really important to their business model, we

25   know towards the end of the year they burn through cash a

Cross - Keryan

1    lot more because their peak season is down.  And that's
2    another kind of factor that was a part of my most recent
3    recommendation to get some funds back to the merchant.
4            We know our exposure is going down and so we
5    released as -- as appropriate.
6            THE COURT:  Okay.  Thank you.
7            Mr. Dogali, back to you.  Sorry for the
8    interruption.
9            MR. DOGALI:  No trouble.
10   BY MR. DOGALI:
11   Q.   Do you remember that when Mr. Fenton rejected your
12   recommendation to release the hold and the reserve on
13   May 13th --
14   A.   Uh-huh.
15   Q.   -- two weeks later you asked that Best Beach Getaways
16   give you more information.  Are you generally aware of that?
17   A.   Yeah.  Uh-huh.  Yes.
18   Q.   It was during that period of time -- that two-week
19   period that the hold was actually lifted on May 21.
20   A.   Yes.
21   Q.   And at the end of the month, you asked Best Beach
22   Getaways for more information as part of your continuing
23   assessment, right?
24   A.   Yes.
25   Q.   Between the end of May when they gave you what you

Cross - Keryan

1    needed and June 22 when the hold was imposed --

2    A.    Uhm-hum.

3    Q.    -- did you do anything at all in relation to this

4    account?

5    A.    I believe I asked for an advance reservation report

6    that had deposit details for upcoming stays the end of May.

7    Q.    If there's no report or document or note anywhere

8    indicating that you did anything between May 29 and June 22,

9    would that be different than your recollection?

10   A.    No.    I don't -- between me asking for the advanced

11   booking report and reimplementing the hold, I don't believe

12   there is any other communication between the merchant and

13   I.

14   Q.    Look at paragraph 22 of your declaration.    There's an

15   area there about a half dozen lines up from the bottom of

16   paragraph 22 that starts with, Because Best Beach Getaways'

17   reservation reports.    Do you see that?

18   A.    Yes.    Yes, I'm there.

19   Q.    Because they did not reflect activities for June 2020,

20   I also concluded that Best Beach's total processing volume

21   as of June 22, the day I conducted the analysis, as Best

22   Beach's top processing generally includes two types of

23   payments.    Do you see that?

24   A.    Yes, sir.

25   Q.    Does that indicate accurately that you performed this

1    whole analysis on that one day of the information that had

2    been given to you May 29th?

3    A.    No.    I -- I have been looking at Best Beach's accounts

4    even just pulling a processing report pretty much every day

5    since mid-April.    This is probably referring to on June 22d,

6    an analysis that I sent up and part of this, too, was

7    because I had been watching the processing history, it was

8    spiking so high -- I mean, June -- June's processing volume

9    for this year was a 46 percent increase over the prior year.

10           And, again, because every payment we process for is

11    in advance, that means every one of those transactions posed

12    increased exposure to TSYS.    And so as that processing

13    volume increased, our risk did.

14    Q.    When -- when the -- when the -- the sales spiked in

15    June, that's actually a really good thing for your merchant,

16    right?

17    A.    Historically, yes.    I would think there's some unknowns

18    given the industry and COVID and what's going to happen in

19    the future.    That's a hard question to answer.    If COVID

20    wasn't happening right now, yes, that's -- you know, that's

21    awesome.    But there's a likelihood of, you know, this

22    exposure turning into more chargebacks and refunds with the

23    possibility of a resurgence, with the possibility of another

24    lockdown in Florida.    Unfortunately, there's just some

25    unknowns there that we have to account for.    There's a

1    likelihood.

2    Q.   Now, when I asked you whether the -- if there are no

3    notes at all reflecting you did anything between May 19th --

4    May 29 and June 22, would that be inconsistent with your

5    recollection?  I thought you indicated no, it wouldn't.  Now

6    you indicated you were looking every day during that period

7    of time at what was going on with Best Beach Getaway,

8    right?

9    A.   I apologize, I thought you asked if there was an

10   analysis or me reaching out to the merchant, which there was

11   not.  But I was trying to keep a pulse on this account by

12   looking at their processing almost every day, yes.  I pulled

13   the report.  So I apologize if I answered that inaccurately.

14   Q.   What does "June 22, the day I conducted the analysis,

15   mean"?

16   A.   The days that I kind of put all of the information I

17   had together and sent it up to, you know, to -- to my

18   director and -- and so on up the chain.

19   Q.   And so you put it together that day, June 22.  It went

20   up to management chain and the decision was made that very

21   day to reimpose another $2 million of hold, right?

22   A.   I believe so, yes.  It may have been the next day that

23   we got an answer from our parent company, but it was within

24   a day or two of me drafting my analysis, sending it up that

25   I got a decision.

Cross - Keryan

1  Q.  Well, you said here June 22 is the day and -- June 22

2  is the day that another hold was implemented, it all

3  happened in one day, right?

4  A.  The day we implemented the hold we would have had a

5  decision, yes.

6  Q.  And it's the same day you reported whatever you

7  reported on June 22.

8  A.  I believe so.  I don't know if we have an exhibit that

9  we can look at just to confirm.  I don't want to give wrong

10  information.

11  Q.  Did -- well, 25 days have passed since you got the

12  answers from Best Beach Getaway.  Is June 22 the best you

13  can do?

14  A.  I wish I could have done better; however, we are in a

15  very unprecedented time right now with COVID and, frankly, I

16  did the best that I could.  My team and I have been working

17  12-plus-hour days to try to stay on top of all of the

18  accounts that need to be reviewed, all the credit reviews

19  that need to be completed, all of the merchants we need to

20  talk to, all of the information we need to source, all of

21  the reports that we need to analyze.  So ideally it could

22  have been quicker, but it wasn't intentional.  And, you

23  know, I did the best that I could do.

24  Q.  So COVID-19 is impacting TSYS's business, too, your

25  ability to perform your work, right?

                         Redirect - Keryan

1    A.   Not my ability.  My workload, certainly.

2            THE COURT:  Mr. Dogali, we've been going about an

3    hour and a half and probably 35 minutes since you told me

4    you had maybe 25 minutes left with this witness so how much

5    longer do you think you have with this witness?

6            MR. DOGALI:  Bear with me, Your Honor, I'll just

7    figure out how much I could skip.

8            THE COURT:  Because you're going to have two more,

9    right?  And --

10           MR. DOGALI:  I have no more question for this

11   witness, Your Honor.

12           THE COURT:  All right.  I think I've -- let me look

13   at my notes.  I think I may have asked my questions.

14           Follow-up by defense counsel?

15           MR. MEADOWS:  Yes, Your Honor.  Briefly.  Thank

16   you.

17                     REDIRECT EXAMINATION

18   BY MS. PEURACH:

19   Q.   Hi, Ms. Keryan.  First thing I would like to ask you

20   relates to the decision to implement the funds hold in April

21   of 2020.  Can you please turn to Exhibit F of your

22   declaration.

23   A.   Yes.

24   Q.   Let me know when you have it.

25   A.   I'm there.

Redirect - Keryan

1    Q.   Okay.  So you were asked some questions about taking

2    into account the merchant's ability and -- to continue as a

3    going concern and continue its business operation when the

4    decision was made to institute a hundred percent funds hold.

5    Do you recall those questions?

6    A.   Yes.

7    Q.   In connection with considering the impact of a funds

8    hold on the merchant, did you request any information from

9    Best Beach?

10   A.   Yes.  When we did our initial hold?

11   Q.   Yes, ma'am.

12   A.   Oh, yeah.  We requested a lot of information about

13   their business operation, their financial positions, their

14   projections, management's insight into impacts from COVID,

15   how they're dealing with TSYS's specific questions about

16   their chargebacks.  I requested a lot of information --

17   liquidity information, their bank account statements.  I

18   requested a lot.

19         THE COURT:  Let me just ask --

20   BY MS. PEURACH:

21   Q.   And --

22         THE COURT:  Hold on, hold on, hold on.  Did you ask

23   for all that information before you implemented the hold or

24   after you implemented the hold?

25         THE WITNESS:  The day we implemented I requested

Redirect - Keryan

1    that information.

2              THE COURT:  So after you implemented the hold,

3    right?

4              THE WITNESS:  Yes.

5              THE COURT:  Okay.  Go ahead.

6    BY MS. PEURACH:

7    Q.   And actually, Ms. Keryan, I meant to direct you to

8    Exhibit D, so let me know when you get there.

9    A.   I'm there.

10   Q.   It's an email from Best Beach Getaways to you dated

11   April 20th.  Do you see that?

12   A.   Yes.

13   Q.   Do you recall receiving this email?

14   A.   Yes.

15   Q.   And I'd like to direct your attention to the first

16   bullet point in the email.  This is the email from Mr.

17   DeVos.

18   A.   Uhm-hum.

19   Q.   And it -- it says a financial summary document which

20   shows our cash position, if we had to refund all advance

21   deposits and run our business for the next six months

22   without any revenue.  You'll see --

23   A.   Uhm-hum --

24   Q.   -- that if that were the case, we would still have over

25   $1.5 million in cash.  Do you see that?

Redirect - Keryan

1    A.    Yes.

2    Q.    Do you recall taking that into consideration when

3    making decisions regarding the implementation of a funds

4    hold and the establishment of a reserve account?

5    A.    Yes.  Both myself and my management teams did.

6    Q.    Okay.  And, Ms. Keryan, it's my understanding that as

7    of today, the funds hold -- I'm sorry, the reserve -- the

8    funds hold has been lifted; is that right?

9    A.    Yes.  We removed the hold -- I believe it was July

10   31st.

11   Q.    And right now the reserve account is set at about

12   $2.3 million; is that correct?

13   A.    Approximately, yes.

14   Q.    And why is it that the reserve account is set at

15   $2.3 million as we sit here today?

16   A.    Because I got information from Mr. DeVos on July 24th

17   and July 31st.  I did analysis of that information, and came

18   up with a risk figure based off of that and released

19   accordingly so that we were fully secured but not

20   oversecured.

21   Q.    And did you have that decision approved by your senior

22   management before implementing it?

23   A.    Did I have the decision to release the hold approved

24   for -- I'm sorry.

25   Q.    No, no worries.  You spoke to the decision to release a

Recross - Keryan

1    portion of the reserve account.  And I'm -- I just want to

2    ask if that decision had been reviewed and approved by your

3    senior management.

4    A.    Oh, yes.  There was two different approvals.  One was

5    on July 31st, which is based off the data provided the 24th,

6    that was for release of 1 million and the funds hold.  And

7    then on last Friday, August 7th, I got additional approval

8    based off of more information I got from the merchant to

9    release about 1.5 million.

10   Q.    And is your review of the Best Beach account still

11   ongoing?

12   A.    Oh, yeah.  Yeah.  Uhm-hum.  Yes.

13            MS. PEURACH:  Thank you.  We have no further

14   questions.

15            THE COURT:  Any follow-up, Mr. Dogali?

16            MR. DOGALI:  Yes, sir.  Very briefly, I promise

17   you.

18                     RECROSS EXAMINATION

19   BY MR. DOGALI:

20   Q.    Ma'am, you were asked about the two releases, on

21   consecutive Fridays, July 31 and August 6th.

22   A.    Uhm-hum.

23   Q.    July 31 release was for an even $1 million.  What is

24   the mathematical formula that created that even number?

25   When you assessed it.

Recross - Keryan

1    A.   So that specific release we were missing information,

2    which is why I had some follow-up requests for Mr. DeVos.

3    But we knew that we had passed our peak processing -- or our

4    peak exposure.  We knew exposure was diminishing, and we

5    knew that we were moving into this latter part of the year

6    where cash flow was going to become more tight for the

7    merchant.  And so we wanted to -- you know, we wanted to

8    kind of just release some money back to the merchant to get

9    that -- to get funds in their bank account and release the

10   hold because, again, we had knew -- we knew our risk wasn't

11   increasing at that point, and that we would -- that we would

12   release whatever else was appropriate based off of that

13   missing data that I requested from Mr. DeVos, which was the

14   1.5.

15   Q.   My question was what created that number -- that

16   precise sort of even number of $1 million?  How did that

17   happen?

18   A.   That was a recommendation --

19             MS. PEURACH:  Objection.

20             THE WITNESS:  Sorry.

21             THE COURT:  Go ahead, Ms. Keryan.

22             THE WITNESS:  That was the approval that I received

23   from my management team, my parent company.  I believe I

24   made a recommendation of 1.5 million and they did a really

25   more thorough deep analysis into the data, the advanced

Recross - Keryan

1   booking report that was provided by the merchant, and the

2   processing history, and they are the ones that finalized the

3   1 million approval.

4   BY MR. DOGALI:

5   Q.   Is there a written record of you recommending 1.5 and

6   they only approved 1.0?

7   A.   Yes.

8   Q.   Now, the next Friday afternoon, the release was made

9   for $1,489,443.  Do you remember that?

10  A.   Yes.

11  Q.   What is the formula that came up with such a precise

12  number the second Friday afternoon?

13  A.   So the big -- we were missing a couple of pieces of

14  information.  The biggest thing was deposit information from

15  mid-July through the end of August, and once we received

16  that, I guess the simplest way to look at it is we kind

17  of -- we sort -- I'm sorry, let me back up.

18          The report that's provided to us has information

19  for every stay, including, you know, how much money has been

20  collected so far, what's outstanding, the first date of the

21  stay and the last day of the stay.

22          And so based on the stay date, we backed out every

23  stay as of, I think, Thursday that had already taken place,

24  and there was a remaining figure.  And then we also back out

25  chargebacks and refunds.  And so the figure we were left

Recross - Keryan

1    with, based on how much we had in reserve funds, is what

2    resulted in the 1.5 -- or 1.489 million release.

3    Q.   Is it part of your standard operating procedure to make

4    releases of reserve funds on Friday afternoons?

5    A.   No.  I -- so I was given the remaining information

6    Friday afternoon, July the 31st.  I was out Monday.  And

7    it's a lot of data, it takes time to review everything, it's

8    not something that we rush through.

9            And once I reviewed everything and sent my

10   recommendation up, it went up three different levels, so

11   three other people that looked at it.  And there's a time

12   difference, too, with our parent company being in London.

13   So I think they received my recommendation on Thursday, but

14   because of the time difference, I didn't get a response

15   until about 3:00 or 4 a.m. on Friday.

16   Q.   So the first Friday you recommend 1.5, and 1.0 was

17   approved.  The second Friday you recommended 1,489,443 and

18   that was approved.

19   A.   The 1.489 was approved, yes, and released on August

20   7th.

21   Q.   And that was your recommendation that time that was

22   approved that time?

23   A.   My recommendation was actually slightly higher than

24   that.

25           MR. DOGALI:  Thank you.  I don't have any more

1    questions.

2           THE COURT:  Okay.  I think the witness is excused.

3    And we're going to take a break because we've been going

4    about an hour and 45 minutes.  So hopefully let's all try

5    and be back at five of 3:00 Denver time, five of 5:00 East

6    Coast time.

7       (Recess taken 2:42 p.m. to 2:58 p.m.)

8           THE COURT:  We are back on the record.  And if we

9    could have defendant TSYS call their next witness, please.

10         MS. PEURACH:  Yes, Your Honor.  We will be calling

11    Mark Fenton.  Is he on the line or video?

12         THE COURT:  I do not have him on the video.

13         UNIDENTIFIED SPEAKER:  Yes.  Mark is on the line.

14    He is having video challenges, however.

15         THE COURT:  Was he on before?  No, he wasn't.

16         MS. PEURACH:  No, we just let him know at the

17    break.

18         UNIDENTIFIED SPEAKER:  He's asking for a meeting ID

19    code.  Is that correct?

20         THE COURT:  The meeting ID?  Did we not

21    circulate -- he should have received all that information.

22         MS. PEURACH:  Does he have the meeting ID?  Mark,

23    are you using a Chrome browser?

24         THE WITNESS:  Yes.

25         THE COURT:  Okay.

1          MS. PEURACH:  If you want one of the things -- we
2     had to try closing and reopening it once on the browser,
3     starting anew.
4          THE WITNESS:  Okay.  I apologize.  I don't have a
5     meeting ID, so . . .
6          THE COURT:  Okay.  We could go to our backup plan,
7     which is the telephone, if it's not working.
8          THE WITNESS:  Okay.  I have the camera, I'm
9     clicking "Joining meeting."  Can you see that?
10          MS. PEURACH:  We'll let you know soon.
11          THE COURT:  Had you tried to get on earlier today
12     or was there any --
13          THE WITNESS:  No, I did not.
14          THE COURT:  Yeah.  It would have been good to do a
15     run-through to --
16          THE WITNESS:  Yeah.  It -- again, it's asking for a
17     password and I don't have a password.
18          MS. PEURACH:  Yeah, I don't think . . .
19          THE COURT:  Robb, is there a password or --
20          COURTROOM DEPUTY:  I think it's just --
21          THE COURT:  Just the link?
22          COURTROOM DEPUTY:  An access code with the link.
23     Actually I don't even think there's an access code with the
24     link, it's just enter your name and go.
25          MS. PEURACH:  Your Honor, I, at this point, subject

1    to potentially a short redirect, would simply be moving his

2    declaration into evidence, so we could try it over the phone

3    if you would prefer that.

4              THE COURT:  Is he on the phone now?  Is that how

5    we're hearing him?

6              THE WITNESS:  Yes, I am on the phone.

7              THE COURT:  Okay.  So you used the phone access; is

8    that correct?

9              THE WITNESS:  Correct.

10              THE COURT:  Okay.  Mr. Dogali, can you hear Mr.

11    Fenton okay?

12              MR. DOGALI:  Yes, Your Honor, we can.

13              THE COURT:  All right.  And I'll just ask my court

14    reporter if she can hear Mr. Fenton all right?  Okay, we'll

15    just do it by telephone.  So why don't we swear the witness

16    initially, if you could -- we won't be seeing you, but if

17    you could please raise your right hand, sir.

18              THE WITNESS:  Yes.

19               MARK FENTON, DEFENDANT'S WITNESS, SWORN

20              COURTROOM DEPUTY:  Please state your full name and

21    spell your full name for the record.

22              THE WITNESS:  My full name is Mark Fenton.  F --

23    M-a-r-k, middle initial L, do you want that -- last name is

24    F, as in Frank, e-n-t-o-n.  Fenton.

25                         DIRECT EXAMINATION

Direct - Fenton

1    BY MS. PEURACH:

2    Q.   Good afternoon, Mr. Fenton, it's Alex Peurach on behalf

3    of TSYS.

4           Do you have your declaration that you submitted in

5    this case before you?

6    A.   I do.

7    Q.   Do you adopt the contents of that declaration as your

8    testimony here today?

9    A.   Yes.

10   Q.   You swear to the truth of the contents of your

11   declaration under penalties of perjury?

12   A.   Yes.

13          MS. PEURACH:  Your Honor, we would move the

14   declaration of Mark Fenton into evidence.

15          THE COURT:  It's admitted.  Assuming there's no

16   objection by Mr. Dogali.

17          MR. DOGALI:  No objection, Your Honor.

18          THE COURT:  It's admitted.

19          MS. PEURACH:  Your Honor, that -- we intend to have

20   our direct examination of Mr. Fenton be accomplished through

21   his declaration and we will reserve the right for any

22   redirect after Mr. Dogali's cross-examination.

23          THE COURT:  Okay.  Mr. Dogali, cross-examination.

24                          CROSS-EXAMINATION

25   BY MR. DOGALI:

1    Q.   Mr. Fenton, do you have your declaration in front of

2    you?

3    A.   Yes, I do.

4    Q.   Can you take a look at paragraph 3 of the declaration.

5    A.   Yes.

6    Q.   Do you see that there's a reference there that says, As

7    a payment processor, TSYS manages a merchant's credit and

8    debit card transaction process by acting as the mediator

9    between the merchant and the financial institution involved.

10   Do you see that?

11   A.   Yes.

12   Q.   What do you mean by mediator there?

13   A.   The merchants, themselves, do not directly interact

14   with the issuer of the credit card, so the issuer of the

15   credit card holds -- has the funds that are used in the

16   transaction, but the merchant really does not interact with

17   every issue that they make up the credit card from.  So

18   that's part of the job that we do.

19          THE COURT:  So, Mr. Fenton -- Mr. Fenton, I don't

20   know if you're -- you have your phone on a table, but you're

21   moving to and from, you got to stay close to the -- whatever

22   the speaker is that you're using because you're fading in

23   and out.

24          THE WITNESS:  Okay.

25          THE COURT:  Thank you.

Cross - Fenton

1    BY MR. DOGALI:

2    Q.   In the context of chargebacks, how routine is it for

3    you to defend your merchant's position *vis-a-vis* the credit

4    card company?

5    A.   Let me rephrase the question.  I'm not sure I

6    understand it.  With regards to chargebacks, how common is

7    it for us to defend the merchant *vis-a-vis* the credit card

8    company?  We give guidance -- is that -- let me back up.

9    Was that the question?

10   Q.   Yes.

11   A.   Okay.  So we, ourselves, again, are simply a

12   facilitator.  I wouldn't say we necessarily defend, although

13   we work with our merchants -- we have a very large

14   department and that is all they do is to work with merchants

15   to help the merchant defend the chargeback.  So we don't do

16   it ourselves, but we will help the merchant -- we facilitate

17   the dialogue between the merchant and the issuing bank that

18   sent out the chargeback.  It's really up to the merchant to

19   defend it.

20   Q.   Okay.  So the merchant defends themselves in relation

21   to a chargeback?

22   A.   Yes.

23   Q.   Would you look at paragraph 7 of your declaration.

24   A.   Yes.

25   Q.   There's an area at the bottom of -- the top of page 3,

Cross - Fenton

1    I think I have that -- actually, that -- pardon me.

2          Near the end of that paragraph, do you see, "and in

3    some cases"?  I'm sorry, it's paragraph 8.  I apologize.

4    A.   Okay.

5    Q.   At the end of that:  And in some cases, there is a risk

6    that a merchant can go out of business after TSYS has

7    processed a large volume of chargebacks leaving TSYS with no

8    financial recourse.  Do you see that?

9    A.   Yes.

10   Q.   How many chargebacks have you processed for Best Beach

11   Getaway?

12   A.   I would have to go to one of the documents that was

13   provided.  I wouldn't know off the top of my head.

14   Q.   Well, is it any?

15   A.   Oh, yes.

16   Q.   Well, you don't have a large outlay on behalf of a

17   merchant unless you actually have to fund the chargeback

18   when the merchant does not, right?

19   A.   As this sentence was referring to, should a merchant go

20   out of business, and at that point unable to fund

21   chargebacks, unable to provide refunds, we could be at great

22   exposure regardless of previous history.

23   Q.   This says that a merchant can go out of business after

24   TSYS has processed a large volume of chargebacks.  And I

25   simply asked, well, have you processed any for Best Beach

Cross - Fenton

1    Getaways yet?

2    A.   Have we processed any chargebacks for Best Beach

3    Getaways?  Is that the question?

4    Q.   Yes, that is precisely the question.

5    A.   Yes, we have.

6    Q.   Is that what -- what do you mean by -- in this sentence

7    of your declaration, what does "process" mean?

8    A.   The meaning of the sentence is if we receive a large

9    number of chargebacks and when we receive a chargeback, we

10   have to fund it, we have to pay the issuing bank

11   immediately.  It's automatically taken out of our account.

12            If we receive process, i.e., pay, send out the

13   letter to the merchant, do our usual routine chargeback

14   activities.  If we receive a large volume of those after the

15   merchant has gone out of business, we could be at

16   significant risk.

17   Q.   Okay.  I must -- I must be -- thank you.  I must be

18   misreading what this sentence says.  So when a merchant goes

19   out of business, you're left holding chargebacks which can

20   cost you a lot of money, correct?

21   A.   It could happen, yes.

22   Q.   Well, then don't you do what you can to help your

23   merchants stay in business?

24   A.   We do several things.  We do what we can to help the

25   merchant fight the chargebacks.  If it's a good merchant

Cross - Fenton

1    that has good policies, has good documentation, then we'll

2    work with them to help them fight those chargebacks, and

3    then it's not a loss for anybody.

4    Q.    I thought we started this --

5    A.    We --

6    Q.    -- you don't do anything to help them fight

7    chargebacks.

8    A.    We -- we provide guidance as to what kind of

9    documentation results in the best defense of the chargeback.

10   As I said, we have a department, that's what they do.  We

11   created that department, it's a very large department, to

12   help our merchants defend chargebacks.

13   Q.    What has TSYS done to help Best Beach Getaways defend

14   chargebacks?

15   A.    I would have to go back through the notes in the

16   electronic file to see what contact Best Beach has had with

17   our chargeback department.

18   Q.    Are you aware to any extent that Best Beach Getaways

19   has reached out to your chargeback department for guidance?

20   A.    There have been responses to some chargebacks, so at

21   some point, yes, they were involved and -- and provided

22   documentation to our chargeback department.

23   Q.    Do you -- is part of your effort for TSYS to work with

24   the merchant card processing agreement and apply the

25   terms?

1   A.    Is the question do we -- is part of my job to apply the

2   terms of the merchant processing agreement?

3   Q.    Yes.

4   A.    Yes.

5   Q.    Do you have access to the Plaintiff Exhibit 9?

6   A.    Plaintiff's -- one moment.  Let me . . .

7          Did we have that -- is Exhibit 9 an email?

8   Q.    Yes.  With a -- with a letter and a standard -- and a

9   merchant card processing agreement attached.

10  A.    Okay.  Yes.

11  Q.    Paragraph 13 appears to be the portion that directly

12  addresses the reserve account concept, correct?

13  A.    Yes, it does.

14  Q.    Let me ask you first about -- in paragraph 13.1B, as in

15  boy.  The second sentence there that says, The reserve

16  account shall be under the sole control of merchant bank and

17  processor shall have access to or move funds in the reserve

18  account.  Do you see that?

19  A.    Yes.

20  Q.    In the case of Best Beach Getaways, who's the merchant

21  bank?

22  A.    One moment.

23          MS. PEURACH:  Objection, Your Honor.  Calls for a

24  legal conclusion.

25          THE COURT:  Well, no, he said he is involved in

Cross - Fenton

1  ensuring the -- this contract is complied with.

2          THE WITNESS:  In this case, the merchant bank is

3  Wells Fargo.

4  BY MR. DOGALI:

5  Q.   Is that where the reserve account now resides?

6  A.   Yes.

7  Q.   When you look at the next paragraph, 13.2 of reserve

8  account deposits --

9          THE COURT:  Reserve account deposits I think he

10  said.  We're having trouble with the clarity, Mr. Dogali.

11  You've just got to speak up.  Thank you.

12          MR. DOGALI:  Apologies.

13  BY MR. DOGALI:

14  Q.   Paragraph 13.2A indicates, At any time in bank's sole

15  and absolute discretion, bank may, 1, designate the minimum

16  balance required to be deposited in the reserve account.  Do

17  you see that?

18  A.   Yes.

19  Q.   Did TSYS ever do that before creating this reserve

20  account?

21  A.   Did we do what?  I'm sorry.

22  Q.   Designate the amount to be deposited into it.

23  A.   It's typical that we set target based on what we

24  estimate the risk to be.  That would be designating the

25  balance required.

Cross - Fenton

1  Q.   When you first created this hold April 14, 2020, what
2  was the target?
3  A.   In many, many cases, this is just normal course of
4  business.  When we first embark on this, we may not have
5  enough information to set a firm target or to even set an
6  initial target, so we see enough red flags, enough alarm, we
7  place the hold, we start building the reserve, and at the
8  same time, we reach out to the merchant to start gathering
9  information to let them know that we started this reserve
10 process, but we're really at that point gathering more
11 information so that we can set a good reserve.
12 Q.   Is it fair to say you did not, as of the time the
13 reserve account was created, designate a minimum balance
14 required to be deposited into it?
15 A.   Not at -- let me go back to the letter and read the
16 letter.  As of April 14th, we had not yet set that balance.
17 We did later on several occasions, but at that time, we did
18 not.
19 Q.   The second paragraph there it says, You can also
20 require that the amount on deposit in the reserve account be
21 increased.  There came a time when that was done, right?
22 A.   I'm sorry, was that the letter -- what was the -- what
23 sentence were you referring to, please?
24 Q.   Subparagraph 2, right after what we just looked at,
25 says Required that the amount on deposit in the reserve

Cross - Fenton

1    account be increased.  That's another thing you can do,

2    right?  And in this case, you did that.

3    A.   Yes -- yes.

4    Q.   Now, the third subparagraph says you can also require

5    that the merchant deposit or merchant bank may deposit for

6    merchant into the reserve account the percentage of or a

7    fixed amount from each transaction process.  Do you see

8    that?

9    A.   Yes.

10   Q.   Why is it that that particular language is not wholly

11   inconsistent with a 100 percent hold?

12   A.   Can you repeat the question, please?

13   Q.   Why isn't subparagraph 13.2A3 wholly inconsistent with

14   the imposition of a 100 percent hold against your merchant?

15   A.   I'm not good at interpreting legalese; however, we can

16   set a withhold amount from transactions -- I don't know if

17   we have a minimum maybe 5 percent, but we can set anything

18   between 5 percent and 100 percent.  This subparagraph

19   indicates that one of the things you can do is designate a

20   percentage of each transaction process.

21   Q.   Is what you're saying that that means you can -- you

22   can apply that to mean that you'll just choose the

23   percentage of 100?

24   A.   In some cases, yes.

25   Q.   As I understand you right, you'll -- you'll read that

1    to indicate you can apply a 100 percent hold and not a

2    percentage of an amount.  And you will do that without

3    designating a minimum balance when you create the reserve.

4    That's what happened here, right?

5    A.   Yes.  Frequently initially where we're still gathering

6    information, but we see enough red flags, enough warnings,

7    that may be what we do.  It's not uncommon to do that.

8    Q.   Now, this paragraph concludes with the bank, at its

9    sole and absolute discretion, may require that each month

10   merchant deposit -- or merchant bank may deposit -- and it

11   concludes with -- sums into the reserve account no later

12   than the 20th day of the month.  Bank shall notify merchant

13   as to the amount of funds to be deposited each month.

14          Doesn't that mean you have to do this incrementally

15   and give your merchant notice of how much you plan to divert

16   the following month?  And then he has the first 20 days to

17   make sure that gets funded?

18          MS. PEURACH:  Objection.  Calls for a legal

19   conclusion.

20          THE COURT:  Overruled.

21          THE WITNESS:  I'm not familiar with this particular

22   sentence.  It sounds like -- and I'm guessing, it sounds

23   like we could set a reserve up that way.  I have never --

24   I've been with the company 10 years; I've never seen that

25   done.  We typically -- and this happens all the time --

Cross - Fenton

1    build a reserve by withholding all or portions of

2    transactions the merchant runs.

3         We also -- if we -- when we establish a target, if

4    we're not at the target yet, we also offer alternatives such

5    as the merchant could fully fund the required reserve with

6    cash.  They could wire funds to us, in which case, we would

7    fully fund the reserve, we would not hold any money out of

8    any of the transactions they ran.

9         Another alternative might be they may provide a

10   letter of credit for the full amount.  Same scenario, we

11   would release what we had held, we would not hold any more

12   out of transactions because we had an acceptable letter of

13   credit for the full amount.

14   Q.   With all those different options, did you do anything

15   here other than to tell Best Beach Getaways without notice

16   that you were immediately diverting 100 percent of their

17   cash flow with no target?

18   A.   I think I answered that, but as of the date of this

19   email and this communication, we didn't have enough -- we

20   saw numerous red flags, numerous warning signs, that told us

21   we had to act quickly.  We did not have enough information

22   to set a target yet.  That's why we sent this out

23   immediately to the merchant, provided them all of the

24   information that we had as to why we were doing it and what

25   allowed us to do it, the legal wording that allowed us to do

Cross - Fenton

1    it.

2             At that point, we did not have a target yet.  We

3    needed the merchant, hopefully, to work with us in a

4    collaborative manner so we could establish a good target.

5    Q.   I only --

6    A.   That -- how it --

7    Q.   Let me ask, sir:  It's true, isn't it, you didn't have

8    a target and you did this without notice, and when you -- as

9    you created the reserve account in the first instance, you

10   did so with a 100 percent hold?

11            MS. PEURACH:  Objection.  Asked and answered.

12            THE COURT:  I'll sustain the objection of compound.

13   So you've got to separate those out, Mr. Dogali.

14   BY MR. DOGALI:

15   Q.   You've already established you did not disclose a

16   target to your merchant, you still --

17            MS. PEURACH:  Object --

18            MR. DOGALI:  -- created --

19            THE COURT:  Sir -- Mr. Dogali, you have to -- when

20   you ask the question, you have to wait for an answer, okay?

21   You can't just speak in multiple sentences.  Make it a

22   question, make it a short question.

23   BY MR. DOGALI:

24   Q.   Did you give any advanced notice to your merchant of

25   your intention to create a reserve account?

Cross - Fenton

1    A.   This notification on the 14th was done the exact same

2    day we overnighted it to the merchant.  That was the exact

3    notice, the same date that we placed the hold.

4    Q.   Did you give this merchant any alternative options that

5    you outlined previously in lieu of this 100 percent hold?

6    A.   At this point, no, because we did not have a target

7    reserve.  We didn't have enough information yet.

8    Q.   Isn't it true that this paragraph 13.2 contemplates

9    that deposits into the reserve account will be made

10   incrementally with notice to the merchant who can fund --

11        MS. PEURACH:  Objection --

12        THE COURT:  Overruled.  You might --

13        THE WITNESS:  I'm sorry, did I miss the question?

14        THE COURT:  Yeah, you might repeat the question,

15   Mr. Dogali.

16   BY MR. DOGALI:

17   Q.   Isn't it true that paragraph 13.2 means that reserve

18   accounts are to be established and funded incrementally with

19   notice to your merchant?

20        MS. PEURACH:  Objection.  Misstates the document.

21        THE COURT:  Overruled.  Go ahead.  You can answer.

22        THE WITNESS:  In practice, that is one option of

23   establishing a reserve.  Depends on the timing, depends on

24   when it's done.  That is an option, but it's not the only

25   option.

1    BY MR. DOGALI:

2    Q.   And, I'm sorry, but I don't remember your answer.   When

3    you say that's an option and that's not the only option, was

4    there any option given to this merchant other than an

5    immediate 100 percent hold with no prior notice?

6    A.   I'll refer back to the letter again.   At this time, no,

7    because we did not have a target, so it wouldn't have made

8    sense at that time to establish other options.

9           MR. DOGALI:  One moment, Your Honor.  I think

10   I'm -- I don't have any more questions.

11          THE COURT:  Okay.  Redirect by defense counsel.

12          MS. PEURACH:  Nothing from defense, Your Honor.

13          THE COURT:  All right.  Let me just look at my

14   notes here.

15          So on page 7 of your declaration, Mr. Fenton,

16   you've got a statement:  At its highest the reserve account

17   was roughly equal to Best Beach's VISA and MasterCard

18   processing volume for only one month.  The peak value of the

19   reserve account amounted to approximately 34 percent of Best

20   Beach's total VISA and MasterCard processing value through

21   July 2020.  At no point did TSYS stop processing

22   transactions on Best Beach's behalf which allowed Best Beach

23   to continue accepting credit card payments from its

24   customers.

25          But they would have been precluded from paying

1     property owners, right?  I mean, if there's a 100 percent

2     hold, and somebody makes a reservation for, I don't know, an

3     apartment on the Beach this coming weekend, they pay the

4     full amount, and they have their vacation, presumably Best

5     Beach has to then pay the property owner, but as long as

6     that hold's in place, they can't pay the property owner with

7     the money that's been deposited by the vacation go-er,

8     correct?

9             THE WITNESS:  Are you asking at the peak time of

10    June or just in general?  Sorry.

11            THE COURT:  Well, so where you say at no point did

12    TSYS stop processing transactions on Best Beach's behalf

13    which allowed Best Beach to continue accepting credit card

14    payments from its customers, that's only one-half of their

15    business, accepting the payments.  The other half is paying

16    off the property owners, right?  And then they keep -- and

17    they couldn't pay off the property owners with the money

18    that was deposited if you were -- had a hundred percent hold

19    on, could they?

20            THE WITNESS:  Understood.  As an -- they couldn't

21    have used that fund.  And the way that the system works,

22    it's only a provisional credit at that point until the

23    cardholder is satisfied; the funds still actually belong to

24    the cardholder.  We were gathering information -- I don't

25    have the exact date -- we had at one point stopped holding

1   funds.  We felt, based on the information we had at that
2   time, we had collected enough.  I think it was towards the
3   end of May we actually stopped holding funds for a while.
4   We got additional information that told us the exposure was
5   much higher and then we started holding again.  So it
6   depends on what we were trying to collect, yes.
7           THE COURT:  Okay.  On page 8, you've got -- in
8   paragraph 35, you say, In connection with TSYS's July 31
9   decision to release 1 million from the reserve account, TSYS
10  also requested additional information from Best Beach to
11  further assess the risk posed by Best Beach's merchant
12  account and to make further adjustments to the reserve
13  account that may be warranted.  Best Beach responded to
14  those requests for information on July 31, 2020, and TSYS is
15  analyzing and considering it to decide whether and to what
16  extent to maintain a reserve account.
17          So very recently, I guess last Friday, the decision
18  was made to release more money, right?
19          THE WITNESS:  Correct, yes.
20          THE COURT:  Okay.  I'm just curious from a business
21  perspective.  How is Best Beach supposed to plan and conduct
22  its business if month-to-month someone's deciding, We're
23  going to withhold $4 million of your money, 2 million.
24  We'll release 1 million.  We'll continue -- I mean, it seems
25  like it almost would be impossible to plan and operate an

1    ongoing business if -- without apparent notice to them, you

2    are making decisions that vary from week to week or month to

3    months on whether it's going to be 2 million or 4 million or

4    we'll release it here.  How are they supposed to operate

5    their business?

6              THE WITNESS:  Hopefully the merchant is -- is open

7    and transparent with us about what is going on with the

8    business.  So they would let us know, here's how many

9    transactions, here's how many visits we have outstanding

10   that have not been filled.  That tells us some information.

11   Hopefully they would tell us, Florida is opening up somewhat

12   and we expect a big boom in June, the volume is going to go

13   up.  That allows us to plan with them and foretell a little

14   bit, give them some advance notice.  Unfortunately, we

15   didn't always have that.  Much of it was reacting and not

16   operating with advanced knowledge.

17             If we -- if were a more normal year and we knew

18   every May this merchant did X million dollars in

19   transactions, we can plan for that.  We know it's going to

20   drop off later.  This year nobody knew.  It varied from

21   month-to-month, depending on what the Florida governor said

22   or didn't say.  It was an extraordinary year and it made it

23   difficult for a lot of people.  It's not our intent to put

24   somebody out of business.  We do have to protect ourselves

25   some and we constantly, constantly reevaluate, and that's

1     why it may seem like one week we need to hold this, next

2     week we need to hold that, but as it's -- as we collect more

3     information from the merchants that allows us to fine-tune

4     really where the risk exposure mitigation has to be.

5              THE COURT:  Was the fundamental concern here that

6     there were large number -- when Florida reopened, there was

7     a large number of reservations, 3- or $4 million worth in a

8     couple of months in a row, were you fearful that the

9     governor would then shut it down again and require all of

10    those to be refunded and you were protecting your company

11    from being left holding the bag if -- if folks wanted all

12    that money back?

13             THE WITNESS:  That is certainly part of the

14    conversation.  None of us have been through this before.

15    We -- we don't know what might happen.  Florida has its

16    challenges for sure.

17             THE COURT:  Okay.  All right.  Those were my

18    questions.  Mr. Dogali, you seem to have dropped off the

19    video.  Can you still hear us, though?

20             MR. DOGALI:  Yeah.  Yes, Your Honor.  Towards the

21    end of the -- my cross-examination of Mr. Fenton, we lost

22    the video and we are restarting that, but it's been

23    perfectly fine on the telephone.  It remains clear the

24    entire time.

25             THE COURT:  Okay.  Good.

Recross - Fenton

1          MR. DOGALI:  We're hoping the video restarts now.

2          THE COURT:  All right.  Well, I was going to ask

3    whether you have any follow-up to my questions and then I'll

4    ask the defendant the same thing and then we'll go on to the

5    next witness, but any follow-up to my questions?

6          MR. DOGALI:  Just one.

7                      RECROSS-EXAMINATION

8    BY MR. DOGALI:

9    Q.   Mr. Fenton, TSYS right now is personal guarantee from

10   one or more principals of Best Beach Getaways?

11   A.   I don't have that off the top of my head.  I would have

12   to go back and look at the application to know that.

13         MR. DOGALI:  No more questions.

14         THE COURT:  Okay.  And, defense counsel, did you

15   have any follow-up to my questions?

16         MS. PEURACH:  None Your Honor, thank you.

17         THE COURT:  Okay.  Mr. Fenton, you're excused.

18         I will now ask defense counsel to call their next

19   witness.

20         MS. PEURACH:  Yes, Your Honor, we will be calling

21   Sam Hewitt who appears to be on video.  Hopefully his

22   microphone is working.

23         THE WITNESS:  I think so, Alex.

24         MS. PEURACH:  Great.

25         THE COURT:  So, Mr. Hewitt, if you could raise

1   your -- uh-oh.  Somebody's --

2         THE WITNESS:  That may be me.  Just a moment.  I'm

3   putting in the headphones.

4         THE COURT:  Mr. Dogali, I don't know if you can put

5   yourself on mute.

6         MS. PEURACH:  Mr. Dogali, you might try muting your

7   computer.  It might be that you are coming through --

8         THE COURT:  Tell you what, Mr. Dogali, why don't

9   you turn off the computer and go back to the phone.  It

10   seemed to -- well, it seems to be okay now.  No.  All right.

11   Let's try this.

12         THE WITNESS:  I'm muted here.

13         THE COURT:  Okay.  That seems good.  Mr. Hewitt,

14   we're going to swear you as a witness.

15          This is not working.  Mr. Dogali, could you go --

16   I think it's your phone, maybe.  Either take off the phone

17   or take off the computer.

18         Test, test, test.  No.  We're getting feedback.

19   Mr. Dogali, do you have -- is your phone on as well as the

20   computer?  Okay.  You turned off the computer.  Okay.

21         COURTROOM DEPUTY:  They froze up again.

22         THE COURT:  No, I think he's just on the phone.

23   Mr. Dogali, can you hear us by phone?

24         MR. DOGALI:  I think hopefully we are at audio now

25   and we'll just give up on the video.

Recross - Fenton

1          THE COURT:  Yeah.  I think that's better.  All

2    right.  Let's try the swearing of Mr. Hewitt again.

3          COURTROOM DEPUTY:  Please raise your right hand.

4          SAMUEL HEWITT, DEFENDANT'S WITNESS, SWORN

5          COURTROOM DEPUTY:  Please state your full name and

6    spell your full name for the record.

7          THE WITNESS:  Samuel Hewitt.  S-a-m-u-e-l,

8    H-e-w-i-t-t.

9                    DIRECT EXAMINATION

10   BY MS. PEURACH:

11   Q.   Good afternoon, Mr. Hewitt.

12   A.   Good afternoon.

13   Q.   You swore to two declarations in this case, right?  One

14   dated August 6th and one dated August 7th?

15   A.   Yes, ma'am.

16   Q.   Do you have those declarations before you right now?

17   A.   I do.

18   Q.   Do you adopt the contents of both of those declarations

19   as your testimony today?

20   A.   Yes, ma'am.

21   Q.   Do you swear to the truth of the contents of those

22   declarations under penalty of perjury?

23   A.   Yes, ma'am.

24          MS. PEURACH:  Your Honor, the defendant moves to

25   admit Mr. Hewitt's declaration dated August 6th, and

Recross - Fenton

1    supplemental declaration dated August 7th, as his direct

2    testimony in the case.

3            THE COURT:  Well, I received the August 6th

4    declaration.  I do not have a copy of the August 7th

5    declaration.  When was that submitted?

6            MS. PEURACH:  That was submitted on the 7th.  There

7    was a 2:00 p.m. deadline and we will double-check whether

8    that --

9            THE COURT:  How long was that deposition?

10           MS. PEURACH:  -- it was a short supplemental

11   declaration.  I want to say it was four pages that was

12   emailed to your chambers.  I don't believe we -- it was 2:00

13   p.m. our time, so it's noon your time.

14           THE COURT:  Okay.  Mr. Dogali, you got a copy of

15   that declaration, I assume?

16           MR. DOGALI:  I'm -- I'm not familiar with it.  And

17   I -- let's see.  Oh, I do see that I was en route when it

18   arrived.  I have it, Your Honor, so no objection.  My

19   understanding you don't -- I got it by email --

20           THE COURT:  Counsel haven't seen it and I haven't

21   seen it.  How many pages is the supplemental declaration?

22           MS. PEURACH:  It's a four-page declaration, Your

23   Honor.  We would be happy to reforward it to -- we've copied

24   Mr. Dogali on the email to chambers and would welcome the --

25   a break for both you and Mr. Dogali to review it if you

Recross - Fenton

1   would like.  It is brief, and I think would expedite things

2   rather than having Mr. Hewitt testify to the contents.

3           THE COURT:  Okay.  Could you summarize -- via

4   question and answer summarize what the supplemental

5   declaration was intended to do?

6           MS. PEURACH:  Sure.  Well, why don't -- if you

7   don't mind, Your Honor, start with this.  Could we move to

8   admit the declaration dated August 6th to just put that

9   housekeeping item to the side?

10          THE COURT:  That's admitted.  Yes.

11          MS. PEURACH:  Okay.

12  BY MS. PEURACH:

13  Q.   Mr. Hewitt, on August 6th, did you receive a

14  declaration submitted by Best Beach's accountant, Sherry

15  Klanjac?

16  A.   Yes.

17  Q.   And did you have an opportunity to review Ms. Klanjac's

18  declaration?

19  A.   Yes.

20  Q.   And did you prepare a supplemental declaration that

21  discusses your reactions to Ms. Klanjac's declaration?

22  A.   Yes.

23  Q.   Would -- did you also have the opportunity after your

24  August 6th declaration to review the bank statements of Best

25  Beach as of July 31st, 2020?

Recross - Fenton

1   A.   Yes.

2   Q.   And did your supplemental declaration address how those

3   actual bank statements affected Best Beach's cash flow for

4   the remainder of the year?

5   A.   Yes.

6   Q.   Taking, first, your review of Ms. Klanjac's

7   declaration, did you have any opinion regarding her cash

8   flow projections that she included?

9   A.   Well, her -- yes, I did.  And her cash flow projections

10  did not offer any support for any of the amounts named, but

11  stated in her -- in her declaration there was a table in

12  paragraph 10 and a table in paragraph 12 which indicated

13  certain cash flows for a period ending as of, first, August

14  15th and another for August 16th through September 15th.

15  None of the amounts were -- had any source or made any

16  reference to any supporting documentation.

17       There was, like I said, no explanation of any of

18  those amounts.  And it was unclear at that time whether she

19  had included the $1 million that had been released.  From

20  her testimony it appears that she did include that amount.

21  But she included only $100,000 in this document for the 15

22  days in the first half of August and only $30,000 in the

23  30-day period ending September 15th for cash that had been

24  received from sources other than TSYS.

25       My review of the July bank statements said that the

Recross - Fenton

1    amount of funds that Best Beach had received from sources
2    other than bank transfers, and since there were no funds
3    coming in from TSYS from other sources, was $389,538.53.
4    That amount is easily divide -- derived by looking at the --
5    what they refer to as their escrow bank account, account
6    number ending in 8152, and deducting the internal transfers
7    of $2 million from another account.
8    Q.   Mr. Hewitt, when you were looking at Ms. Klanjac's
9    projections, when you say that the figures were $100,000 and
10   $30,000, were you -- are you referring to the projected
11   payments to Best Beach in the periods of August 1st to 14th
12   and then August 15th to September 14th?
13   A.   Yes, ma'am.  The second line of the table is in
14   paragraph 10 of her projections has an amount of $1,100,000.
15   $1 million, her testimony explained, was related to the
16   amount released by TSYS.  The $100,000 was an amount that
17   she explained was from other sources.
18           Similarly, in paragraph 12, there's also a table,
19   the second line of which is labeled Projected Additional
20   Prepayments, showing $30,000.  That's for a one-month time
21   period.  And the comparison I was making was for a one-month
22   time period in the most recent period for which we have
23   actual data, July, in which Best Beach actually received
24   $389,000 from other sources.
25   Q.   Instead of $30,000?

1    A.    Yes, ma'am.

2    Q.    And in your review of Ms. Klanjac's declaration, did

3    this projection of additional prepayments include incoming

4    funds being processed by TSYS?

5    A.    They did not.

6    Q.    And now looking at your declaration, which you reviewed

7    Ms. Klanjac's projections, you note that she included a line

8    item for Best Beach's cash on hand as of July 31st 2020.   In

9    your review, did that cash on hand figure include Best

10   Beach's E*TRADE account?

11   A.    It did not.   And that was -- so I can -- let me -- at

12   the time that I did this declaration, I did not have the

13   actual dollar amount.   We have since learned that that --

14   because of receiving the E*TRADE statement, that it's

15   $1,189,000 and some change.

16   Q.    Mr. Hewitt, since submitting your declaration -- your

17   supplemental declaration on August 7th, have you come to

18   learn that TSYS released an additional approximately

19   $1.5 million of previously reserved funds?

20   A.    Yes.

21   Q.    And since submitting your declaration -- your

22   supplemental declaration on August 7th, you also became

23   aware of the precise balance of the E*TRADE account; is that

24   right?

25   A.    Yes, ma'am.

Recross - Fenton

1   Q.   Based on the supplemental information available to you

2   since last Friday, do you have an opinion as to Best Beach's

3   ability to maintain operations throughout the end of the

4   year?

5   A.   Yes.   I should have -- taking into account those two

6   factors and the fact that TSYS is not -- does not have any

7   hold on their funds, they will be able to operate through

8   the entire period that they have projected for 2020 with no

9   problems.   Their cash balances will never go -- I think

10  reprojecting it, I think the lowest amount it should get

11  would be something in excess of $3 million.

12  Q.   Thank you, Mr. Hewitt.

13          THE COURT:   Just a quick question on that.   That

14  includes the E*TRADE money?

15          THE WITNESS:   Yes, sir.

16          THE COURT:   Okay.   And that assumes that there's no

17  further hold placed --

18          THE WITNESS:   It also assumes there's no further

19  funds released brought by TSYS from any of the additional --

20  the funds they are holding right now, based off of their

21  valuation of reduced risk in the future.

22          THE COURT:   And what does that projection assume in

23  terms of the reserve amount that TSYS is holding?

24          THE WITNESS:   It -- it's -- it does not have an

25  assumption because I was not aware of the precise amount and

Recross - Fenton

1    I was evaluating what the Best Beach had produced. They

2    didn't give any consideration to it. As an aside, Best

3    Beach should have the amount that TSYS is holding recorded

4    as a receivable, which is another type of current asset that

5    they should expect to collect at some time in the future.

6              THE COURT: Yeah, but it can't be used to pay

7    current obligations, right, because it's a reserve that TSYS

8    is holding?

9              THE WITNESS: Yes. Which, prior to these events,

10   there had never been a reserve and, you know, one can

11   make -- I'm not going to speak for TSYS, but it's already

12   been reduced twice in the last two weeks, and I'm not going

13   to predict when, but one might expect that further

14   reductions could occur.

15             THE COURT: And the two weeks prior to the

16   preliminary injunction hearing, they released in excess of

17   $2 million, correct?

18             THE WITNESS: Yes, sir.

19             THE COURT: Okay. Cross-examination, Mr. Dogali.

20   Thank you. And, counsel, I appreciate your willingness to

21   do a little direct there for the second declaration.

22             MS. PEURACH: Thank you, Your Honor. We appreciate

23   it. I apologize for any miscommunication on Friday.

24             THE COURT: Okay. Mr. Dogali, I hope you hear us.

25   We can't see you, but we heard you okay last time, so go

1    ahead.

2                        CROSS-EXAMINATION

3    BY MR. DOGALI:

4    Q.   Mr. Hewitt, a moment ago you -- you said that the

5    $389,000 figure that you had for collections during July was

6    the proper number to use instead of $30,000.  Is that --

7    A.   That's not -- that's not exactly what I said, sir.  I

8    said that the most recent time period for which we had

9    historical information of approximately a month, July, had

10   $389,000 into the account where they traditionally deposit

11   customer funds.  And that is net of any other -- any

12   deposits that were transfers from other accounts.

13   Q.   All right.  Are you in the position today to opine

14   about the tax consequences to Best Beach Getaways or its

15   owners of liquidating the E*TRADE account so that Best Beach

16   Getaways can make up the shortfall created by TSYS?

17   A.   No, sir, I am not.  I have no idea what Best Beach's

18   base -- tax base is or any of the security they may hold at

19   this point in time.

20              MR. DOGALI:  I don't have any more questions, Your

21   Honor.

22              THE COURT:  Okay.  Follow-up by TSYS?

23              MS. PEURACH:  Nothing further, Your Honor.  Thank

24   you.

25              THE COURT:  Okay.  Mr. Hewitt, I think you're

1       excused, then.

2                  THE WITNESS:  Glad to be of service, sir.

3                  THE COURT:  All right.  We appreciate it.

4             So here's what I was thinking.  We were -- we were

5       going to talk about closing arguments.  My understanding

6       from all of the documentation was that there appeared to be

7       a critical date of August 15th, I think.  I still, to be

8       honest with you, don't feel that the parties have adequately

9       addressed the standard under Colorado law of what breach of

10      the duty of good faith and fair dealing means and requires

11      under the -- and I'm not sure I gave you the cite earlier

12      today, but it's *Amoco* --

13                 MR. DOGALI:  You did, Your Honor, the *Amoco* --

14                 THE COURT:  Yeah, 908 P.2d 493, Colorado, 1995.

15      And then the Colorado Jury Instruction provisions section

16      30:16, contract performance.  So I don't think it's fair for

17      you all to -- number one, I don't think it's fair for you

18      all to be giving closing arguments to a judge who thinks the

19      parties have sort of missed the boat on the relevant law.

20      Now, maybe I missed the boat and maybe when you take a look

21      at it you'll say, No, Judge, we covered everything we needed

22      to cover.  But what I think would make sense is if you all

23      submitted supplemental briefs on two things:  One is the

24      direct application of the facts as they've been presented in

25      this preliminary injunction hearing to the standard for the

1    breach of the duty of good faith and fair dealing under

2    Colorado law.  And then there *Amoco*, and then also the issue

3    of irreparable harm.  No more than 10 pages in length by

4    close of business on Wednesday.

5         And then what I propose is that we -- if you're

6    available, we reconvene on Friday, and I would hope to have

7    a decision on this issue of the preliminary injunction.

8    Friday I have available.  We could do it at 10:00 a.m. on

9    Friday -- 9:00 a.m. on Friday.  I was wondering what -- I

10   realize that it's vacation time for a lot of folks, but so

11   that's what I'm proposing.

12        Mr. Dogali, you're the plaintiff, I think it would

13   be in everybody's interest to have an opportunity to look at

14   the *Amoco* case and other assorted case law and brief me on

15   that.  What's your view on how I propose we proceed?

16        MR. DOGALI:  I think it makes sense, Your Honor.

17   You're correct in that to some extent the criticality

18   lightened if August 15 was still a date of doom, then an

19   advisement period might be really prejudicial, but now there

20   is a little time for more deliberative approach, and this

21   all makes sense to me.  I'm looking at my calendar at the

22   moment and it looks to be Friday morning, Colorado time,

23   would appear to be okay with the plaintiff.

24        THE COURT:  Okay.  And for -- and for defense

25   counsel?

1          MR. MEADOWS:  Your Honor, certainly happy to submit
2     supplemental brief.  And I'm not usually the kind of person
3     to bring this up.  I was planning to be on vacation in the
4     mountains through Friday afternoon.  If Friday morning is
5     the only available time, I'm happy to join, but if we could
6     push until Monday, that would be great.  I'm not asking for
7     it, I'm just saying it would be great.
8          THE COURT:  Yeah, Monday, I'm going to be driving
9     with my wife to Yellowstone National Park, so that's not
10    doable.
11         MR. MEADOWS:  Okay.
12         THE COURT:  We can -- we can move it later in the
13    day on Friday.  The --
14         MR. MEADOWS:  Later in the day would actually be
15    terrific.  And -- but if that doesn't work, I understand
16    it's necessary to wrap this up and I'll do what I need to
17    do.
18         THE COURT:  Why -- I can move it to as late as 2:00
19    on Friday.  Which is, what, 4:00 Eastern?
20         MR. MEADOWS:  That would be terrific.  Oh, could I
21    ask what you have in mind.  Are you anticipating closing
22    arguments or further argument or just announcement --
23         THE COURT:  Yeah, I think -- you know, I've gotten
24    a flavor and I've read your initial briefs, but I do think
25    I'll give you an opportunity -- you know, I'll have some

1    ideas in my own mind about where to go, but I do think it

2    will be fair to give you a 15-, 20-minute closing argument

3    each and then I'll probably think about it and come out with

4    a decision.  But I'll have -- by that time have read your

5    briefs as well.  So put what you can into the brief, but I

6    really don't want more than 10 pages per side.  And then

7    we'll convene at 2:00 p.m. on Friday.  Does that work for

8    you, Mr. Dogali?  We mentioned -- we mentioned the morning,

9    but are you okay on Friday in the afternoon?

10            MR. DOGALI:  I -- I think so.  I have a deposition

11   that should end by that time.  I'll see if I have somebody

12   in with me.  A little bit later will be no problem, it's

13   just the point at which --

14            THE COURT:  How about 2:30?  It sounds like the

15   later the better for defense counsel, so how about 2:30

16   Denver time?

17            MR. DOGALI:  I think that's safe for my deposition,

18   Your Honor.  I would appreciate that, too.

19            THE COURT:  Okay.  2:30 Denver time --

20            MR. MEADOWS:  That works here.

21            THE COURT:  4:30 on the East Coast.  And we will

22   not have a court reporter for that.  It will be recorded via

23   the FTR system.

24            I don't know, Robb, if you're going to be covering

25   for Friday.

1     COURTROOM DEPUTY:  I do not know either.

2          THE COURT:  Okay.  We need to just make sure that

3     whoever -- that we will have the ability to record those.

4          COURTROOM DEPUTY:  And I'm sorry to interrupt, I

5     just had one question:  Would it be here or in your

6     courtroom?

7          THE COURT:  No, this would be telephonically, it

8     would not be visual, so it would be in my -- I'll be -- just

9     so you know, I came over to the Arraj building, which is our

10    newer courthouse, it's across the street.  As one of the

11    newer magistrate judges, I'm in what's called the Rogers

12    building.  It's not nearly as nice as this one, but it will

13    be telephonic, and you will -- I think we had -- it will be

14    the same dial-in number that we used when we had the prior

15    telephonic hearing to discuss whether to have the

16    preliminary injunction hearing or not.  But we'll send

17    out -- we'll send that -- we ought to send -- Robb, if we

18    could send out a minute order with that dial-in information,

19    that will be good.

20         And to the extent that clients are interested in

21    listening, that's a public line and these are public

22    proceedings, so Mr. DeVos, or representatives of TSYS, if

23    they want to call in and listen to those arguments, they're

24    welcome to.  They're not supposed to say anything but

25    they're allowed to listen in.

1          Okay, I think we have a plan moving forward.  Close

2     of business, Friday.  No more than 10 pages submitted

3     simultaneously addressing principally the standard under

4     Colorado's kind of unique duty of good faith and fair

5     dealing with irreparable harm, too, I think is important to

6     touch on, and then we'll hear closing arguments at --

7     starting at 2:30 on Friday.

8               MR. MEADOWS:  Thank you, Your Honor.

9               MR. DOGALI:  Thank you, Your Honor.

10              THE COURT:  All right, we will be in recess.  Thank

11    you very much.

12         (Proceedings concluded at 4:07 p.m.)

13                              INDEX

14    Item                                              PAGE

15                     PLAINTIFF'S WITNESSES

16    JAMES DeVOS
      Direct Examination by Mr. Dogali            31
17    Cross-examination by Mr. Meadows            38
      Redirect Examination by Mr. Dogali         95
18
      SHERRY KLANJAC
19    Direct Examination by Mr. Dogali            95
      Cross-examination by Ms. Peurach           98
20

21                     DEFENDANT'S WITNESSES

22    HEIDI KERYAN
      Direct Examination by Ms. Peurach          120
23    Cross-examination by Mr. Dogali            121
      Redirect Examination by Ms. Peurach        172
24    Recross-examination by Mr. Dogali          176

25

1          DEFENDANT'S WITNESSES (Continued)

2     **MARK FENTON**
      Direct Examination by Ms. Peurach          183
3     Cross-examination by Mr. Dogali            184
      Redirect Examination by Ms. Peurach        202
4
      **SAMUEL HEWITT**
5     Direct Examination by Ms. Peurach          204
      Cross-examination by Mr. Dogali            212
6

7                 *     *     *     *     *

8                   REPORTER'S CERTIFICATE

9

10        I certify that the foregoing is a correct transcript

11   from the record of proceedings in the above-entitled matter.

12        Dated at Denver, Colorado, this September day of 25th,

13   2020.

14

15

16

17        _                                      _

18              MARY J. GEORGE, FCRR, CRR, RMR

19

20

21

22

23

24

25